UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEEUN FRIEL, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DAPPER LABS, INC. AND ROHAM GHAREGOZLOU,<br><br>Defendants. | Case No.: 1:21-cv-05837-VM<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Gary Leuis, and named plaintiff John Austin, individually and on behalf of all others similarly situated, bring this action against Defendants Dapper Labs, Inc. ("Dapper Labs"), and Roham Gharegozlou ("Gharegozlou"). Plaintiffs' allegations are based on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of press releases, media reports, websites, and other publicly available reports and information about Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

**INTRODUCTION**

1.      Within the Class Period, which is from June 15, 2020, through the present (the "Class Period"), Defendants Dapper Labs and Gharegozlou operated an application called NBA Top Shot that promoted, offered, and sold securities known as NBA Top Shot Moments (or "Moments"), throughout the United States, in violation of federal securities laws.

2.      The Moments are a type of digital asset known as a non-fungible token ("NFT"). In

this case, the NFTs depict video clips of highlights from NBA basketball games.  The NFTs exist

on a "blockchain," which is a decentralized digital ledger that records transactions of digital assets.

Assets that reside on a blockchain are sometimes referred to as "crypto assets."

3.      In particular, the Moments reside on the Flow blockchain – which is powered by the

Flow token – developed and controlled by Dapper Labs.

4.      There are various kinds of digital "crypto assets," including cryptocurrencies like

Bitcoin and Ethereum.  Bitcoin and Ethereum are commodities, not securities, because they are

decentralized means of exchange.  The price of bitcoin, for example, is subject only to market

forces.  There is no "Bitcoin Incorporated" managing the project.

5.      Other types of digital assets, however, derive their value from the success or failure

of a given project, promoter, or start-up.  Investors purchase this type of digital asset with the hope

that its value will increase in the future as the project grows in popularity, based upon the

managerial efforts of the issuer of the asset or token and those working to develop the project.

Because this type of digital asset is properly classified as a security under federal law, the issuers of

this type of token, including Defendants, are required to file registration statements with the U.S.

Securities and Exchange Commission ("SEC"), and comply with federal securities laws.

Defendants failed to do so.  By selling these unregistered securities to investors, Defendants reaped

hundreds of millions of dollars in profits.

6.      Defendants used their control over NBA Top Shot to prevent investors from

withdrawing their funds for months on end.  By preventing investors from "cashing out,"

Defendants ensured that money stayed on the platform, propping up the market for Moments as

well as the overall valuation of NBA Top Shot.

7.      Moreover, Defendants' scheme to enrich themselves by violating the Securities Act

extends beyond NBA Top Shot, as Defendants used the sale of Moments to stimulate interest in the

Flow blockchain and prop up the value of the Flow token, another unregistered security controlled by Dapper Labs.

8.      As a result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiffs and the Class – many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investment in Moments, and were denied the information that would have been contained in the materials required for the registration of the Moments – have suffered significant damages in an amount to be proven at trial.

**PARTIES**

9.      Lead Plaintiff Gary Leuis is a resident of New York.  Leuis purchased Moments, unregistered securities, from Dapper Labs during the Class Period, as set forth in his certification previously filed with the Court and incorporated by reference herein.

10.     Named Plaintiff John Austin is a resident of California.  Austin purchased Moments, unregistered securities, from Dapper Labs during the Class Period, as set forth in his certification attached hereto.

11.     Defendant Dapper Labs is a corporation based in Vancouver, Canada.  Dapper Labs is a blockchain-focused technology company.  Dapper Labs has several employees based in New York and has partnered with the NBA, which is headquartered in New York, in launching NBA Top Shot and engaging in the wrongful conduct complained of herein.

12.     Defendant Roham Gharegozlou is the founder and Chief Executive Officer ("CEO") of Dapper Labs.

**JURISDICTION AND VENUE**

13.     The claims alleged herein arise under Sections 5, 12(a)(1) and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l(a)(1), 77o, and this Court has original subject matter jurisdiction of these claims.

14.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act (15 U.S.C. §77v(a)), as the alleged violations and subsequent damages took place within this judicial district.  The Defendants conducted business in this District, have employees based in this District, and in launching NBA Top Shot have partnered with the NBA, which is based in this District.

## BACKGROUND

### *Bitcoin: The First Cryptocurrency*

16.     Cryptocurrencies are digital assets designed to function as a medium of exchange, a store of value, or both.  Cryptocurrencies rely on a variety of cryptographic principles to secure transactions, control the creation of additional units, and authenticate the transfer of digital assets.

17.     Bitcoin was the world's first cryptocurrency.  It is also the world's largest and most popular cryptocurrency, with a market capitalization over $1 trillion.  Bitcoin is the fastest asset to reach a $1 trillion market capitalization, which it achieved in only twelve years.  (Because the term "bitcoin" can refer to the system as well as the unit of exchange, the accepted practice is to use "Bitcoin" to refer to the system, and "bitcoin" to refer to the units of exchange or currency.)

18.     At the core of Bitcoin is a public ledger that tracks the ownership and transfer of every unit of bitcoin.  The ledger is known as a blockchain.

19.     Blockchains stand at the core of many crypto assets.  While their technical protocols may vary, blockchains are generally designed to achieve the similar goals of decentralization and transparency.

