**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEEUN FRIEL, Individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>    -against-<br><br>DAPPER LABS, INC. and ROHAM GHAREGOZLOU,<br><br>             Defendants. | Case No. 1:21-cv-05837-VM<br><br>**<u>ORAL ARGUMENT REQUESTED</u>** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

I.     NBA TOP SHOT REVOLUTIONIZES SPORTS TRADING CARDS ......................... 2

    A.     NBA Top Shot Launches ............................................................... 2

    B.     The Inspiration for Moments ......................................................... 3

    C.     Moments Are Digital Collectibles ................................................. 3

    D.     Dapper Does Not Set Moment Values ........................................... 4

II.     PLAINTIFFS SHOW THEIR ACTIVE PARTICIPATION ................................... 5

STANDARDS OF REVIEW ....................................................................................... 5

ARGUMENT .......................................................................................................... 6

I.     COLLECTIBLE SPORTS CARDS ARE NOT SECURITIES .................................. 6

    A.     Plaintiffs Fail To Plead Facts Showing a Common Enterprise ........... 8

        1.     Plaintiffs Allege No Horizontal Commonality Among Moment Purchasers .......................................................... 8

        2.     Plaintiffs Do Not and Cannot Allege Strict Vertical Commonality. ....... 15

    B.     Dapper Did Not Lead Collectors To Expect Profits ......................... 18

        1.     Plaintiffs Do Not Adequately Allege that Dapper Reasonably Led Collectors To Expect Profits ...................... 18

        2.     Plaintiffs Do Not Allege Dapper Persistently Promised Profits ............. 19

        3.     Plaintiffs' Allegations Fail Under Forman ............................. 20

    C.     Plaintiffs' Allegations Fail the Essential Efforts Prong ..................... 21

        1.     Plaintiffs' Scarcity Allegations Fail To Establish Managerial Efforts .......................................................... 22

        2.     Plaintiffs' Hype Allegations Fail To Establish Managerial Efforts ........ 24

        3.     The Marketplace Does Not Demonstrate Dapper's Efforts .................... 25

        4.     Plaintiffs' Contractual and Retained Control Is Dispositive .................... 26

II.     *HOWEY* REQUIRES DISMISSAL REGARDLESS OF THE DIGITAL NATURE OF MOMENTS ................................................................... 28

    A.     Plaintiffs' FLOW Allegations Are Irrelevant ..................................... 28

    B.     The Alleged Facts of Digital Products, Rather than Their Digital Nature, Determine Whether They Are Securities ......................... 28

III.     THE CONTROL PERSON CLAIM AGAINST MR. GHAREGOZLOU MUST BE DISMISSED ...................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albanese v. Fla. Nat'l Bank of Orlando*,
  823 F.2d 408 (11th Cir. 1987) ........................................................................25, 27

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011) (per curiam)...................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)........................................................................................6

*Audet v. Fraser*,
  No. 3:16-CV-940 (MPS), 2022 WL 1912866 (D. Conn. June 3, 2022).....................13, 23, 29

*Austin v. Bradley, Barry & Tarlow, P.C.*,
  No. 85-4767-S, 1992 WL 560915 (D. Mass. June 17, 1992) .................................17

*Ave. Cap. Mgmt. II, L.P. v. Schaden*,
  843 F.3d 876 (10th Cir. 2016) ................................................................................27

*Balestra v. ATBCoin LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019)................................................................13, 29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................5

*Bender v. Cont'l Towers Ltd. P'ship*,
  632 F. Supp. 497 (S.D.N.Y. 1986)................................................................21, 24

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
  534 F. Supp. 3d 326 (S.D.N.Y 2021)......................................................................22

*Coan v. Bell Atl. Sys. Leasing Int'l, Inc.*,
  813 F. Supp. 929 (D. Conn. 1990)............................................................................8

*Copeland v. Hill*,
  680 F. Supp. 466 (D. Mass. 1988) ............................................................................6

*Curran v. Merrill Lynch*,
  622 F.2d 216 (6th Cir. 1980) ..................................................................................16

*Dahl v. Eng.*,
    578 F. Supp. 17 (N.D. Ill. 1983) ..............................................................................11, 12

*Davis v. Rio Rancho Estates, Inc.*,
    401 F. Supp. 1045 (S.D.N.Y. 1975)..................................................................................25

*Deckebach v. La Vida Charters, Inc. of Fla.*,
    867 F.2d 278 (6th Cir. 1989) ............................................................................................9

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*,
    683 F. Supp. 1463 (S.D.N.Y. 1988)...................................................................................7

*Diamond Fortress Techs., Inc. v. EverID, Inc.*,
    274 A.3d 287 (Del. Super. Ct. 2022) ...............................................................................13

*Endico v. Fonte*,
    485 F. Supp. 2d 411 (S.D.N.Y. 2007)..............................................................................27

*Gary Plastic Packaging Corp. v. Merrill Lynch*,
    756 F.2d 230 (2d Cir. 1985)............................................................................................26

*Gebhardt v. Allspect, Inc.*,
    96 F. Supp. 2d 331 (S.D.N.Y. 2000)..................................................................................5

*Gugick v. Melville Capital LLC*,
    2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) ................................................................17, 18

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)..............................................................................30

*Hirk v. Agri-Rsch. Council, Inc.*,
    561 F.2d 96 (7th Cir. 1977) ............................................................................................10

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) (en banc) .........................................................................27

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*,
    439 U.S. 551 (1979).........................................................................................................8

*Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*,
    205 F. Supp. 2d 243 (S.D.N.Y. 2002).........................................................................15, 16

*Kaplan v. Shapiro*,
    655 F. Supp. 336 (S.D.N.Y. 1987).....................................................................................9

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
    179 F. Supp. 2d 159 (S.D.N.Y. 2001)..............................................................................23

*Long v. Shultz Cattle Co.*,
    881 F.2d 129 (5th Cir. 1989) ...............................................................................17, 18

*Lowenbraun v. Rothschild*,
    685 F. Supp. 336 (S.D.N.Y. 1988).................................................................................18

*In re Lyft Inc. Sec. Litig.*,
    484 F. Supp. 3d 758 (N.D. Cal. 2020) ...........................................................................6

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ..............................................................16, 18

*Mechigian v. Art Capital Corp.*,
    612 F. Supp. 1421 (S.D.N.Y. 1985)...........................................................................6, 12

*Milnarik v. M-S Commodities, Inc.*,
    457 F.2d 274 (7th Cir. 1972) ......................................................................................8, 10

*In re Mona Lisa at Celebration, LLC*,
    472 B.R. 582 (Bankr. M.D. Fla. 2012), *aff'd*, 495 B.R. 535 (M.D. Fla. 2013) ......................18

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) .........................................................................................23

*Notorious B.I.G. LLC v. Yes. Snowboards*,
    No. LACV19-01946-JAK, 2022 WL 2784808, . (C.D. Cal. June 3, 2022) .....................28, 29

*Pungitore v. Barbera*,
    506 F. App'x 40 (2d Cir. 2012) ...................................................................................10

*Rensel v. Centra Tech, Inc.*,
    No. 17-24500-CIV-KING/SIMONTON, 2018 WL 4410126 (S.D. Fla. June
    25, 2018)..............................................................................................................13, 14, 29

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ...................................................................................... *passim*

*Rice v. Branigar Org., Inc.*,
    922 F.2d 788 (11th Cir. 1991) ..................................................................................19, 20

*Savino v. E. F. Hutton & Co.*,
    507 F. Supp. 1225 (S.D.N.Y. 1981).............................................................................10

*SEC v. Aqua-Sonic Prod. Corp.*,
    524 F. Supp. 866 (S.D.N.Y. 1981)..............................................................................19

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) .......................................................................................6

*SEC v. Cavanagh,*
  445 F.3d 105 (2d Cir. 2006).....................................................................................................7

*SEC v. Glenn W. Turner Enter., Inc.,*
  474 F.2d 476 482 (9th Cir.), *cert denied*, 414 U.S. 821 (1973)..............................................21

*SEC v. Life Partners, Inc.,*
  87 F.3d 536 (D.C. Cir. 1996) ............................................................................................23, 26

*SEC v. Ripple Labs, Inc.,*
  No: 1-20-cv-10832-AT-SN (S.D.N.Y. Mar. 22, 2021), ECF No. 79 ......................................22

*SEC v. SG Ltd.,*
  265 F.3d 42 (1st Cir. 2001)...............................................................................................14, 19

*SEC v. Telegram Grp. Inc.,*
  448 F. Supp. 3d 352 (S.D.N.Y. Mar. 24, 2020)........................................................7, 8, 18, 29

*SEC v. Unique Fin. Concepts, Inc.,*
  196 F.3d 1195 (11th Cir. 1999) ..............................................................................................14