20.     Accordingly, blockchains are designed as a framework of incentives that encourages people to do the work of validating transactions on the network.  In the case of Bitcoin, those

engaged in the validation must solve a "Proof of Work" mathematical problem by expending computational resources.  The first person to solve the "Proof of Work" problem is rewarded in newly minted bitcoin.  This process is known as "mining" bitcoin.

21.     Mining is one method of acquiring cryptocurrencies like bitcoin.  Another is simply to buy cryptocurrencies from another party, typically on an online cryptocurrency exchange.

22.     While bitcoin was the only cryptocurrency listed on the exchanges shortly following its creation in 2009, there are now thousands.  Following the surge in cryptocurrency interest in recent years, the daily trading volume of major cryptocurrencies has reached $62.5 billion.

23.     Bitcoin is a commodity, and not a security, because it allows for fast and secure transactions, can serve as a long-term store of value, and is decentralized.  Critically, Bitcoin is free from any government or private control.  There is no entity behind Bitcoin that can cause the price of a bitcoin to increase through prudent management or decrease through mismanagement.  Rather, the cost of bitcoin is determined solely by market forces, and one buying bitcoin is not investing in a common enterprise.  The Commodity Futures Trading Commission ("CFTC") and a number of courts have recognized that bitcoin is a commodity.  Likewise, the Chair of the SEC has acknowledged that bitcoin is not a security.

***Ethereum: The Addition of Smart Contract Functionality***

24.     Ethereum is the second-most popular cryptocurrency, with a market capitalization that is currently over $300 billion.  Ethereum uses a blockchain similar to that used by Bitcoin.  Like Bitcoin, Ethereum uses "miners" to act as the validators of transactions on its network, and these miners solve complicated math problems in exchange for newly minted units of currency, in this case called units of "ether."  Also like Bitcoin, Ethereum is a commodity rather than a security.

25.     Unlike Bitcoin, however, Ethereum was designed to enable "smart contract" functionality.  A smart contract is code that verifies and enforces the negotiation or performance of

a contract.  Smart contracts can be self-executing and self-enforcing, potentially lowering the transaction costs associated with traditional contracting.

26.     There are many uses for smart contracts.  For example, two parties might enter into a hedging contract where both parties put up $1,000 worth of ether.  The parties might agree that, in a month, one of them will receive $1,000 worth of ether at the dollar exchange rate at that time, while the other party receives the rest.  Alternatively, a smart contract might be programmed to release funds only at a certain time, similar to a traditional escrow agreement.

### Dapper Labs' Debut: CryptoKitties

27.     Smart contracts, it turns out, can also be used to breed and collect digital cats called "CryptoKitties."

28.     In November of 2017, Dapper Labs released its first product, CryptoKitties, which used the smart contract functionality of the Ethereum blockchain to allow users to breed and collect digital cats with a variety of characteristics.

29.     CryptoKitties quickly caught on.  In fact, CryptoKitties was so popular that it resulted in a highly publicized slowdown of the entire Ethereum blockchain, which relies on Proof-of-Work mining and must therefore process each transaction with a complex math problem.  For example, Bloomberg reported on December 4, 2017 that "CryptoKitties mania overwhelms Ethereum network's processing."  BBC News reported the following day that "CryptoKitties Craze slows down transactions on Ethereum."

30.     Dapper Labs, and its CEO Gharegozlou, had learned an important lesson: In order to leverage blockchain technology to support a craze on the scale of CryptoKitties, it would not be feasible to rely on a blockchain that used "Proof of Work" math problems to process transactions.  Something else would be required.

31.     As Dapper Labs CEO Gharegozlou put it in an interview with USA Today:

We've been working on Flow for a long time. In November of 2017, we released CryptoKitties. By Dec. 1, everything was on fire and we starting to work on a scaling solution. It was (chief technology officer Dieter Shirley's) job from December to May 2019, when we decided 'We got to build Flow,' it was like 'What do we do?'

## FACTUAL ALLEGATIONS

### The Flow Blockchain: Dapper Labs Builds a Blockchain of its Own

32.     In September of 2019, Dapper Labs announced that it was developing Flow, a new blockchain that relies not on Proof-of-Work mining, but on an alternate technique known as Proof-of-Stake.

33.     Blockchains that use the Proof-of-Stake technique still rely on miners to verify transactions on the public ledger, but mining power is determined by the amount of tokens a miner owns, rather than the miner's solving of a math problem.

34.     With Proof-of-Stake, miners must pledge a "stake" of digital currency before being able to validate transactions.  A miner's capacity to validate transactions depends on how many tokens the miner has put up for stake and how long the miner has been validating transactions.  The more tokens the miner owns, the more power for mining.  The miner selected for each transaction is chosen through a weighted algorithm that takes the miners' relative power into account.

35.     Proof-of-Stake blockchains like Flow require much less energy and computing power than Proof-of-Work blockchains, making them attractive candidates for scaling up rapidly. What Proof-of-Stake blockchains do require, however, is a native token that can be used to power the network, as users stake their tokens to validate transactions and earn additional tokens as a reward.