*SEC v. W.J. Howey Co.,*
  328 U.S. 293 (1946).................................................................................................... *passim*

*Stenger v. R.H. Love Galleries, Inc.,*
  741 F.2d 144 (7th Cir. 1984) ..................................................................................................12

*United Hous. Found., Inc. v. Forman,*
  421 U.S. 837 (1975)...................................................................................................7, 19, 21

*SEC v. Kik Interactive Inc.,*
  492 F. Supp. 3d 169 (S.D.N.Y. 2020)...............................................................................21, 29

*United States v. Leonard,*
  529 F.3d 83 (2d Cir. 2008)....................................................................................................1, 27

*Villeneuve v. Advanced Bus. Concepts Corp.,*
  698 F.2d 1121 (11th Cir. 1983), *aff'd en banc*, 730 F.2d 1403 (11th Cir. 1984) ...................14

*Wals v. Fox Hills Dev. Corp.,*
  24 F.3d 1016 (7th Cir. 1994) ..................................................................................................16

*Warfield v. Alaniz,*
  569 F.3d 1015 (9th Cir. 2009) ............................................................................................8, 19

*Wells v. Jackie Fine Arts, Inc.,*
  No. C-2-86-0374, 1989 WL 140912 (S.D. Ohio Sept. 25, 1989)............................................12

iv

*Woodward v. Terracor,*
   574 F.2d 1023 (10th Cir. 1978) ...................................................................................19, 25

**Statutes**

15 U.S.C.
   § 77b(a)(1) .........................................................................................................................7
   § 77e .................................................................................................................................7
   § 77l .................................................................................................................................7
   § 77o(a) ...........................................................................................................................30

PSLRA ....................................................................................................................1, 5, 6

Securities Act ...........................................................................................................30

Securities Act
   Section 5...........................................................................................................................6
   Section 12(a)(1) .......................................................................................................6, 7, 30
   Section 15........................................................................................................................6, 30

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) .................................................................................2

## PRELIMINARY STATEMENT

Plaintiffs are trying to make a federal securities case over basketball cards.  Basketball cards are not securities.  Pokémon cards are not securities.  Baseball cards are not securities.  Common sense says so.  The law says so.  And, courts say so.  Courts recognize that collectibles like art are not securities subject to the federal securities laws.  Plaintiffs' Complaint should be dismissed with prejudice.

The backdrop of Plaintiffs' claims is simply stated.  Plaintiffs acknowledge that Dapper, in partnership with the NBA and the NBPA, sell basketball cards—NBA Top Shot Moments.  AC ¶ 2.  These Moments are digital basketball cards that feature video clips of plays, along with stats about players and games.  AC ¶ 2.  Like most sports cards, Moments can be bought in packs, or traded or sold among collectors.  And like most sports cards, they can be enjoyed by their collectors, assembled into sets, used for playing games, and shown off to friends.

Plaintiffs make no allegations to the contrary.  Nevertheless, Plaintiffs try to muddy the waters, claiming that because the basketball cards are digital and sold using non-fungible token ("NFT") technology, AC ¶ 2, the securities analysis changes.  Thus, in Plaintiffs' eyes, a clip of a LeBron James dunk should be subject to the same registration and disclosure requirements as a share of Apple stock.  Plaintiffs are wrong.  Their Complaint is overreach; plain and simple.

Plaintiffs cannot and do not plead sufficient facts to state a claim that the digital basketball cards they seek to put at issue meet the definition of an "investment contract" and thus a "security" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  As their PSLRA certifications show, Plaintiffs exercised significant control over their *personal* collections.  They bought packs and specific players' cards; they sold specific players' cards; and they traded or gifted still other players' cards.  *See* Dkt. 22-2, 27-1.  "It is the passive investor 'for whose benefit the securities laws were enacted[,]'" *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (citations

omitted), and Plaintiffs are not that.  Their experience is that of the *active* collector.  For the reasons stated below, the Court should dismiss Plaintiffs' claims with prejudice.

## FACTUAL BACKGROUND[1]

### I.   NBA TOP SHOT REVOLUTIONIZES SPORTS TRADING CARDS

   A.   NBA Top Shot Launches

In July 2019, Dapper Labs, Inc. ("Dapper") announced the formation of NBA Top Shot ("Top Shot"), a joint venture among Dapper, the National Basketball Association ("NBA"), and the National Basketball Players Association ("NBPA").  AC ¶ 51.  Top Shot sells digital basketball cards called "Moments."  AC ¶ 51.  Moments feature a short video clip of a play from an NBA game, AC ¶ 53, and are accompanied by statistics about the player and the game, AC ¶ 59.[2]  Like physical basketball cards, Moments are sold in "packs," a random selection of cards that are revealed to a collector only when they are opened.  AC ¶ 56.  Multiple Moments can be created ("minted") from a single play, though each card is assigned its own serial number.  AC ¶ 54.  As a result, each card is "a unique digital asset."  AC ¶ 53.

Moments are a type of digital asset known as "non-fungible tokens," or NFTs.  AC ¶ 2.  As NFTs, Moments reside on a "blockchain," which is a decentralized, public digital ledger that records the ownership and transfer of the cards.  AC ¶ 2.  Aside from their digital nature, Moments are like other sports cards, reflecting a player at a particular time, with their basketball statistics and a unique ID number.  AC ¶¶ 54, 59.[3]

---

[1] Defendants obviously dispute Plaintiffs' assertions.  Consistent with the standards governing a Rule 12(b)(6) motion to dismiss, however, the factual description below is based on Plaintiffs' own factual allegations, documents incorporated by reference into the Complaint, or matters capable of judicial notice.

[2] For the ease of the Court's review, when, in this Motion, Defendants rely on a document or website Plaintiffs have incorporated by reference into the Complaint, Defendants will cite the paragraph number in the Amended Complaint (herein referred to as the "Complaint" and cited as "AC") where the reference occurs and then add a footnote with a link to the incorporated document.  *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.

[3] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.

B.     The Inspiration for Moments

Moments are digital alternatives to physical sports cards.  AC ¶ 61.[4]  Physical sports cards can be lost, damaged, or counterfeited.  Even if a collector takes good care of a card, the cardboard can degrade or fade.  The mere act of trading a cardboard card can damage it, and without a digital authenticating trail, scams and counterfeits can happen.  AC ¶ 59.[5]

Using NFT technology for digital cards aims to solve many of these problems:

> Think of NFTs like pieces of digital memorabilia . . . . Their appeal is simple:  Like anything on the blockchain, their history (how much they've sold for, when and to whom) is public.  Forgeries are nonexistent in the digital art or NFT world; there are no counterfeits.  They can be traded instantaneously, bypassing the logistical nightmares that mar material-world collecting—no packaging or shipping, no authenticators or graders or auctioneers.

AC ¶ 61.[6]  And unlike physical cards, digital cards like Moments can be enjoyed any time on a collector's phone—a boon in today's phone-driven world.

C.     Moments Are Digital Collectibles

From their inception, Dapper marketed Moments as digital sports cards and as an opportunity to demonstrate basketball fandom.  Moments are "an engaging . . . way for fans and players to celebrate exhilarating basketball plays."  AC ¶ 106.[7]

Opening a pack of Moments "works an awful lot like physical cards: you get a wrapper that you click on to open, revealing a number of mystery Moments inside.  Then, one by one, you click on your Moment to reveal them."  AC ¶ 59.[8]  Many collectors of physical cards were drawn to Top Shot because of the obvious parallel with the new digital card.  *Id.*  Just like with

---

[4] *See* https://www.si.com/nba/2021/03/17/nba-top-shot-crypto-daily-cover.
[5] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.
[6] *See* https://www.si.com/nba/2021/03/17/nba-top-shot-crypto-daily-cover.
[7] *See* https://www.nytimes.com/2021/05/13/business/nba-top-shot-moments.html.
[8] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.

physical cards, individual Moments can be traded, shown off, curated, sought after, and bought and sold.  AC ¶ 59.[9]  And just like with physical cards, Moment collectors are active participants in the Top Shot collecting community.  As one collector put it, "[p]robably the best takeaway from my perspective is meeting the people and community and kind of finding new friends."  AC ¶ 59.[10]

        D.    <u>Dapper Does Not Set Moment Values</u>

As with other sports cards, individual Moments can be traded, bought, and sold.  AC ¶ 58.  Moments can be purchased on Top Shot's own safe and secure secondary marketplace (the "Marketplace").  AC ¶ 58.  These sales are "peer-to-peer."  AC ¶ 92.  Just like at a trade night at a local card shop, collectors buy and sell to other collectors.  AC ¶ 58.  Moments can also be purchased outside of the Top Shot ecosystem, on secondary markets on third-party websites.  AC ¶ 61.[11]