### The Flow Token: The Native Currency That Powers It All

36.     To make its new blockchain function, then, Dapper Labs had to create the Flow token.

37.    As Dapper Labs states on the Flow Token Distribution portion of its website:

The FLOW token is the native currency of the Flow network, ultimately required for the network and all the applications on top of it to function. FLOW is designed as a payment method as well as long-term reserve asset for the entire Flow economy. The token is a low-inflation and low-circulating-supply asset that is used by validators, developers, and users to participate in the FLOW network and earn rewards.

. . .

While the network is fully functional and the tokens have immediate utility in NBA Top Shot as of day one, all tokens distributed to backers, team members, or the community start fully locked up and can only be used for purposes of staking for at least 12 months.

38.    The Flow Token Economics portion of the website elaborates:

Token holders can earn rewards by staking their FLOW as a security deposit and working to secure the network through running validator nodes – or delegating their stake to professional operators to run validator nodes on their behalf. Validator nodes receive staking rewards and transaction fees in exchange for providing the security, computation, and storage services the network needs.

Small amounts of FLOW token are also required for every activity on the network – from new user accounts to storage for assets and smart contracts. As the network matures, FLOW token holders will be able to use their FLOW in an evolving number of ways:

- Payment for computation and validation services (i.e., transaction fees)

- Medium of exchange

- Deposit for data storage

- Collateral for secondary tokens

- Participation in governance

. . .

FLOW token's ubiquity on the network makes it the obvious "bridge asset" for currency exchanges between thinly traded token pairs. As the number of secondary tokens on Flow becomes large, the number of possible trading pairs increases exponentially, meaning that some swaps will require an intermediary asset like FLOW.

Importantly, FLOW is required for the creation and usage of all other tokens on

8

the network – to pay for storage and/or serve as collateral. These details are outlined in the technical details section below, and will be fully specified in future whitepapers. ***The economic impact is that as more value is created on top of the Flow blockchain, more demand is generated for FLOW token.***

(Emphasis added.)

39.     Dapper Labs created 1.25 billion Flow tokens at the start of the token generation and distribution phase – a milestone known as "Genesis" – which took place circa September of 2020.

40.     At Genesis, there were at least nine institutional investors who owned at least 10 million Flow tokens.

41.     In addition, 350 million Flow tokens were set aside for "ecosystem development," 95 million tokens were set aside to compensate developers, and 130 million tokens were set aside for ongoing development grants.

42.     Dapper Labs also set aside 250 million tokens for itself, explaining that "[a]s the corporate entity that funded the development of Flow technology, Dapper Labs has been allocated 250 million tokens which it intends to hold as part of its long-term treasury."

43.     From September 21 to October 2, 2020, Dapper Labs held a public offering for Flow tokens on CoinList, the popular token sale platform.

44.     Dapper Labs' public token sale had two phases: There was a "community sale," during which investors could purchase up to 10,000 Flow tokens at $0.10 per token.  There was also an auction phase, where investors could submit bids for a block of 25 million available Flow tokens.

45.     Dapper Labs' public sale of Flow tokens raised $18 million from nearly 13,000 investors, making it the largest sale in the history of CoinList at the time.

46.     Investors from the United States were not allowed to participate in the sale, as Dapper Labs' public distribution of Flow tokens would qualify as a securities offering under the securities laws.

47.     Dapper Labs appears to understand this.  In addition to not registering the Flow token as a security under the Securities Act and restricting the public sales and auctions of Flow tokens to non-United States persons, the Flow website claims to be "commit[ted]" to "compliance with securities laws."

48.     In the time since Dapper Labs' public sale for Flow tokens, the Flow token has been growing its footprint, expanding to many major cryptocurrency exchanges.  For example, Flow was listed on the popular cryptocurrency exchange Kraken in January of 2021, on the Seychelles-based OKEx exchange in February, and on Binance – the largest cryptocurrency exchange of all – in July.

49.     During that time period, the vast majority of activity on the Flow blockchain – and uses for the Flow token – has consisted of transactions involving digital assets within Dapper Labs' signature application, NBA Top Shot.

50.     NBA Top Shot does offer digital assets, known as Moments, to United States investors and, in fact, has sold over $750 million worth of them, including Moments sold directly and through the Dapper Labs-controlled Marketplace.  As detailed below, these Moments are securities under the securities laws.

***NBA Top Shot Moments***

51.     First announced in July 2019 as a joint venture between Dapper Labs, the NBA and the NBA Players Association ("NBPA"), NBA Top Shot is a platform built on Dapper Labs' Flow blockchain that allows investors to purchase virtual assets known as "Moments."

52.     NBA Top Shot launched what is known as a "closed beta" on June 15, 2020, making Moments available to a select list of individuals.  NBA Top Shot launched its "open beta" on October 1, 2020, making Moments available to the public at large.  Moments have been on sale ever since.

53.     After the NBA, the NBPA and Dapper Labs all agree that a certain video highlight

should become a Moment, Dapper Labs "mints" the highlight into an NFT, creating a unique digital asset that is recorded on the Flow blockchain.

54.     One can think of the minting process as imprinting the NFT with its own serial number or barcode.  The minting process also creates the beginning of the record associated with the NFT.  Ownership, transfers, and prices will be recorded permanently on the Flow blockchain. While editions of Moments are minted from the same basketball play, NFTs are, by nature, unique.