The value of a given card depends on many factors outside of Dapper's control, including player popularity, player performance, injuries, and collectors' personal preferences.  AC ¶ 60.[12]  "Prices for rookie Anthony Edwards' Base Set, Series 2 layup moment," for example, "spiked after two career-high scoring nights, and then again when [LaMelo] Ball, his primary competitor for Rookie of the Year, suffered an injury."  AC ¶ 60.[13]

Even the unique serial number of a Moment can make it more or less attractive to a collector.  AC ¶ 59.[14]  The "low serial numbers are more valuable."  AC ¶ 59.[15]  And, one

---

[9] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.
[10] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.
[11] *See* https://www.si.com/nba/2021/03/17/nba-top-shot-crypto-daily-cover.
[12] *See* https://www.yahoo.com/now/nba-top-shot-wild-1-095529854.html.
[13] *See* https://www.yahoo.com/now/nba-top-shot-wild-1-095529854.html.
[14] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.
[15] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.

collector, "value aside," wanted to collect serial number 23 for a given play because 23 was Michael Jordan's jersey number.  AC ¶ 59.[16]

## II.      PLAINTIFFS SHOW THEIR ACTIVE PARTICIPATION

Plaintiffs' own purchasing histories attached to their PSLRA certifications reflect the unique nature of each Moment and the varied approaches that collectors take to their collections. *See* Dkt. 22-2, 27-1.  Their histories show the purchases of packs (*see, e.g.*, 6/23/21, 7/9/21, 12/16/21, etc.), the purchases of individual cards (*see, e.g.*, 12/22/21), interests in particular players (*see, e.g.*, Chris Paul)), and gifts to others (*see, e.g.*, 3/2/21, 4/12/21, 4/28/21, etc.).  *Id.* They show some cards bought and held (*see, e.g.*, Andre Iguodala #20954, purchased 4/11/21 with no record of being sold).  *Id.*  And, some cards bought and sold (*see, e.g.*, Jalen Smith #3169, purchased 4/12/21 and sold 5/2/21).  *Id.*  Their histories, in short, show active collectors engaging with their collections.

## STANDARDS OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiffs must go beyond "the speculative level," *see Twombly*, 550 U.S. at 555 (citations omitted), and must do more than plead "[c]onclusory allegations or legal conclusions masquerading as factual conclusions."  *Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) (quoting 2 Moore's Federal Practice ¶ 12.34(1)(b) (3d ed. 1997)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678 (citation omitted).  In ruling on the Complaint, the Court should look to Plaintiffs'

---

[16] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.

allegations but also consider documents "attached to the complaint" or "incorporated into [it] by reference." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Plaintiff certifications made in connection with the PSLRA are considered incorporated by reference into a complaint. *See In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 764 (N.D. Cal. 2020). "[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam) (citation omitted).

## ARGUMENT

## I.      COLLECTIBLE SPORTS CARDS ARE NOT SECURITIES

At its core, the syllogism that controls this case is straightforward. Basketball cards are collectibles. The law rejects the idea that collectibles are securities. *See, e.g., Copeland v. Hill*, 680 F. Supp. 466, 468-69 (D. Mass. 1988) (holding that there is no security where, as with rare coins, "[t]he primary risks and rewards—appreciation or depreciation in market value—rested on the plaintiffs"); *see also SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1390 (9th Cir. 1986) (gold coins were not securities because "profits to the coin buyer depended upon the fluctuations of the gold market, not the managerial efforts of [the promoter]"). And, thus Plaintiffs' Complaint should be dismissed with prejudice. "In our mercantile economy, we should not try to turn every 'thing' which might be purchased and sold into a 'security.'" *Michigan v. Art Cap. Corp.*, 612 F. Supp. 1421, 1428 (S.D.N.Y. 1985) (rejecting argument that artwork, a lithographic plate, was a security). Yet, that is exactly what Plaintiffs try to do here. Plaintiffs claim that Defendants violated Sections 5, 12(a)(1) and 15 of the Securities Act, by selling basketball cards without registering them as securities. AC ¶¶ 13, 120-31.[17] The application of long-standing law to

---

[17] Section 5 "requires that securities be registered with the SEC before any person may sell or offer to sell such

those claims compels dismissal.

In a statutory case, the analysis starts with the statute.  Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), does not include collectibles within its defined set of "securities." Nor does the Act mention sports cards, gold coins, or art, which is hardly a surprise.  The Supreme Court has already recognized that consumables are not securities.  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) ("[W]hen a purchaser is motivated by a desire to use or consume the item purchased . . . the federal securities laws do not apply.").

But, Plaintiffs press on in their effort to convert sports cards into something they are not. Plaintiffs claim that the basketball cards sold as Moments are "securities" because they are "investment contracts" under the Act.  AC ¶¶ 68-112; 15 U.S.C. § 77b(a)(1).  In *Howey*, the Supreme Court provided the test for what qualifies as an "investment contract."  328 U.S. at 298-99.  Specifically, the Supreme Court explained that an investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party[.]"  *Id.*  Courts have interpreted *Howey* to mean that for "a contract, transaction or scheme" to be "deemed an investment contract," it must "satisf[y] the four prongs of the *Howey* test, namely (1) an investment of money (2) in a common enterprise (3) with the expectation of profit (4) from the essential efforts of another."  *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 367-68 (S.D.N.Y. 2020) (quoting *Howey*, 328 U.S. at 298-99).[18]  A plaintiff seeking to allege a transaction is an

---

securities."  *SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006); 15 U.S.C. § 77e.  Section 12(a)(1) of the Securities Act creates a private right of action for violations of the registration provisions contained in Section 5.  15 U.S.C. § 77l.  Therefore, to state a claim under Section 12(a)(1), by way of Section 5, a plaintiff must show "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."  *Cavanagh*, 445 F.3d at 111 n.13 (citation omitted).

[18] There is some vernacular disagreement on the articulation of the *Howey* test.  Some courts have articulated the test as a five-part test.  *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 683 F. Supp. 1463, 1472 (S.D.N.Y.

"investment contract" must plead each element "to a very substantial degree." *Teamsters v. Daniel*, 439 U.S. 551, 560 (1979) (affirming dismissal of complaint). Here, Plaintiffs' allegations fail as to numerous *Howey* elements.

A.    Plaintiffs Fail To Plead Facts Showing a Common Enterprise

It is a fundamental truism in securities law that not "every conceivable arrangement" is an "investment contract" that "was intended to be included within the statutory definition of a security." *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 275-76 (7th Cir. 1972). Instead, as *Howey* confirms, there must be a "common enterprise." *Howey*, 328 U.S. at 299.

Where here, each card is unique, AC ¶¶ 53-54; each collection is unique, AC ¶ 59, Dkt. 22-2, 27-1; where collectors, as collectors, actively trade, buy, and sell the player cards that interest them, AC ¶¶ 58-59, Dkt. 22-2, 27-1; and where the value of an individual player's card can rise or fall independent of other cards (because of a good game, because a particular team loses a key game, etc.), Plaintiffs have not pleaded and cannot hope to plead that Moment holders are engaged in a common enterprise.

1.    *Plaintiffs Allege No Horizontal Commonality Among Moment Purchasers*

The Circuits have differed to some degree in the tests they apply to evaluate whether a "common enterprise" has been alleged. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994) (noting split). Controlling here, the Second Circuit has expressly endorsed only one

---

1988) ("The Supreme Court has established a five-part test for determining whether an instrument or transaction is an investment contract."). "Some courts refer to Howey's four-prong test, omitting the fifth element." *Coan v. Bell Atl. Sys. Leasing Int'l, Inc.*, 813 F. Supp. 929, 934 n.8 (D. Conn. 1990) (collecting cases). And, still "[o]ther courts refer to a three-prong test which combines the third and fourth elements and omits the fifth element." *Id.* (collecting cases). Even in those latter courts, however, there is a recognition that the third element has two parts that must *both* be met. *See, e.g.*, *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) ("The third prong of this test, requiring 'an expectation of profits produced by the efforts of others,' involves two distinct concepts: whether a transaction involves any expectation of profit and whether expected profits are the product of the efforts of a person other than the investor."). Thus, if for simplicity if for nothing else, Defendants adhere to the description of the test as four parts, *see Telegram*, 448 F. Supp. 3d at 367-68, recognizing that the test may be labeled differently.

test—the "horizontal commonality" test, which looks at whether the fortunes of would-be investors are linked to the fortunes of other would-be investors. *See id.* (using horizontal commonality test and refusing to adopt broad vertical commonality test). "[H]orizontal common enterprise . . . requires a *heightened* degree of affiliation" among investors. *Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 282 (6th Cir. 1989) (emphasis added) (citations omitted). To plead horizontal commonality, the Complaint must allege that individual investors have tied their fortunes "to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, 18 F.3d at 87 (citations omitted). Plaintiffs plead neither.

        a.       Plaintiffs Do Not Plead Facts Showing Their Fortunes Are Tied to the Fortunes of Other Moment Owners by a Pooling of Assets

Plaintiffs fail to allege that their fortunes are tied to the fortunes of other card owners. To the contrary, the Complaint alleges that "[w]hile editions of Moments are minted from the same basketball play, NFTs are, by nature, unique," AC ¶ 54, and card prices vary depending on the card purchased. AC ¶ 56. And, the Second Circuit has made clear that horizontal commonality requires "the tying of each individual investor's fortunes to the fortunes of the other investors[.]" *Revak*, 18 F.3d at 87. Thus, no horizontal commonality exists because card owners "could make profits or sustain losses independent of the fortunes of other purchasers." *Id*. at 88.