55.     While an owner of a Moment owns the NFT as reflected on the blockchain, the owner does not acquire any intellectual property rights or rights to the underlying NBA highlight.

56.     NBA Top Shot sells digital "packs" of Moments, the prices of which vary based on scarcity.  There are three tiers of packs generally available: (1) Common: nine common Moments, which have production of over 1,000 with no maximum; (2) Rare: seven common Moments and one rare Moment, with a maximum production of 999; and (3) Legendary: six common Moments, one rare Moment, and one legendary Moment, with a maximum production of 99.  NBA Top Shot sometimes releases other types of packs as well, such as Rising Stars packs or Deck the Hoops packs in honor of the holiday season.

57.     NBA Top Shot creates scarcity in another way too.  There are not unlimited packs available.  Rather, the packs are released in limited size "drops" that can and often do sell out. Investors must wait in a virtual queue to buy them while supplies last.

58.     In addition to buying packs from Dapper Labs, there is another way to acquire Moments.  Moments can trade in the Marketplace – created and controlled by Dapper Labs – where individuals can buy Moments from other individuals.  The prospect of acquiring a Moment in a pack from NBA Top Shot and then re-selling the Moment for a huge profit in the Marketplace, or buying a Moment in the Marketplace and then turning around and selling it for more, has provided the impetus behind the surge in demand for Moments.

11

59.     For example, a recent article on the NBA Top Shot craze discusses an investor

named Michael Levy, who owns the second-most-valuable collection of Moments, worth $15.6

million, according to a valuation service that specializes in valuing Moments.  The article

interviews another investor named Jesse Schwarz, who set a record in February, 2021, by buying a

Moment of a Lebron James dunk on the Marketplace for $208,000:

> "These are investments," he [Schwarz] says. "That Lebron that I bought for
> $208,000 was worth seven figures right away.  And, that's a big reason why I
> bought it."

60.     Another article reported that the combined market capitalization of NBA Top Shot

Moments had reached $1.9 billion in late February of 2021, which is greater than the median value

of an NBA franchise.

61.     A Sports Illustrated article from March 2021 put it this way:

> A number of the platform's users interviewed for this story told of similar arcs;
> they initially invested a few thousand dollars, only to see the value of their
> accounts balloon by factors greater than 10, almost overnight. The promise of
> soaring earnings—even offset against the fear, among some, of a bubble in the
> making—has kept a steady stream of new users joining [NBA Top Shot].

62.     Dapper Labs and NBA Top Shot know that purchasers of Moments view them as

investments.  Not only have Defendants failed to disclaim this notion, but they use the prospect of

making money from investing in Moments as a central tenet in their marketing efforts.

63.     For example, after a Moment trades for a particularly high price in the Marketplace,

NBA Top Shot often tweets the information out publicly from its official Twitter account,

announcing the price paid and adding a stamp "Acquired" on the bottom-right.  After the sale of the

$208,000 Lebron James Moment mentioned above, for instance, NBA Top Shot released a tweet,

reporting that it had been bought for $208,000 and calling it "The top acquisition for any NBA Top

Shot Moment… so far."[1]

64.     Because users of NBA Top Shot know that the Moments trading for these high

prices in the Marketplace would have been acquired in packs from Dapper Labs for a fraction of the

prices being publicized, these tweets are dangling the prospect of huge profits in an attempt to

further pump up the price of Moments.

65.     Some of NBA Top Shot's marketing is even more blatant.  For example, on January

15, 2021, NBA Top Sheet tweeted an update on sales and surging marketplace transactions,

incorporating emojis like the spaceship taking off, the stock chart shooting up, and the money bag[2]:



Thus, investors viewed Moments as get-rich-quick investments because that is how Defendants

marketed them.

---

[1]     *See* https://twitter.com/nbatopshot/status/1363969592779890690 (last accessed on
December 27, 2021).  Similar marketing tweets include
https://twitter.com/nbatopshot/status/1352684941365047296?lang=en (last accessed on December
27, 2021); https://twitter.com/nbatopshot/status/1353552626713907200 (last accessed on
December 27, 2021); and https://twitter.com/nbatopshot/status/1357816933832298498 (last
accessed on December 27, 2021).
[2]     *See* https://twitter.com/nbatopshot/status/1350185458177724416?lang=en (last accessed on
December 27, 2021).

66.     NBA Top Shot generates revenue from selling Moments, and also receives a 5%

transaction fee on all transactions that occur in the secondary Marketplace.  Dapper Labs also takes

a cash-out fee when users try to transfer the balance from their Dapper wallet to their bank account.

67.     Other than in the secondary Marketplace, which is part of the NBA Top Shot

platform, controlled by Dapper Labs, and where all transactions generate additional revenue for

NBA Top Shot, there is no other way for individuals to sell their Moments.

*The Moments are Securities*

68.      NBA Top Shot Moments are securities because they constitute an investment of

money in a common enterprise with a reasonable expectation of profits to be derived from the

efforts of others.[3]

69.     On April 3, 2019, the SEC published a "Framework for 'Investment Contract'

Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset

is an investment contract and whether offers and sales of a digital asset are securities transactions."

NBA Top Shot Moments are securities under that Framework.