There are also no allegations of pooling. "Courts espousing a theory of horizontal commonality *require* [a] plaintiff to show a pooling of the investors' interests in order to establish a common enterprise." *Kaplan v. Shapiro*, 655 F. Supp. 336, 339-40 (S.D.N.Y. 1987) (emphasis added). "Pooling" involves a situation where an individual invests money and their investment "constitutes a single unit of a larger investment enterprise in which . . . the profitability of each unit depends on the profitability of the investment enterprise as a whole."

9

*Savino v. E. F. Hutton & Co.*, 507 F. Supp. 1225, 1236 (S.D.N.Y. 1981).  In *Savino*, the court

gave the example of a "'commodity pool,' in which investors' funds are placed in a single

account and transactions are executed on behalf of the entire account rather than being attributed

to any particular subsidiary account." *Id.*  Other courts have looked not only to whether there

was a combination of funds but also whether there were "trade[s] in a uniform manner." *See*

*Milnarik*, 457 F.2d at 278.  And if "each discretionary trading account is unitary in nature[,]" and

"each account has a success or failure rate without regard to the others[,]" then there was no

pooling and horizontal commonality was lacking. *Hirk v. Agri-Rsch. Council, Inc.*, 561 F.2d 96,

101 (7th Cir. 1977).  For pooling to exist, "[e]ach investor's rate of return" needs to be "*entirely*

a function of the rate of return shown by the entire account." *Savino*, 507 F. Supp. at 1236

(emphasis added).

  None of that is alleged here.  Indeed, no variation of the word "pool" appears in

Plaintiffs' Complaint.  And, there are no meaningful facts alleged showing pooling.  Rather,

Plaintiffs plead the legal conclusion that card buyers "participated in a common enterprise." AC

¶ 74.  But that does nothing.  In ruling on a motion to dismiss "[a] court *must first ignore* 'mere

conclusory statements' or legal conclusions, which are not entitled to the presumption of truth."

*Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012) (emphasis added).  Instead, the

question is "what *facts* have Plaintiffs alleged to show pooling?" and the answer is "none."

  To the contrary, Plaintiffs, through their certifications, acknowledge that their cards are

held in *individual* accounts.  Dkt. 22-2, 27-1.  They acknowledge that each card is unique and

that cards will vary by player, by team, by play, by serial number, and by the number of similar

cards issued.  AC ¶¶ 53-54, Dkt. 22-2, 27-1.  They acknowledge they made individual purchase

and sale decisions with respect to cards in their collection.  Dkt. 22-2, 27-1.  And, the profits and

losses of those sales did not flow to all other card collectors in a like way; they were *individual*. AC ¶ 59 (noting the distinct value of a particular collector's collection), Dkt. 22-2, 27-1.

This is easy to understand. Think about the individual cards in Plaintiffs' collections (the Chris Paul's, or the Deandre Ayton's, or the Devin Booker's, *see* Dkt. 22-2, 27-1) and the collector-to-collector sales or trades. AC ¶¶ 58, 92. If a seller *makes* money from holding and selling a Jalen Smith card, *see* Dkt. 27-1 (reflecting purchase of Jalen Smith #3169 for $78 on April 12, 2021, and sale for $127 on May 2, 2021), it is entirely possible that the person he bought the card from *lost* money. And, regardless, there is no suggestion that any *other* collector made money. No part of this process involves pooling.

Enforcing these rules here leads to dismissal. Plaintiffs' allegations and certifications confirm that collectors pursued their own collections, made their own purchase and trade decisions, and expressed their fandom in ways that were personal to them. Dkt. 22-2, 27-1. They did not pool their card purchases, but instead bought different player cards, bought packs at different times, actively managed their collections, and otherwise expressed their fandom in unique ways. *See* AC ¶ 59.[19] No horizontal commonality was or could be alleged.

> b.    Courts Consistently Hold that Unique Collectibles Like Art Are Not Securities

In dismissing Plaintiffs' claims, this Court will be doing what other courts have done in other collectibles cases. Recognizing reality, courts considering collectibles have held that the individualized pursuit of the collectible—the coveted play or player, the coveted card, your team's players—defeats the horizontal commonality the law requires.

For example, in *Dahl v. English*, the court rejected the theory that a sale of "original works of art in lithographic plate form" was in fact the sale of securities. 578 F. Supp. 17, 19

---

[19] *See* https://www.theverge.com/22348858/nba-nft-top-shot-dapper-labs.

(N.D. Ill. 1983).  Applying the horizontal commonality test, the court dismissed the claims:
"The court finds it difficult to conceive of a transaction with a more unitary nature than that in
the instant case, i.e., the sale of unique pieces of artwork to individual purchasers at different
prices through different contracts executed at different times."  *Id.* at 20.

The Seventh Circuit affirmed the dismissal of allegations similar to those in *Dahl* in
*Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144 (7th Cir. 1984).  There, the court held that
even "assum[ing] that defendants sold paintings to other investors, there [wa]s no basis for
assuming that the appreciation or depreciation of plaintiff's collection would benefit anyone
other than himself[,]" preventing the application of horizontal commonality.  *Id.* at 147.

More cases could be cited.  *See, e.g., Wells v. Jackie Fine Arts, Inc.*, No. C-2-86-0374,
1989 WL 140912, at *2 (S.D. Ohio Sept. 25, 1989); *Mechigian*, 612 F. Supp. at 1428.  The
collective takeaway from the cases supports dismissal:  each Moment is unique.  Dapper mints a
card based on a *unique* basketball play, with different players, teams, seasons, and types of plays
(*e.g.*, dunk vs. layup vs. pass vs. steal).  AC ¶ 53.  The pursuit and ability to determine the use of
these individual collectibles, as with traditional artwork, defeats commonality.

As *Dahl* recognizes, and as is true for collectibles generally, where "each purchaser was
in competition with every other purchaser" for specific cards they wanted, there can be no
horizontal commonality and no common enterprise.  *Dahl*, 578 F. Supp. at 20.  Far from showing
commonality, the pleaded pursuit of basketball cards instead shows competition.

c.      Plaintiffs' Cited Authority Does Not Support Their Cause

Plaintiffs have no real response to this.  Tellingly, in their letter leading up to this Motion,
Plaintiffs did not point to any Complaint allegations they believed alleged the facts necessary to
show that each individual Moment collector's fortunes are tied to the fortunes of other card
collectors by the pooling of their cards or funds.  Dkt. 31.  Instead, they cited to two cases:

12

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) and *Rensel v. Centra Tech, Inc.*, No. 17-24500-CIV-KING/SIMONTON, 2018 WL 4410126 (S.D. Fla. June 25, 2018).  *See* Dkt. 31, 2.  But just as apples are not oysters, Plaintiffs' invoked cases do not get them past their failure to plead their fortunes are tied to those of other Moment owners by pooling.

 In *ATBCOIN*, the court concluded that the plaintiff sufficiently pleaded the pooling necessary for horizontal commonality because "the funds raised through the [initial coin offering ("ICO")] were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of [the] [p]laintiff's ATB Coins[]" proportionately. *ATBCOIN*, 380 F. Supp. 3d at 353.

 Since then, courts have cited *ATBCOIN* for the proposition that "[c]ourts commonly classify a cryptocurrency as a security when the economic harm directly relates to or arises from its [ICO]," and have done so because "the purpose of an ICO is to *raise capital* by selling *new* coins or tokens to investors."  *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 302, n.108 (Del. Super. Ct. 2022) (emphasis in original).  Courts have likewise *rejected* reliance on *ATBCOIN* when the product at issue was not a fundraising ICO.  *See, e.g., Audet v. Fraser*, No. 3:16-CV-940 (MPS), 2022 WL 1912866, at *14 (D. Conn. June 3, 2022) (rejecting invocation of *ATBCOIN* because "Hashlets, which were mechanisms for mining bitcoin and other established cryptocurrencies, are distinguishable from the cryptocurrency products involved in . . . *ATBCOIN*").