70.     In that Framework, the SEC cautioned potential issuers: "If you are considering . . .

engaging in the offer, sale, or distribution of a digital asset, you need to consider whether the U.S.

federal securities laws apply."  The SEC went on to explain the basics of the *Howey* test:

> The U.S. Supreme Court's Howey case and subsequent case law have found that
> an "investment contract" exists where there is the investment of money in a
> common enterprise with a reasonable expectation of profits to be derived from
> the efforts of others. The so-called "Howey test" applies to any contract, scheme,
> or transaction, regardless of whether it has any of the characteristics of typical
> securities. The focus of the Howey analysis is not only on the form and terms of
> the instrument itself (in this case, the digital asset) but also on the circumstances
> surrounding the digital asset and the manner in which it is offered, sold, or resold
> (which includes secondary market sales). Therefore, issuers and other persons
> and entities engaged in the marketing, offer, sale, resale, or distribution of any
> digital asset will need to analyze the relevant transactions to determine if the

---

[3]     *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

federal securities laws apply.

71.     Investors who bought Moments invested money or other valuable consideration in a common enterprise – NBA Top Shot and, by extension, Dapper Labs and its Flow blockchain. Investors had a reasonable expectation of profit based on the efforts of Dapper Labs.

### Moment Purchasers Invested Money

72.     Investors purchasing Moments made an investment of money or other valuable consideration for the purposes of the *Howey* test.  As the SEC states in its Framework: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

### Moment Investors Participated in a Common Enterprise

73.     The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

74.     This is true of Moment investors.  Investors who buy Moments are passive participants in the enterprise, with the profits of each investor intertwined with the fate of NBA Top Shot and the Flow blockchain on which it sits.  Unlike Bitcoin, which is decentralized, here Dapper Labs controls the enterprise, sharing in the profits and risks of this venture.  Accordingly, investors in Moments participated in a common enterprise.

### Moment Investors Purchased with a Reasonable Expectation of Profit

75.     In terms of "reasonable expectations of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

76.     In particular, the SEC's Framework identifies a number of factors to help assess

15

whether the "reasonable expectation of profits" element is met:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:
>
> The digital asset gives the holder rights to share in the enterprise's income **or profits or to realize gain from capital appreciation of the digital asset.**
>
>> **The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.**
>>
>> This also can be the case where the digital asset gives the holder rights to dividends or distributions.
>
> **The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.**
>
> **Purchasers reasonably would expect that an AP's [Active Participant, or promoter] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.**
>
> The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.
>
> (Emphasis added.)

77.     Investors in Moments are clearly expecting profit.  As investor Jesse Schwarz said of

his record-setting Lebron James Moment:

> "***These are investments***," he [Schwarz] says. "That Lebron that I bought for $208,000 was worth seven figures right away.  ***And, that's a big reason why I bought it***."
>
> (Emphasis added)

78.     Schwarz also explained how similar he sees investing in Moments to investing on

Wall Street:

> Schwarz says that investing in Top Shot Moments is a lot like investing in stocks. "There's a lot of psychology behind it," he says. "It's not only about what the best company or best player is. It's about understanding what's baked into the

price and what other people aren't seeing." Although, in the case of LeBron
James, his greatness is part of what creates the value.

79.     In an article in March 2021, the former Chief of the SEC's Office of Internet

Enforcement observed that Moment investors are seeking profits, regardless of any fine print that

Dapper Labs might slip into the User Agreement:

> Buried in its Service Terms of Use, Dapper requires its users to agree that they
> "are using NFTs primarily as objects of play and not for investment or
> speculative purposes." ***This provision would be laughable were it not so
> disturbingly contradictory and absurdly self-serving.***
>
> ***The reality is that the growing fanatical NBA Top Shot database is all about
> the investment, speculation and appreciation of the Top Shot NFTs and the
> NBA Top Shot Marketplace. With its varying levels of scarcity and its legion of
> clamorous promoters, NBA Top Shots reinforces these notions exponentially.
> This is precisely why investors are not the only ones fawning over NFTs, and
> other capital market participants are buying into the hype as well.***
>
> (Emphasis added.)

80.     Defendant Gharegozlou himself has admitted as much, saying in a February 2021

podcast that:

> Younger and younger generations [think]: Do I want to go to a [NBA] game all
> the time?  Like I'd rather just carry my fandom in my pocket, ***and benefit
> financially from it, and have skin in the game***, rather than just be a passive
> consumer, especially of physical experiences.[4]

81.     Accordingly, Moment investors have a reasonable expectation of profit.

***Moment Investors Expected Profits to be Derived from the Managerial Efforts of the Issuers***

82.     The SEC Framework provides that the "inquiry into whether a purchaser is relying

on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on

the efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those

---

[4]      The podcast, the February 11, 2021 episode of the Layer One Podcast, can be found at:
https://www.iheart.com/podcast/256-distributed-media-the-bloc-30986944/episode/roham-
gharegozlou-flow-network-flow-81739848/ (last accessed on December 27, 2021).

essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

83.     The SEC Framework continues:

Although no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the "efforts of others":

*An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.*

Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

*An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity,* through, for example, buybacks, "burning," or other activities.

*An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset.* In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

*An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network . . .*

(Emphasis added.)

84.     Purchasers of Moments are entirely reliant on the managerial efforts of the issuers for their potential profits. The success of NBA Top Shot's ability to maintain the Moment craze is essentially what controls the investment. This is again unlike an investment in Bitcoin, for

example, which is decentralized and run by no one other than the market.