 Courts, in other words, have looked for apples-to-apples comparisons.  Unlike in *ATBCOIN* and other fundraising ICO cases, the basketball cards sold as Moments here were not sold to launch NBA Top Shot.  As Plaintiffs acknowledge, NBA Top Shot was developed through a joint venture between Dapper, the NBA, and the NBPA.  AC ¶ 51.  Top Shot was

13

developed before a single Moment was sold.  When Dapper sold Moments, it was not looking for

investors; it was selling products to *customers*.  AC ¶ 52.  This, in other words, was not an ICO.

A pack-buyer received no stake in NBA Top Shot, and Plaintiffs do not allege otherwise.

Rather, Moments were products, basketball cards.  AC ¶ 52.  Once acquired each collector could

manage his or her collection as he or she chose.  *See* Dkt. 22-2, 27-1.

Plaintiffs' reliance on *Rensel* also gets them nowhere.  The defendants in *Rensel*

conducted an ICO "in order to raise capital for further development of the Centra Debit Card and

Centra Wallet."  2018 WL 4410126, at *1.  *Rensel* is not a product sales case like this one.  And,

Plaintiffs neglect to mention that the test applied in *Rensel* was not horizontal commonality but

rather broad vertical commonality, *see id.* at *5 (citing *SEC v. Unique Fin. Concepts, Inc.*, 196

F.3d 1195, 1199 (11th Cir. 1999)), [20] which the Second Circuit *rejects*.  *Revak*, 18 F.3d at 88.

With inapposite cases and no Complaint allegations, Plaintiffs have simply failed to

allege the pooling that Second Circuit law requires.

    d.    Plaintiffs Do Not Plead Facts Showing Pro-Rata Distributions

Nor do Plaintiffs cite to any Complaint allegations suggesting that a purchase of a

Moment entitled Plaintiffs to any pro-rata distribution of Dapper's or NBA Top Shot's profits.

Pro-rata distributions of profits are presumptively required to meet horizontal commonality.  *See*

*Revak*, 18 F.3d at 87 (a showing that common enterprise exists "usually" requires a showing of a

"pro-rata distribution of profits").  But, the Complaint here does not and cannot make any

allegation that the purchase of basketball cards entitled them to any distribution of Top Shot

---

[20] *Rensel* cites to *Unique*, and *Unique,* at the cited page, explains "we have adopted the concept of vertical commonality," citing *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983), *aff'd en banc*, 730 F.2d 1403 (11th Cir. 1984).  *See Unique*, 196 F.3d at 1199.  Courts recognize *Villeneuve* as applying a broad form of vertical commonality.  *See, e.g., SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir. 2001) (citing *Villeneuve* as an example of broad vertical commonality).

profits let alone pro-rata distributions.  Instead, the only way a collector of Moments makes money (if indeed they do) from their basketball cards is by selling them, which is done wholly at the collector's discretion.  AC ¶ 58.  In legal language, any such economic benefit from the sale of cards is "instead the sole responsibility of the [Moment] owner."  *See Revak*, 18 F.3d at 88.  Making the point simple:  There is no pro-rata distribution, nor could any be alleged because the value of each card is independent of other cards, so much so that—in the winner-take-all world of the NBA—the value of Moments from different players or teams, (or even different players on the same team) can move in opposite directions.  Thus, a Knicks win over the Nets may be good for Knicks' cards and bad for Nets' cards, and depending on player performance, that same game may increase demand for certain Knicks players' cards (like RJ Barret) and decrease demand for other Knicks players' cards (like Julius Randle).  Card collecting is not a pro-rata exercise; it is a competitive exercise.  Plaintiffs offer no allegations otherwise.

With no allegations showing their fortunes are tied to other Moment owners by pooling or the presumptively required pro-rata distributions, Plaintiffs have failed to allege facts sufficient to meet the horizontal commonality test.

2.   *Plaintiffs Do Not and Cannot Allege Strict Vertical Commonality.*

Going with the kitchen sink approach in their letter, Plaintiffs also argued they sufficiently pleaded facts to show strict vertical commonality.  Dkt. 31, 1-2.  On the substance, Plaintiffs did not, but before showing that, Defendants note that it is not at all clear that an appeal to strict vertical commonality is proper.  While recognizing that sister district courts within the Second Circuit have considered cases under the "strict vertical commonality" test, *see*, *e.g.*, *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 249 (S.D.N.Y. 2002), the Second Circuit itself has yet to hold that such approach is proper.  *Revak*, 18 F.3d at 87-88 (endorsing horizontal commonality test).  The Second Circuit may indeed choose to go

the way of the Seventh Circuit and others in rejecting strict vertical commonality.  As those

Circuits explained, the purpose of *Howey*'s common enterprise test is to recognize that the

inclusion of "'investment contract'" within the meaning of "security" serves "the *limited* purpose

of identifying unconventional instruments that have the *essential* properties of a debt or equity

security[,]" and without pooling of assets the essential properties are missing.  *Wals v. Fox Hills

Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994) (emphasis added); *see also Curran v. Merrill

Lynch*, 622 F.2d 216, 221-22 (6th Cir. 1980).

　　　Pointing to that end, when the Second Circuit considered adopting vertical commonality

as a way to satisfy *Howey*'s common enterprise element (albeit only as to broad vertical

commonality), it *rejected* it:  "We do consider whether broad vertical commonality satisfies

*Howey's* second requirement, and we hold that it does not."  *Revak*, 18 F.3d at 88.  Defendants

thus ask this Court to dismiss on the grounds that as a matter of law an invocation of strict

vertical commonality is not sufficient to meet *Howey*'s common enterprise requirement.

　　　But even were this Court to consider Plaintiffs' allegations, the allegations fail.  For those

courts that allow it, strict vertical commonality *requires* that "the fortunes of plaintiff and

defendants are linked so that they rise and fall together."  *Jordan (Bermuda) Inv. Co.*, 205 F.

Supp. 2d at 249 (citation omitted).  This link must be "inextricable."  *Marini v. Adamo*, 812 F.

Supp. 2d 243, 261 (E.D.N.Y. 2011) (noting that "determin[ing] as a matter of law whether . . .

fortunes were inextricably linked" was necessary to "establish[] the existence of a common

enterprise").  "Stated otherwise, strict vertical commonality exists where there is a one-to-one

relationship between the investor and investment manager such that there is an interdependence

of *both profits and losses* of the investment."  *Id.* at 256 (emphasis in original) (citations

omitted).  Here, Plaintiffs do not and cannot allege sufficient facts to meet strict vertical

commonality.

Plaintiffs revealed their theory in their letter preceding this Motion, suggesting that they had alleged strict vertical commonality because of the fee Dapper charges on sales in Dapper's Marketplace.  *See* Dkt. 31, 2-3.  In the Complaint, Plaintiffs recognized the fee for what it was: "*a 5% transaction fee*."  AC ¶ 66 (emphasis added).

Plaintiffs say this transaction fee constitutes the required inextricable linking for the "strict vertical" commonality test.  Dkt. 31, 1-2.  Simple math proves the argument wrong.  As Plaintiffs acknowledge, Dapper charges the transaction fee "on all transactions that occur in the secondary marketplace."  AC ¶ 66.  This means if a customer buys a card on Dapper's secondary market for $10, Dapper will receive $0.50.  Should the customer months later sell the card for $8, Dapper will receive $0.40.  The seller would be down $2.40 (as the seller pays the transaction fee), but Dapper will have received $0.90.  There is no inextricable link such that profits or losses *necessarily* occur in kind as strict vertical commonality requires.  *Gugick v. Melville Cap., LLC*, No. 11-CV-6294 CS, 2014 WL 349526, at *4 (S.D.N.Y. Jan. 31, 2014) (noting required link).

Courts have described theories looking to a set transaction fee (like Plaintiffs') as appealing, at best, to *broad* vertical commonality:  "An example of broad vertical commonality is any vertical agency relationship where a promoter receives a set commission for his services, regardless of the investor's profits or losses."  *Austin v. Bradley, Barry & Tarlow, P.C.*, No. 85-4767-S, 1992 WL 560915, at *6 (D. Mass. June 17, 1992).  And, again, the Second Circuit *rejects* the application of the broad vertical commonality theory.  *Revak*, 18 F.3d at 88.[21]  Conversely, "[i]n situations where courts have found *strict* vertical commonality, the

---

[21] In *Revak*, the Second Circuit expressly identified *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989)

promoter's fees were directly tied to whether the investor secured a profit on his investment."
*Gugick*, 2014 WL 349526, at *5 (emphasis added) (citation omitted).  Where the alleged
promoter "was entitled to a commission . . . regardless of whether Plaintiff made a profit from
the sale" *no* "strict vertical commonality exists." *Id.*[22]

Collectors have complete control over their Moments.  As a result of this control, these
cards are just like other collectibles over which collectors exercise control, to which courts have
refused to apply strict vertical commonality.  *See Marini*, 812 F. Supp. 2d at 257-58 ("[B]ecause
plaintiff was free to direct the sale of his coins separate and apart from [defendant's] decision to
sell his coins . . . the fortunes of [plaintiff] and [defendant] clearly were not directly linked[.]").