85.    Moreover, investors in Moments have said as much:

> *There were some periods early in Top Shot's lifespan where people questioned whether Dapper Labs was making good decisions with the supply of Moments and whether the website itself would hold up with a larger user base*, Levy says. "It's really exploded and become very, very mainstream," he says. "So it feels validating to see it all play out the way a lot of us hoped it would."

(Emphasis added.)

86.    Not only are investors in Moments hitching their wagons to the continued success of NBA Top Shot, but also to Dapper Labs and the Flow blockchain that underlies the platform.

87.    A Yahoo news article put it this way, quoting *Decrypt* editor Dan Roberts:

> If you're buying NFTs in the hopes of realizing a financial return, NBA Top Shot is a better bet than a digital collectible from a team or player-specific collection. "Dapper Labs is here to stay, and there is probably more potential and more interesting things that will happen with Top Shot over time [in terms of use-cases]," Roberts said.

[Alteration in original.]

88.    Dapper Labs CEO Gharegozlou said during a recent livestream that "The FLOW token is what powers it all, but you don't need to know that in order to play NBA Top Shot."[5]

89.    While one does not need to know about the Flow token to participate in NBA Top Shot, this does not change the fact that much of the investor interest in Moments is intertwined with interest in Dapper Labs, its burgeoning new blockchain, and the token that "powers it all."

90.    In fact, according to NBA Top Shot's own website, one of the most common question it gets is for more information about Flow tokens:

**FLOW TOKENS**

> Mosey on over to this preview to learn more about Flow, the blockchain that NBA Top Shot is built on. One of the most common questions we get is for more

---

[5]    *See* https://www.coindesk.com/markets/2021/02/26/nba-top-shot-overwhelmed-by-demand-in-record-1m-pack-drop/ (last accessed on December 27, 2021).

information about FLOW tokens.

> At launch, FLOW will be utility tokens used only to run the network. This will change in the future as the token is more widely adopted, but for the beta period, don't expect to hold FLOW tokens in the Dapper on Flow account for use in NBA Top Shot.

91.     Investors' profits in Moments are to be derived from the managerial efforts of others, specifically of Dapper Labs and NBA Top Shot.  Most immediately, should Dapper Labs and NBA Top Shot fail to maintain the crazed level of hype and interest in Moments, investor profits will dry up.  In addition, should Dapper Labs fail to deliver on its Flow blockchain, excitement will wane and investor profits will take a hit as well.

### *Dapper Labs Used its Control over the Platform to Prevent Investors From Cashing Out*

92.     After investors purchase a Moment, the ball is in Top Shot's court, so to speak.  The investor is entirely reliant on the NBA Top Shot platform to make a profit, by finding a purchaser in the Marketplace and executing a peer-to-peer sale, but also to get one's money out.

93.     While NBA Top Shot is very good at taking investors' money, it is less good at giving it back.

94.     As has been widely reported, investors are being told to wait *months* before they can cash out.

95.     On March 26, 2021, the NBA Top Shot website published an "Update on Withdrawals."  The Update attempted to soothe investors by saying that "[t]he money in your Top Shot account is yours," but then continued to explain: "Currently we estimate most accounts will have withdrawals enabled within 6-8 weeks."  Even after withdrawals are enabled, the Update stated that "[m]ost withdrawals are processed within 21 days but others may take 40 days or more."

96.     According to a recent CNN article entitled, *NBA Top Shot Customers Can't Get Their Money Out. Experts are Confounded*:

NBA Top Shot is the hottest NFT marketplace on the planet. It's also got a big problem: Customers are complaining about exceptionally long wait times to get paid from sales of digital tokens that can often cost hundreds of thousands of dollars.

. . .

Vincent Diciglio, a 32-year-old data analyst for Microsoft, told CNN Business that he's been waiting weeks for his wire transfer to go through.

"There's no reason that a company should be worth billions of dollars and can't cover these withdrawals or even have the employees to help move this process along," said Diciglio. "It just doesn't make sense."

The lengthy period for wire transfers even after the six-to-eight-week fraud monitoring period "just doesn't make sense," said Rakhi Talwar, an anti-money-laundering compliance consultant for artwork based in the UK. "Isn't the whole point of these crypto transactions to be instant?"

97.    Another article observed: "Millions of dollars slosh through NBA Top Shot each day, but not much money is getting out."

98.    Investors have also had their Dapper Labs accounts emptied with no recourse, frozen for no reason, and are being ignored by Dapper Labs all the while.

99.    Investors have also watched scarcity, and therefore value, decline when NBA Top Shot decides to give packs away to NBA players or other celebrities or influencers.

100.    One article explains:

As demand — and perceived value — of packs increase another frequent criticism from collectors has been packs seemingly set aside before drops. They've noticed unopened packs landing in the hands of NBA players and others to open on livestreams, sometimes hours after pack drops where hundreds of thousands are left out in the cold. Dapper has been more transparent about holding some packs back lately, saying certain amounts are "withheld for community giveaways, customer service and promotional purposes." And Eisenberg [Community Lead at Dapper Labs] admitted that, while players have gotten packs for giveaways and promotions, that's part of the company's strategy.