B.    Dapper Did Not Lead Collectors To Expect Profits

Plaintiffs' failure to plead a common enterprise (horizontal or strict) is enough to warrant
dismissal.  Plaintiffs, however, also fail to plead that their cards come with any "reasonable
expectation of profits," another *Howey* requirement.  *Telegram*, 448 F. Supp. 3d at 375.

1.    *Plaintiffs Do Not Adequately Allege that Dapper Reasonably Led
        Collectors To Expect Profits*

In determining whether or not a purchaser had a "reasonable expectation of profits,"
courts engage in "an *objective* inquiry into the character of the instrument or transaction offered

---

as reflecting broad vertical commonality, the test it rejected.  *Revak*, 18 F.3d at 87-88 (citing *Long* and rejecting broad vertical commonality).  Across the pin-cited pages, the *Long* Court explained that broad vertical commonality can be satisfied "even where the promoter receives only a flat fee or commission rather than a share in the profits of the venture."  *Long*, 881 F.2d at 140-41.  The Second Circuit, in other words, has already *rejected* the idea that transaction fees will satisfy *Howey's* common enterprise requirement.  And, broad vertical commonality could not apply here regardless given the *exclusive* control each collector retains for basketball cards they buy, keep, trade or sell.  *See, e.g.*, *In re Mona Lisa at Celebration, LLC*, 472 B.R. 582, 617 (Bankr. M.D. Fla. 2012), *aff'd*, 495 B.R. 535 (M.D. Fla. 2013) (broad vertical commonality not shown based on investor retained control).

[22] In their letter, Plaintiffs noted that the *Marini* court found factual issues as to strict vertical commonality. Dkt. 31, 1-2.  But that case-specific factual issue does not change the law.  *Gugick* explains that "[i]n situations where courts have found strict vertical commonality, the promoter's fees were directly tied to whether the investor secured a profit on his investment."  2014 WL 349526, at *5.  *Marini* itself credited *Lowenbraun v. Rothschild*, 685 F. Supp. 336, 341 (S.D.N.Y. 1988) as accurate, and it held strict vertical commonality was lacking where "profits and losses were not interdependent since the broker allegedly profited from the commissions while plaintiffs suffered losses." *Marini*, 812 F. Supp. 2d at 256 (quoting *Lowenbraun*, 685 F. Supp. at 341).  So too here.

based on what the purchasers were 'led to expect.'" *See Warfield*, 569 F.3d at 1021 (quoting *Howey*, 328 U.S. at 298-99) (emphasis added). "The subjective intentions or motivations of the investors are irrelevant." *SEC v. Aqua-Sonic Prods. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) (citation omitted), *aff'd*, 687 F.2d 577 (2d Cir. 1982). The mere fact that someone wanted to invest or profit is not sufficient to render an instrument an investment contract. *Woodward v. Terracor*, 574 F.2d 1023, 1024-25 (10th Cir. 1978) (finding no investment contract despite several purchasers indicating they "did not intend to actually build on the land, and that they bought the land as an 'investment'"). The analysis, instead, looks to the defendant's marketing materials and a mere passing reference to investment is not enough. *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 791 (11th Cir. 1991) (rejecting security claim; "[o]f the several marketing items introduced into evidence, there was only one *passing* reference to buying the property as an investment" (emphasis added)). There needs to be a "persistent" promise of profit. *SG Ltd.*, 265 F.3d at 54 (finding "*persistent* representations of substantial pecuniary gains for privileged company shareholders" enough to satisfy this *Howey* element (emphasis added)).

But that is only if *Howey*'s profits-expectation prong applies. The Supreme Court has also held that "when a purchaser is motivated by a desire to use or consume the item purchased — 'to occupy the land or to develop it themselves,' as the *Howey* Court put it [] — the securities laws do not apply." *Forman*, 421 U.S. at 852-53 (citation omitted). Plaintiffs' burden then is twofold: to plead sufficient facts to meet *Howey's* "expectation of profits" prong and to make sufficient allegations showing how *Forman* does not apply. Plaintiffs do neither.

2.      *Plaintiffs Do Not Allege Dapper Persistently Promised Profits*

Plaintiffs come nowhere close to alleging that Dapper consistently promised profits. Plaintiffs cite to a handful of tweets. AC ¶¶ 63, 65. But these tweets merely provide accurate facts regarding recent sales, and do not reference any gains or losses. AC ¶¶ 63, 65. At no point

19

does the Complaint cite to anything from Top Shot's website, press releases, or Top Shot's Terms of Use that would suggest collectors would have any expectation of profits, much less a reasonable one. To the contrary, the Terms of Use define the videos and pictures underlying each Moment as "Art."[23] Plaintiffs' Complaint fails to show Dapper's consistent promise of or emphasis on profits in their marketing materials as the law requires. *See Rice*, 922 F.2d at 791 (no investment contract where "there was only one passing reference to buying the property as an investment").

Plaintiffs instead quote fragments from podcast interviews of Mr. Gharegozlou, but again there is no there, there. Mr. Gharegozlou did say that younger generation sports fans would "rather just carry [their] fandom in [their] pocket, and benefit financially from it, and have skin in the game, rather than just be a passive consumer, especially of physical experiences," AC ¶ 80, and that he is "very, very proud" of his own collection, AC ¶ 102. But that is hardly a guarantee of future *profits* required to establish a reasonable expectation of profits—if anything, it only further shows that Dapper expected its customers to be *active* collectors.

Plaintiffs' conclusory allegations regarding Dapper contributing to the "hype," AC ¶¶ 79, 91, and "craze," AC ¶ 91, around Moments fail for similar reasons. Dapper marketed the products it created and sold. Dapper is unaware of any case where simply marketing a product at a time that it was popular was sufficient to create a reasonable expectation of profits or convert the sale of goods into the sale of securities. Plaintiffs' allegations fail.

         3.     *Plaintiffs' Allegations Fail Under Forman*

Having failed in their "reasonable expectation of profits" allegations, Defendants could end this part of the analysis here. But it is telling that Plaintiffs did not attempt to distinguish

---

[23] *See* Terms of Use § 4 (https://nbatopshot.com/terms) (cited in Declaration of Erin Zatlin in Support of Defendants' Request for Judicial Notice ("Zatlin Declaration") ¶ 9).

*Forman* in either their Complaint allegations or in their letter.  Plaintiffs do not disavow that they

intended to consume—"to occupy the land or to develop it themselves," *Forman*, 421

U.S. at 852-53—the basketball cards in the way that other collectors do, *e.g.*, by buying preferred

player cards, seeking cards from preferred teams, and actively selling or trading cards.  *See*

*supra*, p. 5.  With *binding* law from the Supreme Court holding that the consumptive purchase of

a product (*e.g.*, cards in a collection) takes a claim *outside* of the securities laws, Plaintiffs should

have addressed *Forman*.  They didn't.  And while their claim fails for many reasons, it fails

under *Forman*, too.  The securities laws do not apply.

       C.     <u>Plaintiffs' Allegations Fail the Essential Efforts Prong</u>

      Even if Plaintiffs could somehow get past the "expectation of profits" prong (and they

cannot), they still have not plausibly pleaded any such expectation would be based on Dapper's

essential managerial efforts.  The law requires just that:  the efforts of the *promoters*—not

anyone else—must be necessary to the success of the venture, such that without them, the

"investments would be virtually worthless."  *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp.

497, 501 (S.D.N.Y. 1986); *see also SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 180

(S.D.N.Y. 2020) (finding fundraising token a security because without promised *future* efforts

the token "would be worthless").  For the efforts of a promoter to render an instrument a

security, those efforts must be "*undeniably significant*, those essential managerial efforts which

affect the failure or success of the enterprise."  *Glenn W. Turner Enter., Inc.*, 474 F.2d 476, 482

(9th Cir. 1973) (emphasis added).  Plaintiffs have failed to plead facts that show that any

expectation of profits would be based on Dapper's ongoing efforts such that after purchase, the

product would fail or be virtually worthless without Dapper.

      Plaintiffs' allegations as to this prong can be put into three buckets.  First, Plaintiffs

allege that "NBA Top Shot creates scarcity."  AC ¶¶ 56-57, 79, 83.  Second, Plaintiffs allege that

cards would only retain their value if Dapper kept up interest.  AC ¶ 84.  And, third, Plaintiffs'

letter pointed to the Marketplace.  Dkt. 31, 3.  None of these allegations are sufficient as a matter

of law.  Across all three, and dispositive, Plaintiffs' allegations fail based on the retained

collector control the Complaint reflects.