"We made a conscientious decision not too long ago that if it's an NBA player coming to us wanting to do anything from you know, a pack opening to a giveaway, we're going to help facilitate that," Eisenberg said. "Because at the end of the day, NBA Top Shot is nothing without the players, the moments they create on the court."

101.     NBA Top Shot might be nothing without the players, but it would also be nothing without investor money, money that NBA Top Shot has been wrongfully retaining for months.

102.     Based on the online valuation service, Own The Moment, NBA Top Shot insiders appear to be holding large "on paper" profits in their Dapper Labs wallets.  For example, Defendant Gharegozlou appears to own a collection of Moments that purports to be worth, on paper, over *$10 million*.

103.     In fact, when was asked about his "personal, kind of, stash" in the February 2021 podcast,[6] Gharegozlou stated that he was "very, very proud" of his own collection:

> Q: So the last thing I have on NBA Top Shot is collectibles and your personal, kind of, stash.  What have you collected so far that you're like super interested in?  Do you have any Lebrons, maybe, waiting in the wings?
>
> A: Yeah, so this is an interesting one.  We had a play policy for NBA Top Shot, where all of Dapper Labs' team members were encouraged to play NBA Top Shot, especially in the beginning, because we didn't exactly understand what we had built, right.  Six months ago, when we said "digital collectibles," even the biggest trading card collector would sort of laugh at us and say, well, what are you talking about?  So it was very, very important early on for all of us to participate in pack drops, in challenges, all of these things, and playing with our own money, and sort of, playing the game fairly, just like everybody else, but really trying to understand it, and so I built up quite the collection in those times, and I think it was critical.  There was no way I would have understood what we had created to the degree I do now, had I not gone super deep and experienced it, become a collector.  And, sorta, the folks that are coming in six months later and saying, well, why did you play the game, did you not know that the assets… basically blaming me for collecting assets that are now valuable, it's sort of a survivorship bias in a way, right, there's no way the things would have been valuable had we not really gone deep and understood them.  So my collection is… I'm very, very proud of it.

104.     However, after defending his personal collection as necessary to understanding NBA Top Shot and discounting the criticism of it as the product of "survivorship bias," Gharegozlou

---

[6]     The February 11, 2021 episode of the Layer One Podcast can be found at: https://www.iheart.com/podcast/256-distributed-media-the-bloc-30986944/episode/roham-gharegozlou-flow-network-flow-81739848/ (last accessed on December 27, 2021).

explained that he has stopped trading and has placed all of the employee accounts in lock mode.

105.     Later in the same podcast, Gharegozlou describes his favorite NBA Top Shot Moments as the Challenge Rewards, which are only available to those who own the entirety of a particular subset of Moments.  Gharegozlou added: "Oh, by the way, the people that earn those Challenge Rewards, because they're the people that have the full sets, are also the biggest collectors, and so they're also the least likely to sell, and so they're owned by the strongest hands, if you sort of think about it that way, so those are my favorite."

106.     Underlying Gharegolzlou's praise for the investors most averse to selling as having the "strongest hands," perhaps, is the fact that Defendants need money to remain on the platform in order to continue to raise money at a high valuation.  If investors pull their money from the platform, the platform will collapse.[7]

***Dapper Labs is Selling Moments to Investors to Prop Up the Price of its Flow Token – the Unregistered Security Token that Powers the Flow Blockchain***

107.     As Dapper Labs states on its website, the Flow token is required for every activity on the blockchain, and **"[t]he economic impact is that as more value is created on top of the Flow blockchain, more demand is generated for FLOW token."** (emphasis added).

108.     Not only are inquiries about Flow tokens one of the most commonly asked questions on the NBA Top Shot website, but investors seeking exposure to Flow tokens are being funneled into NBA Top Shot.  One analyst's report entitled, *A journey into FLOW. Investing in the tech behind Topshot*, concludes: "FLOW token usage is dependent on the number of projects running on

---

[7]     A New York Times article from May of 2021 warned of the possibility: "Top Shot is risky, too, because the price of the highlights could plummet at any time if people decide they are no longer interested. . . . 'It's a marketplace that obviously is purely built on demand and scarcity,' said Darren Heitner, a lawyer and a sports law professor at the University of Florida. Between shifting interests and the ebbing of the pandemic, he said, 'there's a lot of reasons you could see this marketplace drying up and find individuals left holding the bag.'"

the network, and their success.  At the present time it's hard to justify holding large amounts of

FLOW. A better approach for investing is to participate in NBA Topshot."

109.    Accordingly, Dapper Labs is engaged in an elaborate end-run around the federal

securities laws.  In order to promote an unregistered security that it cannot legally sell in the United

States – the Flow token is functionally identical to the tokens that courts have deemed unregistered

securities in similar cases where the common venture under the *Howey* test is the blockchain

"ecosystem" being developed – Dapper Labs has instead offered other unregistered securities that

reside on its blockchain, Moments, albeit securities disguised as basketball trading cards.

110.    However, investors buying digital securities on the Flow blockchain, namely NBA

Moments, are entitled to important information not just about NBA Top Shot, but about the Flow

blockchain and the Flow token that powers it.  For example, how exactly will the supply of

Moments and Flow tokens fluctuate over time?  These are basic questions that investors are entitled

to know, but Defendants have withheld the answers by failing to register either Moments or Flow

tokens under the Securities Act.