        1.     *Plaintiffs' Scarcity Allegations Fail To Establish Managerial Efforts*

As to Plaintiffs' first set of allegations, scarcity, Defendants are again aware of no law

suggesting that the selling of sports trading cards qualifies as selling a federal security.  Yet,

scarcity is and always has been a component of the sports card market.  Scarcity is common in

the sale of all collectibles and goods.  That doesn't mean they are securities.  Plaintiffs cited to

no cases in their letter supporting the theory that the seller of sports cards becomes an issuer of

securities simply because it sells only a certain number of those sports cards initially.

The sole basis for Plaintiffs' scarcity theory is a reference in the SEC Strategic Hub for

Innovation and Financial Technology, Framework for "Investment Contract" Analysis of Digital

Assets, April 3, 2019 (the "SEC Framework").  *See* AC ¶ 83.  The SEC Framework, however,

cites no authority for this statement.  And the SEC Framework itself notes that it has effectively

no precedential weight, because it is not "a rule, regulation, or statement of the Commission,"

and it does not "supersede existing case law."  SEC Framework at 1, n.1.  Federal courts in this

District have agreed, noting that the SEC Framework is "merely a non-binding agency

interpretation of the longstanding Howey test and did not create new rights."  *In re Bibox Grp.*

*Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 339 (S.D.N.Y 2021).  The SEC itself has noted

that *Howey* cases, rather than SEC statements, determine whether an asset is a security.  *See* Pl.'s

Resp. at 7, *SEC v. Ripple Labs, Inc.*, No: 1-20-cv-10832-AT-SN (S.D.N.Y. Mar. 22, 2021), ECF

No. 79.  *Howey* controls.  Plaintiffs' theory in other words is yet another overreach.

The theory also fails temporally.  Plaintiffs admit that these scarcity metrics are disclosed

*prior* to the purchase of cards.  *See, e.g.*, AC ¶ 56.  Plaintiffs offered nothing in their letter

explaining how *backwards* looking scarcity can satisfy this prong.  While admittedly a general

statement and with exceptions, Circuits have expressed strong "doubt that pre-purchase services

should ever count for much" for this prong.  *SEC v. Life Partners, Inc.*, 87 F.3d 536, 548 (D.C.

Cir. 1996).  Instead, the *Howey* test focuses on what the buyers of the products were led to

expect about the nature of the product "as of the time that the transaction took place, together

with the knowledge and the objective intentions and expectations of the parties at that time."

*Audet*, 2022 WL 1912866, at *13 (quoting *Aqua-Sonic Prods.*, 524 F. Supp. at 876).

Plaintiffs' scarcity allegations don't establish such present or future efforts.  Plaintiffs

make no allegations other than admitting that Dapper disclosed the frequency rates of certain

cards prior to sale.  AC ¶ 56.  After that, market forces set the price—and the decision whether to

buy, trade, or sell at a certain price is the collector's.  *See* Dkt. 22-2, 27-1.  Courts have held

where that is true, the efforts of others prong is not satisfied.  *See Noa v. Key Futures, Inc.,* 638

F.2d 77, 79 (9th Cir. 1980) ("Once the purchase of silver bars was made, the profits to the

investor depended upon the fluctuations of the silver market, not the managerial efforts of Key

Futures.  The decision to buy or sell was made by the owner of the silver.").  In *Lehman Bros.*

*Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, for example, a court from this

District held the same regarding specified foreign exchange options, because "any gain likely

would result in large part from market movements, not from capital appreciation due to [the

promoter's] efforts."  179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001).  So too here.  Each Moment

ties to specific plays, specific players, and specific teams.  AC ¶ 53, Dkt. 22-2, 27-1.  While

Dapper initially chooses the Moments to mint, that is true for every basketball card and

collectible available for purchase.  There are no allegations that Dapper can control whether the

Warriors win or lose; whether Steph Curry or Klay Thompson has a good game or a poor one. Whether a collector trades a card after a good game or a poor one is not in Dapper's control. It is entirely the choice of the collector.

2. *Plaintiffs' Hype Allegations Fail To Establish Managerial Efforts*

As to Plaintiffs' second set of allegations—premised on maintained hype—Plaintiffs point to nothing in the sale of these basketball cards where Defendants *promised* to do anything to continue a hype level or continued interest after sale. AC ¶ 84. Lest this point be confused, NBA Top Shot, as a business in the selling of goods, certainly wants new and existing customers to continue buying the basketball cards it sells. It certainly markets its products and seeks to engage with its customer base. AC ¶¶ 63, 65. But, Plaintiffs point to nothing in their Complaint where Dapper promised that it could or would maintain a certain level of consumer interest or guarantee profits of customers who purchased its products. And, further, again recognizing that we are talking about basketball cards—with different plays and players—there is nothing where Defendants promised that a *particular* card would maintain its value or market interest, in either direction. Thus, Dapper's marketing efforts would have no effect on the value of the basketball cards being sold, because each card has an inherent worth not solely dependent on the efforts of Dapper. *See Bender,* 632 F. Supp. at 501 (dismissing complaint on grounds that defendant's marketing efforts and its own buying and selling strategies "would have at most only a marginal effect on the value of the condominium units" being sold because "a piece of real estate, such as a condominium, has an inherent worth, a worth not solely dependent on the efforts of a promoter"). NBA Top Shot cannot control, for example, whether a Rookie of the Year favorite will suffer an injury, increasing interest in his primary competitor, or whether that favorite will instead return to play, reversing the trend, as happened with LaMelo Ball and Anthony Edwards.

24

AC ¶ 60.[24]  The absence of such an allegation of such promises is damning to Plaintiffs' claims.

The analysis of the "efforts" prong looks to the on-going contractual promises.  *Albanese v. Fla. Nat'l Bank of Orlando*, 823 F.2d 408, 410 (11th Cir. 1987) ("[T]he first step in analyzing investment contracts is to look to the contracts themselves.").  Plaintiffs here make no allegation that Dapper made any promise of future efforts to collectors in the Terms of Use, the controlling contract.  When there are no future efforts promised, courts dismiss claims for lack of the requisite "efforts of others."  *See Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1050-51 (S.D.N.Y. 1975) (granting motion to dismiss on the grounds that there were no promised efforts of others as to real estate contracts that were "not . . . part of an enterprise whereby it [wa]s expressly or impliedly understood that the property w[ould be] developed or operated by others" (internal quotation marks omitted) (citation omitted)).  Indeed, courts reject theories alleging the sale of a thing is a security when the defendant "was under no contractual obligation to the plaintiffs other than to deliver title once purchase terms were met."  *Woodward*, 574 F.2d at 1025 (rejecting claim that land sales were a contract).

With no contractual promises alleged, Plaintiffs' "hype" theory fails too.

3.      *The Marketplace Does Not Demonstrate Dapper's Efforts*

Plaintiffs' third theory—the Marketplace theory—fails the efforts test just like the other two.  Plaintiffs allege that Dapper "created and controlled" a closed market and "there is no other way for individuals to sell their Moments."  AC ¶¶ 58, 67.  It is true that one of the features that NBA Top Shot has provided collectors is the "Marketplace," where collectors can securely buy or sell Moments.  Collectors, however, can sell Moments outside the Marketplace and without involvement from Dapper, as documents Plaintiffs incorporate show.  *See* AC ¶ 61.[25]

---

[24] *See* https://www.yahoo.com/now/nba-top-shot-wild-1-095529854.html.
[25] *See* https://www.si.com/nba/2021/03/17/nba-top-shot-crypto-daily-cover.

While Plaintiffs have not done so yet, Defendants anticipate that Plaintiffs may cite *Gary Plastic Packaging Corp. v. Merrill Lynch*, 756 F.2d 230 (2d Cir. 1985) in their opposition and claim it supports their position on this prong.  It doesn't.  In *Gary Plastic*, the promoter, Merrill Lynch, used its "significant economic power" to negotiate with issuing banks to obtain a favorable rate of interest to create a secondary market, agreed to continue to do so, and *agreed to buy back* insured CDs sold to facilitate trading, making future profits dependent on the *promoter's* ability to buy back CDs—making Merrill Lynch both an initial seller and promised *future* buyer.  *Id.* at 233, 240-41.

None of that is alleged here.  And, Courts have rejected claims that a mere marketplace will meet the "efforts of others" prong:  The "promise of help in arranging for the resale of a [good] is not an adequate basis upon which to conclude that the fortunes of the investors are tied to the efforts of the company, much less that their profits derive '*predominantly'* from those efforts."  *Life Partners, Inc.*, 87 F.3d at 546 (emphasis added).  More is needed.  So too here.  As Plaintiffs' own records show, profits tie predominantly to market forces:  the player, the play, the team, etc.  *See* Dkt. 22-2, 27-1.  Plaintiffs have simply failed to allege that if any profits were to be made by collectors, those profits were to come primarily from Defendants' doing rather than normal market forces.