111.    The result appears to be a scheme to stir up activity on the Flow blockchain and prop

up the value of the Flow token, at the expense of innocent investors in Moments, including

Plaintiffs.  This sort of scheme is exactly what the securities laws were designed to prevent.

112.    As Defendant Gharegozlou himself put it in an April 2021 podcast, shortly after

Dapper Labs had raised $305 million at a valuation of $2.6 billion: "We're already a platform

business.  You know, Flow, as a sort of part of Dapper Labs' enterprise value is… We hold more

Flow tokens than we have dollars, let's put it that way."[8]

---

[8]      The podcast, the April 13, 2021 episode of This Week in Startups, is available at
https://podcasts.apple.com/us/podcast/dapper-labs-ceo-roham-gharegozlou-on-powering-
nfts/id315114957?i=1000517007651 (last accessed on December 27, 2021).

*The Class Has Suffered Significant Damages from Defendants' Actions*

113.    As a direct result of Defendants' issuance, promotion, and sale of unregistered

securities, Plaintiffs and the Class – many of whom are retail investors who lack the technical and

financial sophistication necessary to have evaluated the risks associated with their investments in

Moments, and were denied the information that would have been contained in the materials

required for the registration of the Moments – have suffered significant damages in an amount to be

proven at trial.

## CLASS ALLEGATIONS

114.    Plaintiffs bring this action as a class action on behalf of a class consisting of all

persons other than Defendants who purchased or otherwise acquired Moments during the Class

Period, and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the

officers and directors of Dapper Labs, members of the Defendants' immediate families and their

legal representatives, heirs, successors or assigns and any entity in which the officers and directors

of Dapper Labs have or had a controlling interest.

115.    The members of the Class are so numerous that joinder of all members is

impracticable.  As of April 2021, there were over 800,000 users on NBA Top Shot, according to a

spokesperson for Dapper Labs.  While the exact number of Class members is unknown to Plaintiffs

at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are

thousands of members in the proposed Class.  Plaintiffs believe that Class members can be

identified from records maintained by Defendants, and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions,

including being given an opportunity to exclude themselves from the Class.

116.    Plaintiffs' claims are typical of the claims of the members of the Class, as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

117.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

118.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> a)    whether Defendants violated the Securities Act;
>
> b)    whether Moments constitute securities under federal law;
>
> c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

119.    A class action is superior to all other methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**SECURITIES ACT – PRIMARY LIABILITY**
**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Dapper Labs)**

120.    Plaintiffs reallege the allegations above.

121.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to

sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

122.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security[.]" *Id*. § 77e(c).

123.    When issued, the Moments were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).  Defendant Dapper Labs promoted, solicited or sold Moments to Plaintiffs and Members of the Class.  Dapper Labs thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  No registration statements have been filed with the SEC or have been in effect with respect to the offering described herein.

124.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id*. § 77*l*(a)(1).

125.    Accordingly, Dapper Labs has violated Sections 5(a), 5(c), and 12(a)(1) of the

Securities Act.  *Id*. § 77*l*(a)(1).

126.     Plaintiffs and the Class seek rescissory damages with respect to Moments purchased during the Class Period.

**SECOND CAUSE OF ACTION**
**SECURITIES ACT – ADDITIONAL LIABILITY**
**Control Person Liability for Violations of Sections 5, 12(a)(1)**
**(Gharegozlou)**

127.     Plaintiffs reallege the allegations above.

128.     This Count is asserted against Defendant Gharegozlou for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

129.     Defendant Gharegozlou, by virtue of his office, agreements and understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Dapper Labs and NBA Top Shot, and to cause Dapper Labs to engage in the wrongful conduct complained of herein.  Defendant Gharegozlou had and exercised the power and influence to cause the unlawful solicitation of Moments as complained of herein.

130.     Defendant Gharegozlou had and has the power to direct or cause the direction of the management and policies of Dapper Labs and NBA Top Shot.

131.     By virtue of the conduct alleged herein, Defendant Gharegozlou is liable for the wrongful conduct complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages suffered for Moments sold during the Class Period.

**PRAYER FOR RELIEF**

132.     On behalf of themselves and the Class, Plaintiffs request relief as follows:

    a)     That the Court determine that this action may be maintained as a class action, that Lead Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

b)     That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

c)     That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

d)     That the court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled;

e)     That the Court award Plaintiffs and the Class pre- and post-judgment interest;

f)      That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

g)     That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

**JURY TRIAL**

133.    Plaintiffs respectfully demand a trial by jury for all claims.

DATED:          December 27, 2021
                New York, New York

                                **THE ROSEN LAW FIRM, P.A.**

                                /s/ *Phillip Kim*
                                Phillip Kim, Esq.
                                Laurence M. Rosen, Esq.
                                Michael Cohen, Esq.
                                275 Madison Avenue, 40th Floor
                                New York, New York 10016
                                Telephone: (212) 686-1060
                                Fax: (212) 202-3827
                                Email: pkim@rosenlegal.com
                                Email: lrosen@rosenlegal.com
                                Email: mcohen@rosenlegal.com

                                *Counsel for Plaintiffs and the Class*