### 4. *Plaintiffs' Contractual and Retained Control Is Dispositive*

While Defendants have taken each of Plaintiffs' "efforts of others" allegations and shown them inadequate, there is an overarching legal rule cutting across all case law that shows irrespective of anything else Plaintiffs could never meet the "efforts of others" prong.  That rule looks to control:  where a plaintiff has it, there is no security.

The Second Circuit holds that "[i]t is the passive investor for whose benefit the securities laws were enacted; where there is a reasonable expectation of significant investor control, the

protection of the 1933 and 1934 Acts would be unnecessary." *Leonard*, 529 F.3d at 88 (internal

quotation marks omitted) (citation omitted).  In *Howey* itself, the Court was animated by the fact

that there was a service contract that granted management "full discretion and authority" over the

groves, including the fruit grown on each investor's plot—in other words, it looked to control.

*Howey*, 328 U.S. at 296.  Thus, "[t]he amount of control that the investors retain under their

written agreements" is the "crucial inquiry."  *Albanese*, 823 F.2d at 410.  "The greater the control

acquired by [buyers], the weaker the justification to characterize their investments as investment

contracts."  *Ave. Cap. Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 882 (10th Cir. 2016).  Where the

plaintiff "maintains legal control over his investment (or the ability to regain control), in order to

claim the investment is a security he must show practical dependence, an inability to exercise

meaningful powers of control or to find others to manage his investment."  *Hocking v. Dubois*,

885 F.2d 1449, 1460 (9th Cir. 1989) (en banc).

Here, the Terms of Use state that collectors "own the underlying NFT completely," and

"have the right to swap their Moment, sell it, or give it away."[26]  As Plaintiffs' own certifications

show, card collectors can decide what specific player cards they want to buy, which ones they

want to sell, and which they want to trade.  *See* Dkt. 22-2, 27-1.  And they have those rights over

time, meaning they can choose to buy if packs are available for purchase, or buy a specific card

in secondary markets.  AC ¶ 61.[27]  The law says that where the things sold are "not passive,"

they are "not investment contracts within the meaning of *W.J. Howey*."  *Endico v. Fonte*, 485 F.

Supp. 2d 411, 415 (S.D.N.Y. 2007).  Here, both legally and practically the basketball cards sold

assumed actively engaged collectors showing their fandom, actively managing their accounts.

Their retained control precludes a finding that Plaintiffs have sufficiently pleaded the "efforts of

---

[26] *See* Terms of Use § 4 (https://nbatopshot.com/terms) (Zatlin Declaration ¶ 9).
[27] *See* https://www.si.com/nba/2021/03/17/nba-top-shot-crypto-daily-cover.

others" prong as *Howey* requires.

## II.   *HOWEY* REQUIRES DISMISSAL REGARDLESS OF THE DIGITAL NATURE OF MOMENTS

Plaintiffs' claims fail under *Howey.*  That should be the end of it.  Perhaps recognizing that, Plaintiffs attempt to blur the issue by trying to change the test, by making irrelevant allegations about the Flow blockchain, or by invoking inapposite crypto fundraising token cases. Their attempts fail.  They lose under *Howey* and *Howey* controls.

### A.   Plaintiffs' FLOW Allegations Are Irrelevant

Plaintiffs' references to the Flow Blockchain and FLOW tokens are irrelevant and an attempt at distraction.  Plaintiffs do not allege that they have purchased any FLOW tokens, and the alleged class in this action consists of people who purchased *Moments*, not FLOW tokens. AC ¶ 114.  There is no allegation, and certainly no legal support, connecting FLOW tokens to digital basketball cards.  FLOW tokens and digital basketball cards (Moments) are, as alleged, separate products.  The involvement of blockchain technology does not alter the conclusion that the securities analyses for these products are, likewise, separate.

### B.   The Alleged Facts of Digital Products, Rather than Their Digital Nature, Determine Whether They Are Securities

If their letter is any indication, Plaintiffs are going to try confuse the Court by talking a lot about technology and cases involving cryptocurrencies.  Defendants offer some brief guidance in the hopes it will disperse any of the anticipated dust.

First, while Dapper is surely proud of its digital sports cards, the fact that it embraces a new technology—NFTs—does not change the underlying legal analysis.  Defendants acknowledge, as other have, that "NFTs are a relatively new technology."  *Notorious B.I.G. LLC v. Yes. Snowboards*, No. LACV19-01946-JAK (KSx), 2022 WL 2784808, at *5 n.3. (C.D. Cal. June 3, 2022).  Yet, that same acknowledgement does not change the fact that "an NFT is a

'digital representation' of the underlying asset, i.e., the photographs at issue." *Id.*  In other words, the analysis still turns on the reality of what is at issue—here, basketball cards.  And, the analysis still turns on *Howey,* whose elements Plaintiffs fail to plead.  Any attempt to blur the core issues by appeals to "crypto" or confusing invocations of the NFT technology, cannot mask Plaintiffs' failure to plead all that *Howey* requires.

Second, Defendants expect Plaintiffs to place heavy reliance on inapposite cases involving initial coin offerings.  This would be more dust.  Defendants have explained above, for example, why the invocation of *ATBCOIN* and *Rensel* fail.  *See supra* Section I.A.1.c.  Other cases Plaintiffs invoke, like *Telegram* and their anticipated cite to *Kik*, fail along the same lines—they involved tokens that did not exist, express capital fundraising, and promised uses of capital investments to develop other products from which the buyers would directly profit.  *See, e.g.*, *Telegram*, 448 F. Supp. 3d at 375 ("As Telegram has noted, Grams do not exist and did not exist at the time of the 2018 Sales . . . . But the Initial Purchasers provided capital to fund the TON Blockchain's development in exchange for the future delivery of Grams, which they expect to resell for a profit."); *Kik*, 492 F. Supp. 3d at 175 ("The Private Placement Memorandum further explained to Pre-Sale participants that money they paid would be used to create a 'Minimum Viable Product,' advance the development of a 'Kin Ecosystem,' and build an application to make the Kin Ecosystem available via Kik Messenger.").

Not so with digital basketball cards.  When Dapper sold its Moments, it was selling formed *products* not as part of capital fundraising but as products.  AC ¶ 52.  This was not a capital investment drive, not an appeal to passive investors, but the sale of cards to collectors. *Id*.  As *Audet* reflects, 2022 WL 1912866, at *12, and courts realize, each case must be considered on its own.  And, any appeal by Plaintiffs that "we are they" to cryptocurrency cases

is just wrong.  This case fails on its allegations.  It does not succeed based on someone else's.

## III.   THE CONTROL PERSON CLAIM AGAINST MR. GHAREGOZLOU MUST BE DISMISSED

Because Plaintiffs cannot allege a primary violation of the Securities Act in this case, this Court must dismiss the Section 15 control person claim against Mr. Gharegozlou.  Section 15 of the Securities Act requires a primary violation of the Securities Act.  15 U.S.C. § 77o(a).  When plaintiffs fail to allege a primary violation of the Securities Act, their Section 15 control person claims must also be dismissed.  *See, e.g.*, *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 305 (S.D.N.Y. 2021) (citing *Rombach v. Chang*, 335 F.3d 164, 177-78 (2d Cir. 2004)).  Plaintiffs failed, as described above, to allege any violation of Sections 5 or 12(a)(1) of the Securities Act.  As such, this Court must dismiss the Section 15 control person claim against Mr. Gharegozlou.

## <u>CONCLUSION</u>

There is no dispute that the *Howey* test substantively controls this Motion.  Because Plaintiffs have failed to plead sufficient facts meeting each *Howey* element, their claims fail.  Basketball cards are not securities.

Dated:          San Francisco, California
                August 30, 2022

                                    PAUL HASTINGS LLP

                                    */s/ Kenneth P. Herzinger*
                                    Kenneth P. Herzinger
                                    Sean D. Unger (*Pro Hac Vice*)
                                    Erin Zatlin (*Pro Hac Vice*)
                                    101 California Street, 48th Floor
                                    San Francisco, CA 94111
                                    Tel: 415-856-7000
                                    kennethherzinger@paulhastings.com
                                    seanunger@paulhastings.com
                                    erinzatlin@paulhastings.com

Zachary S. Zwillinger
200 Park Avenue
New York, NY, 10166
Tel:  212-318-6000
zacharyzwillinger@paulhastings.com

*Attorneys for Defendants Dapper Labs, Inc.,*
*and Roham Gharegozlou*