**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEEUN FRIEL, Individually and on behalf of all others similarly situated, | Case No.: 1:21-cv-05837-VM |
| Plaintiff, | <u>Oral Argument Requested</u> |
| v. | |
| DAPPER LABS, INC. AND ROHAM GHAREGOZLOU, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS ..................................................................................... 2

   A.   Background on Cryptocurrency, Crypto Assets and the Blockchain ......................... 2

   B.   Dapper Labs Builds the Flow Blockchain and Mints Flow, a Security Token ........... 2

   C.   Dapper Labs Launches NBA Top Shot ....................................................................... 3

   D.   The Market for Moments ............................................................................................ 6

III.  ARGUMENT .......................................................................................................... 6

   1.   Legal Standard on a Motion to Dismiss .................................................................... 6

   2.   Section 5 and Section 12(a)(1) of the Securities Act ................................................ 7

   3.   The Supreme Court's *Howey* Test Defines a Security .............................................. 7

   A.   MOMENTS ARE SECURITIES UNDER THE *HOWEY* TEST ............................ 8

   1.   Plaintiffs Invested in a Common Enterprise .............................................................. 8

      a.   Strict Vertical Commonality ................................................................................ 8

      b.   Horizontal Commonality ..................................................................................... 13

      c.   The Recent Spate of Crypto Cases Supports Plaintiffs' Position ....................... 14

         i.    Dapper Labs' Attempt to Cabin the Crypto Cases to ICOs Fails ................. 16

         ii.   Plaintiffs Allege Pooling ............................................................................. 18

         iii.  The Law is Clear that Unique and Collectible Assets can be Securities Under Howey ............................................................................................................... 19

   2.   Plaintiffs Reasonably Expected Profits ................................................................... 20

   3.   Plaintiffs Clear the Essential Efforts Prong ............................................................ 24

      a.   The Structure of NBA Top Shot Shows Dapper Labs' Complete Control ........... 25

      b.   Dapper Labs' "Contractual and Retained Control" Argument Fails ............... 29

**IV.   CONCLUSION** ..................................................................................................... **30**

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

<u>Cases</u>

*Audet v. Fraser*,
   2022 WL 1912866 (D. Conn. June 3, 2022) ............................................................ 17, 18, 21, 22

*Balestra v. ATBCOIN LLC*,
   380 F. Supp. 3d 340 (S.D.N.Y. 2019) ................................................................................ passim

*Bell Atl. Corp v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................................... 6

*Diamond Fortress Techs., Inc. v. EverID, Inc.*,
   274 A.3d 287 (Del. Super. Ct. 2022) ......................................................................................... 17

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   756 F.2d 230 (2d Cir. 1985) ....................................................................................................... 28

*Gugick v. Melville Cap., LLC*,
   2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) ........................................................................... 8, 12

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
   851 F. Supp. 2d 746 (S.D.N.Y. 2012) ........................................................................................ 30

*In re J.P. Jeanneret Assocs., Inc.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................................................... 8, 9, 10, 11

*Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*,
   205 F. Supp. 2d 243 (S.D.N.Y. 2002) ........................................................................................ 12

*Kaplan v. Shapiro*,
   655 F. Supp. 336 (S.D.N.Y. 1987) ....................................................................................... 18, 19

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
   179 F. Supp. 2d 159 (S.D.N.Y. 2001) ........................................................................................ 27

*Marini v. Adamo*,
   812 F. Supp. 2d 243 (E.D.N.Y. 2011) .................................................................................. passim

Noa v. Key Futures, Inc.,
   638 F.2d 77 (9th Cir. 1980) ........................................................................................................ 27

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ...................................................................................................................... 7

*Porat v. Lincoln Towers Cmty. Ass'n*,
    464 F.3d 274 (2d Cir. 2006) ............................................................................. 30

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ......................................................................... 8, 9, 13

*S.E.C. v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001) .............................................................................. 30

*Savino v. E. F. Hutton & Co.*,
    507 F. Supp. 1225 (S.D.N.Y. 1981) ........................................................... 18, 19

*SEC v. Hui Feng*,
    935 F.3d 721 (9th Cir. 2019) ............................................................... 20, 22, 23

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ..................................................... passim

*SEC v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) ......................................................................... 24

*SEC v. Ripple Labs, Inc.*,
    2021 WL 1335918 (S.D.N.Y. Apr. 9, 2021) ...................................................... 8

*SEC v. Sayid*,
    2018 WL 357320 (S.D.N.Y. Jan. 10, 2018) ...................................................... 7

*SEC v. Telegram Grp.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ..................................................... passim

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ..................................................................................... 1, 8

*Stenger v. R.H. Love Galleries, Inc.*,
    741 F.2d 144 (7th Cir. 1984) ..................................................................... 19, 20

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975) ........................................................................................ 23

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) .............................................................................. 29

## Rules

Fed. R. Civ. P. 8(a)(2) ....................................................................................... 6

## I.    INTRODUCTION

Dapper Labs claims that Moments are not securities because they are basketball cards. Plaintiffs agree that not all basketball cards are securities, but neither are rare coins or orange groves or any number of investment opportunities that promoters have thought up over the years. Rather, what makes Moments securities is the same thing that has always made an asset a security under the law; it is the way Dapper Labs structures and sells them to investors.  Investments in Moments involve (i) an investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to be derived solely from the efforts of others.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  Moments easily meet every element of the Supreme Court's *Howey* test.

Dapper Labs accuses Plaintiffs of "overreach," MTD at 1, 22;[1] of importing the strictures of the securities laws and the technological complexities of the blockchain into a realm where they do not belong: the collecting of sports cards.  That is exactly backwards.  If Dapper Labs were, for instance, selling autographed baseballs that fans could collect or freely sell on eBay, the securities laws would not be implicated.  But as Dapper Labs proclaims, "NBA Top Shot Revolutionize[d] Sports Trading Cards."  MTD at 2.  How so?  Certainly the Moments are digital rather than cardboard, but that alone is not what makes something a security.  Rather, Moments are securities because of the many ways in which they are unlike traditional trading cards: They are crypto assets, alienable instantaneously, hyped up as investments, issued exclusively by Dapper Labs that can only be sold on the secondary marketplace that it controls and profits from.  Not only does Dapper Labs retain a going interest in the price of Moments, but their price is dependent on Dapper Labs' ability to succeed in stimulating demand for Moments and growing its fledgling blockchain and ecosystem.  Basketball highlights or not, the economic reality is that these are securities.  Plaintiffs

---

[1] Citations to "MTD" are to Defendants' Memorandum of Law.  Dkt. No. 39.

are not improperly importing the securities laws to trading cards; Dapper Labs has capitalized on trading cards by turning them into securities under the well-established *Howey* test.

## II.     STATEMENT OF FACTS

As set forth in the Amended Complaint, Plaintiffs allege that Defendants Dapper Labs and its CEO, Roham Gharegozlou (collectively, "Defendants"), sold unregistered securities, Top Shot Moments (or "Moments"), throughout the Class Period in violation of the Securities Act.[2]

### A.  Background on Cryptocurrency, Crypto Assets and the Blockchain

The Moments that Defendants sold are a species of digital "crypto asset," meaning that they reside on a blockchain.  ¶¶2-3.  Think of the blockchain as a decentralized public ledger that – through a framework of incentives that encourages people to do the work of validating transactions – creates an ownership trail of every asset in the network.  ¶¶ 18-20.  Blockchain technology can be leveraged for many different uses.  Cryptocurrencies like Bitcoin and Ethereum use it to track individual units, for example, which are used to facilitate transactions.  ¶¶ 20-23.  Importantly, cryptocurrencies like Bitcoin are free from any government or private control, as there is no entity responsible for the price of bitcoin.  ¶23.  Rather, the cost of bitcoin is determined solely by market forces, and one buying bitcoin is not investing in a common enterprise.  ¶23.

Other types of digital assets, however, derive their value from the success or failure of a given project, promoter, or start-up.  ¶5.  Investors purchase this type of asset with the hope that its value will increase in the future as the project grows in popularity.  ¶5.  Because this type of digital asset is properly classified as a security, it must be registered under the securities laws.  ¶5.

### B.  Dapper Labs Builds the Flow Blockchain and Mints Flow, a Security Token

After launching its first product, CryptoKitties, on the Ethereum blockchain in 2017,

---

[2] Citations to "¶_" are to paragraphs of the Amended Complaint.  Dkt. No. 27.

Dapper Labs realized that it would need to build its own blockchain if it were really going to succeed in the crypto space.  ¶¶27-31.  Accordingly, in 2019, it announced that it was developing Flow, a new blockchain that relies not on traditional Proof-of-Work mining, but on an alternate technique known as Proof-of-Stake.  ¶32.  While Proof-of-Stake blockchains requires less energy than Proof-of-Work blockchains, they do require a native token to power the network, as users stake their tokens to validate transactions and earn additional tokens as a reward.  ¶¶33-35.

To make its new blockchain function, Dapper Labs created the Flow token.  ¶36.  In 2020, Dapper Labs created 1.25 billion Flow tokens, setting aside 250 million for itself, and reserving another 350 million for "ecosystem development."  ¶¶39-41.  Dapper Labs' website clarified: "The economic impact is that as more value is created on top of the Flow blockchain, more demand is generated for FLOW token."  ¶38.  Since 2020, Dapper Labs has distributed Flow tokens widely in public offerings, and Flow tokens now appear on the major cryptocurrency exchanges.  ¶¶43-48.  However, Dapper Labs has restricted its sale of Flow tokens to non-U.S. investors, as Dapper Labs' sale of Flow would constitute an unregistered securities offering.  ¶46.  With FLOW tokens successfully minted, Dapper Labs needed transactions for them to power.  Dapper Labs turned its sights to the NBA to create another crypto asset that could be traded on the Flow blockchain.

### C.  Dapper Labs Launches NBA Top Shot

First announced in July 2019 as a joint venture between Dapper Labs, the NBA and the NBA Players Association ("NBPA"), NBA Top Shot is a platform built on Dapper Labs' Flow blockchain that allows investors to purchase crypto assets known as "Moments."  ¶51.  Moments are a type of crypto asset known as a non-fungible token ("NFT").  ¶¶52, 2.  In this case, the NFTs depict video clips of highlights from NBA basketball games.  ¶2.

After the NBA, the NBPA and Dapper Labs all agree that a certain video highlight should

become a Moment, Dapper Labs "mints" the highlight into an NFT, creating a unique digital asset that is recorded on the Flow blockchain.  ¶53.  One can think of the minting process as imprinting the NFT with its own serial number or barcode.   ¶54.   The minting process also creates the beginning of the record associated with the NFT, as all ownership, transfers, and prices will be recorded permanently on Dapper Labs' Flow blockchain.  ¶54.

Moments are sold in two ways.  ¶¶56-58.  First, Dapper Labs sells digital "packs" of Moments, the prices of which vary based on scarcity.  ¶56.  Dapper Labs sells these packs in limited size "drops" that often sell out.  ¶57. In order to participate in the "drops," investors must create an account on Dapper Labs' website.  There are no other means to participate in drops. Investors then must wait in a virtual queue to buy the Moments while supplies last.  ¶57.  Second, Moments can trade in the secondary Marketplace – created and controlled by Dapper Labs – where individuals can buy Moments from other individuals.  ¶58.  Thus, there is the prospect of acquiring a Moment in a pack and then re-selling the Moment for a huge profit in the Marketplace, or buying a Moment in the Marketplace and then turning around and selling it for more.  ¶58.  For example, one article interviewed an investor who set a record by buying a Lebron James Moment in the Marketplace for $208,000.  ¶59.  "***These are investments***," he says. "That Lebron that I bought for $208,000 was worth seven figures right away.  ***And, that's a big reason why I bought it***."  ¶59.  Another article observed: "A number of the platform's users interviewed for this story told of similar arcs; they initially invested a few thousand dollars, only to see the value of their accounts balloon by factors greater than 10, almost overnight. ***The promise of soaring earnings— even offset against the fear, among some, of a bubble in the making—has kept a steady stream of new users joining [NBA Top Shot]***."  ¶61.

Once Moments have been purchased by investors, Dapper Labs retains an interest in the

prices they fetch on the secondary Marketplace.  ¶66.  This is because, not only does NBA Top Shot generate revenue from selling Moments, but it also receives a 5% transaction fee on all transactions that occur in the secondary Marketplace.  ¶66.  Dapper Labs also takes a cash-out fee when users try to transfer the balance from their Dapper wallet to their bank account.  ¶66.  Other than in the secondary Marketplace, which is part of the NBA Top Shot platform, controlled by Dapper Labs, and where all transactions generate additional revenue for NBA Top Shot, there is no other way for individuals to sell their Moments.  ¶66.

Dapper Labs knows that purchasers of Moments view them as investments, and uses the prospect of making money from investing in Moments as a central tenet in its marketing efforts. ¶62.  For example, after a Moment trades for a particularly high price in the Marketplace, Top Shot often tweets the information from its official Twitter account, announcing the price paid and teasing that prices will climb higher still.  ¶63.  Because users know that Moments trading for these high prices in the Marketplace would have been acquired in packs for a fraction of the prices being publicized, these tweets are dangling the prospect of huge profits in an attempt to further pump up the price of Moments.  ¶64.  Some of Top Shot's marketing is even more blatant, incorporating emojis like the spaceship taking off, the stock chart shooting up, and the money bag.  ¶65.  Defendant Gharegozlou has acknowledged that the desire to benefit financially is a large part of what drives investors to Top Shot, commenting that: "Younger and younger generations [think]: Do I want to go to a [NBA] game all the time?  Like I'd rather just carry my fandom in my pocket, *and benefit financially from it, and have skin in the game[.]"*  ¶80.

After investors purchase a Moment, the investor is entirely reliant on the NBA Top Shot platform to make a profit, by finding a purchaser in the Marketplace and executing a peer-to-peer sale, but also to get one's money out.  ¶92.  As has been widely reported, NBA Top Shot has told

investors that they will have to wait months before they can cash out.  ¶94.  While the reasons for such delays are unclear, the fact is that Dapper Labs needs investor money to remain on the platform in order to continue to raise money at a high valuation.  ¶¶6, 106.  If investors pull their money from the platform, the platform will collapse.  ¶106.

### D.  The Market for Moments

In a sense, Dapper Labs' claim to have "Revolutionized" trading cards is true.  *See* MTD at 2.  As many have observed, the market for Moments – both because of the frictionless technology of the blockchain, and the structure of the platform ensuring that Dapper Labs retains an interest in the going price of Moments – is very different from the market for trading cards:

> Users [] began listing and delisting moments rapidly, trying to chase the market's movement and predict the next surge. List too low and he could miss out on thousands of dollars in potential profits; list too high and his moment could have gone unclaimed. He was chasing theoretical cash gains, but he was also looking for a rush. The instant gratification gained from buying a moment for one price and selling it for more, just seconds later, can be intoxicating, the immediacy of the victory akin to a dealer busting in blackjack or the overwhelming paydays some found during the GameStop stock surge[.]  . . . "When you see how quickly you can buy an NFT and have it appreciate in value … it's dynamic in a way that physical goods are not[,]" [said a longtime investor]. [3]

## III.   ARGUMENT

### 1.  Legal Standard on a Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 548 (2007).  "To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead

---

[3] Defendants included this article in their Request for Judicial Notice, Dkt. No 38, and have filed it as Dkt. No. 40-2.

'enough facts to state a claim to relief that is plausible on its face.' *SEC v. Sayid*, 2018 WL 357320, at *3 (S.D.N.Y. Jan. 10, 2018).  "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id*.  "On a motion to dismiss, a court must accept the factual allegations in the complaint as true and draw reasonable inferences in the plaintiff's favor." *Id*.

### 2.   Section 5 and Section 12(a)(1) of the Securities Act

Section 12(a)(1) of the Securities Act creates a private right of action against any person who "offers or sells a security in violation of" Section 5.  Section 5 of the Securities Act, in turn, prohibits the offer or sale of unregistered securities.  Due to the innumerable ways in which investors are likely to be harmed absent the protections of the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  *See Pinter v. Dahl*, 486 U.S. 622, 638 (1988).

### 3.   The Supreme Court's *Howey* Test Defines a Security

Under Section 2(a)(1) of the Securities Act, the definition of a "security" includes an "investment contract."  "The determination of whether a particular offering qualifies as an investment contract – and, in turn, a security – is governed by the three-prong test set forth in *S.E.C. v. W.J. Howey Co.*"  *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 352 (S.D.N.Y. 2019).  "Under *Howey*, an offering is an investment contract security where there is '(i) an investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to be derived solely from the efforts of others.'"  *Id*. (citation omitted).[4]

---

[4] Dapper Labs looks to a case that divides the *Howey* language into a four-part test.  *See SEC v. Telegram Grp.*, 448 F. Supp. 3d 352, 367-68 (S.D.N.Y. 2020) ("'a contract, transaction or scheme' is deemed an investment contract if it satisfies the four prongs of the *Howey* test, namely (1) an investment of money (2) in a common enterprise (3) with the expectation of profit (4) from the

"The *Howey* test is a 'flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'"   *Id*. (citation omitted).   "In analyzing whether an investment satisfies the *Howey* test, 'form should be disregarded for substance.'"   *Id*. (citation omitted). "Moreover, the emphasis should be on the 'economic realities underlying a transaction, and not on the name appended thereto.'"   *Id*.; *see also SEC v. Ripple Labs, Inc.*, 2021 WL 1335918, at *2 (S.D.N.Y. Apr. 9, 2021) ("The question [] becomes whether ... in light of the economic reality and the totality of circumstances ... the customers were making an investment....") (citation omitted).

## A.  MOMENTS ARE SECURITIES UNDER THE *HOWEY* TEST

### 1.  Plaintiffs Invested in a Common Enterprise

"In the Second Circuit, to establish the existence of a 'common enterprise,' a plaintiff must show **_either_** 'horizontal commonality' **_or_** "strict vertical commonality."  *Gugick v. Melville Cap., LLC*, 2014 WL 349526, at *4 (S.D.N.Y. Jan. 31, 2014) (emphasis added).  While Plaintiffs only need to show one, Plaintiffs have pleaded facts showing both.[5]

#### a.  Strict Vertical Commonality

Plaintiffs have pleaded strict vertical commonality because they have shown that the fortunes of the investors are linked to the fortunes – not merely the efforts – of the promoter.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 359-60 (S.D.N.Y. 2011).  In arguing otherwise, Defendants misread the

---

essential efforts of another.").  Plaintiffs do not quarrel with the numbering, as Plaintiffs satisfy every element of the *Howey* test, no matter how it is organized.

[5] As to this prong, the SEC has weighed in that: "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."  ¶73.

caselaw and overcomplicate the distinction between strict and broad vertical commonality.

In *Revak*, the Second Circuit explained that courts have developed different concepts of commonality for the purposes of the common enterprise prong of the *Howey* test.  *See Revak*, 18 F.3d at 87-88.  In addition to horizontal commonality, which looks to the tying of each individual investor's fortunes to the fortunes of other investors – discussed below – vertical commonality focuses on the relationship between the promoter and the body of investors.  *See id*.  Vertical commonality comes in two types, "broad vertical commonality" and "strict vertical commonality." *See id*.  While "broad vertical commonality" requires that the fortunes of the investors are linked only to the *efforts* of the promoter, "strict vertical commonality" requires that the fortunes of the investors are linked to the *fortunes* of the promoter.  *See id.*

The court in *Revak* held that a showing of "broad vertical commonality" alone does not satisfy the common enterprise prong because, "[i]f a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by *Howey*—whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others—are effectively merged into a single inquiry[.]"  *Id*. at 88.  But *Revak* did not impugn strict vertical commonality, and, indeed, "courts in this district have held that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*."  *See In re J.P. Jenneret Assocs*., 769 F. Supp. 2d at 360 (collecting cases).

"Strict vertical commonality exists when the fortunes of the investor are tied to the fortunes of the promoter.  Where strict vertical commonality exists, 'the fortunes of plaintiff and defendants are linked so that they rise and fall together.'"  *Id*. at 359-60 (citation omitted).  An explicit link between the fortunes of the investor and the promoter is the key to strict vertical commonality, and

numerous courts have found that the link exists where the promoter takes a fee that is based – even in part – on the ultimate performance of the investment.  *Id.*; *Marini v. Adamo*, 812 F. Supp. 2d 243, 260 (E.D.N.Y. 2011) (noting that "courts have found that, where an investment manager, such as Adamo, ***earns a fee based on the ultimate performance of an investment***, strict vertical commonality does exist") (emphasis added).  While Dapper Labs harps on dicta to argue that the link must be "inextricable" in the sense that, for strict vertical commonalty to adhere, there can be no possible outcome where the investor does not profit in lockstep with the promoter, that is not the link courts have required.

*In re J.P. Jeanneret Assocs.* is instructive.  769 F. Supp. 2d 340 (S.D.N.Y. 2011).  There, the court examined the relationship between investor and promoter, as spelled out in the applicable Discretionary Investment Management Agreement (or "DIMA"), and found their fortunes to be sufficiently linked for the purposes of strict vertical commonality:

> Plaintiffs allege sufficient facts from which a trier could conclude that the DIMA links the fortunes of the investor to the fortunes of JPJA, Section 10 of the DIMA outlines the compensation of the investment manager (in this case, JPJA). The investment manager is paid (1) a basic quarterly fee in the amount of one-eighth of one percent (.00125) of the "closing value" of the assets in the investment account, and (2) a performance fee equal to 20% of the profits in the investment account that exceed the preferred return and the basic quarterly fee. "Profits" are defined as "the aggregate appreciation in value of all Investment Account Assets" in the calendar year. ***Thus, JPJA's compensation was dependent on the successful performance of the investment account. If profits were not generated in a calendar year, or if the profits did not exceed the preferred return, then JPJA did not receive a performance fee. Unlike a stockbroker, who collects a fee for every consummated transaction, JPJA's financial compensation was linked to the fortunes of the investors[.]***

*Id.* at 360 (internal citations omitted) (emphasis added).

Thus, that the investment manager's compensation was directly linked to the performance of the underlying investment, even in part, distinguished the case from the typical situation where

a stockbroker earns a flat fee per trade.  *See id*.  In fact, one can imagine how the relationship from *Jeanneret* – a case where strict vertical commonality existed – would fail the "inextricable linking" test that Dapper Labs invites the Court to apply here.  MTD at 17.  Since the investment manager earns a quarterly fee based on total assets in the account, the manager could make a profit in a quarter where the investor took a loss.  *See In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d at 369-60.  But that possibility did not destroy the linkage for the purposes of strict vertical commonality. *See id*.  The same is true here, where Dapper Labs earns a transaction fee based on the prices of Moments changing hands in the secondary Marketplace.  When Moments sell in the marketplace for high prices, Dapper Labs makes more money.  The arrangement here is functionally the same as the arrangement in *Jeanneret*.

*Marini v. Adamo*, 812 F. Supp. 2d 243 (E.D.N.Y. 2011), is similar.  *Marini* was a case brought by collectors against a dealer of rare coins.  *Id*. at 248-49.  The coin dealer moved for summary judgment on the grounds that the plaintiffs could not show strict vertical commonality. *Id*. at 259-61.  The motion for summary judgment was denied, because the plaintiff alleged that the dealer profited not just from the initial purchase of the coins, but ***also that the coin dealer earned a commission on the plaintiff's eventual sale of the coins***.  *See id*.  This key fact linked the plaintiff's and the defendant's fortunes for the purposes of strict vertical commonality:

> ***In this case, plaintiffs assert that Adamo "retain[ed] a percentage commission on each eventual sale" of Marini's coins.  Accordingly, because Adamo asked that Marini sell his coins only through Adamo, if Adamo were to receive a commission on the sale of the coins, his fortunes would be inextricably tied to those of Marini's. . . .  Because a finding of strict vertical commonality hinges on this latter sales-based commission*** . . .  the Court cannot determine as a matter of law whether Adamo's and Marini's fortunes were inextricably linked for purposes of establishing . . . a common enterprise.

*Marini*, 812 F. Supp. 2d at 260-61 (citations and footnotes omitted).  While the court was clear

that, had the coin dealer only profited on the initial sale of the coins, strict vertical commonality would not apply, the coin dealer's commission on the eventual sale of the coins (between 5 and 10 percent) meant that that the fortunes of the investor and promoter were linked. *See id*. In addition, it appears that this section of the *Marini* opinion is the source of the "inextricably linked" language that Dapper Labs reads into the test. *See* MTD, 16. But while the phrase "inextricably linked" appears in *Marini*, the facts of *Marini* would seem to fail Dapper Labs' "inextricable linkage" test. After all, the key point was that the coin dealer profited not only upon the initial sale, but also earned a commission based on the eventual sales price, which gave the promoter the requisite interest in the investment's performance. There is no indication that, if the final sales price was lower or only marginally above the initial price, the coin dealer would have to forego the commission on the sale or return the commission earned at the outset. Thus, one can imagine a situation where the promoter would turn a profit while the investor took a loss but, because the promoter's profit was tied to the performance of the underlying investment, the fortunes of the investor and promoter were linked and strict vertical commonality was met.[6]

Dapper Labs also relies on cases finding a lack of strict vertical commonality where the promoter's profits did not depend on the performance of the underlying investment. *See Gugick*, 2014 WL 349526, at *4 ("The November 3, 2008 letter indicates that if Plaintiff were to sell the

---

[6] Even the case that *Marini* cites for the language that strict vertical commonality means that "the fortunes of plaintiff and defendants are linked so that they rise and fall together" would seem to fail Dapper Labs' "inextricable linkage test" requiring that there be no possibility that the promoter might turn a profit while the investor takes a loss. *See Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 249 (S.D.N.Y. 2002). In finding vertical commonality in that case, the court pointed out that manager defendants maintained, directly or indirectly, an interest in the performance of the underlying investment, noting that the investment managers would receive a semi-annual performance fee equal to 20% of the trading profits of each series of shares. *Id*. at 249, n.4. This sounds very much like the arrangement in *Jeanneret*.

Policy within four years after the contestability period expires, Melville would receive a $50,000 commission. Defendants argue that no interdependence or linking of the parties' fortunes exists because, pursuant to the November 3, 2008 letter, Melville would receive a fixed $50,000 commission regardless of whether Plaintiff realized a profit or loss on the sale of the Policy.") That is not the case here, where the transaction fee that Dapper Labs takes is based on the prices of Moments trading in the Marketplace and therefore ensures that Dapper Labs – like the investment manager in *Jeanneret* and the coin dealer in *Marini* – maintains an interest in the prices of Moments over time.[7]

### b. *Horizontal Commonality*

In addition to strict vertical commonality, a plaintiff may also show a common enterprise by pleading horizontal commonality. *Revak*, 18 F.3d at 87. "In an enterprise marked by horizontal commonality, 'the fortunes of each investor in a pool of investors' are tied to one another and to the 'success of the overall venture.'" *ATBCOIN*, 380 F. Supp. 3d at 353. While plaintiffs must show a pooling of investors' interests in order to establish a common enterprise, a formalized profit-sharing mechanism or pro-rata distribution of profits is not required. *Id.* at 354. Rather, courts have found that when a promoter sells crypto assets to investors and uses the proceeds to strengthen its ecosystem and blockchain – which in turn supports the value of the crypto asset – horizontal commonality is met. *See id.*, *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178-79

---

[7] Plaintiffs discuss the importance of Dapper Labs' Flow blockchain, Flow tokens and attempts to grow its ecosystem further in connection with horizonal commonality and the other *Howey* prongs, but note that courts have also found strict vertical commonality to be met when, as here, investors in crypto assets depend on the future success of the promoter's product or blockchain. *See Telegram Grp.*, 448 F. Supp. 3d at 370-71 ("[T]he SEC has made a substantial showing of strict vertical commonality. Each Initial Purchaser's anticipated profits were directly dependent on Telegram's success in developing and launching the TON Blockchain").

(S.D.N.Y. 2020); *Telegram Grp.*, 448 F. Supp. 3d at 369-70.

    *c.   The Recent Spate of Crypto Cases Supports Plaintiffs' Position*

    At the end of its Motion to Dismiss, Defendants warn that "Plaintiffs are going to try to confuse the Court by talking a lot about technology and cases involving cryptocurrencies." MTD at 28. Plaintiffs are not confusing the Court. Rather, Plaintiffs are merely pointing to the significant similarities between this case and the numerous other recent crypto cases in which courts have found horizontal commonality to be met where the fate of the investment on the secondary market depends on the promoter's ability to succeed in launching its products, blockchain and digital ecosystem. Dapper Labs argues that this case is different, yet to disregard these key similarities would be to place form over function in a way that is anathema to the search for economic reality underlying the *Howey* test.

    In *ATBCOIN*, a technology company called ATB sold coins to the public, and investors who bought the coins expected the value of the coins they had purchased to increase in the future as ATB's nascent blockchain grew in popularity. *ATBCOIN*, 380 F. Supp. 3d at 347. When ATB's blockchain failed to catch on, investor interest in the coins waned, and the value of the coins fell. *Id*. at 347-48. Contending that there was no horizontal commonality, ATB coin made the same arguments that Dapper Labs makes here. ATB argued that "purchasers of the ATB Coin 'gained no share in a common enterprise, but rather exercised individual control over the ATB Coin asset,'" and stressed "that ATB Coins did not entitle purchasers to a pro rata share of the profits derived from any ATB-managed transaction." *Id*. at 354.

    The court rejected the promoter's arguments. In finding that horizontal commonality was established, the court explained that a pro rata share of profits or other formalized profit-sharing mechanism is not required. *Id*. Rather, the court followed recent cases that have found horizontal

commonality where "'the fortunes of individual investors in [Defendants'] ICO were directly tied to the failure or success of the products the Defendants purported to develop[.]'" *See id*. at 354 (citation omitted); *id*. ("The SEC concluded that the MUN token was a security, even though it 'did not promise investors any dividend or other periodic payment.' Rather, investors were led to believe that as more individuals began using the MUN 'ecosystem,' the value of investors' MUN tokens would increase.") (internal citations omitted).

Other crypto cases where the outcome of the investment hinged on the promoter's success in establishing a digital ecosystem are in accord.  In *SEC v. Kik Interactive Inc.*, for instance, the instant messaging application Kik sold a crypto asset known as Kin in an effort to create a "digital ecosystem" for the buying and selling of digital products and services.  492 F. Supp. 3d at 173-74. The court found horizontal commonality to be met, writing "[t]he economic reality is that Kik, as it said it would, pooled proceeds from its sales of Kin in an effort to create an infrastructure for Kin, and thus boost the value of the investment. . . .  The stronger the ecosystem that Kik built, the greater the demand for Kin, and thus the greater the value of each purchaser's investment."  *Id*. at 179.  And in *SEC v. Telegram Grp. Inc.*, where Telegram sold coins to fund the release of its new blockchain, the court found that horizontal commonality was established.  448 F. Supp. 3d at 369-70.  The court explained that "[t]he ability of each Initial Purchaser to profit was entirely dependent on the successful launch of the TON Blockchain."  *Id*. at 369.  The court held that horizontal commonality existed post-launch too, as investor profits depended on the continued success and expansion of Telegram's enterprise.  *Id*. at 369-70.

Here, the fortunes of Moment investors are linked in the same way the fortunes of investors in other crypto ventures have been found to be linked: The proceeds of investors' purchases in Moments are pooled together in the hands of Dapper Labs, which works to stir up interest in the

Marketplace for Moments and build out its Flow blockchain, further driving interest, traffic, and money to the NBA Top Shot platform.  ¶¶74, 84-91.  Without continued traffic in the Marketplace and interest and faith in the Flow blockchain, the investments fail.

> i.   *Dapper Labs' Attempt to Cabin the Crypto Cases to ICOs Fails*

Dapper Labs points out that the cases discussed above involve initial coin offerings (ICOs) used to launch blockchains, while the "Moments here were not sold to launch NBA Top Shot." MTD at 13.  It is true that Top Shot was in existence at the time the Moments were sold, but that does not change the fact that the investment depended on Dapper Labs' ability to continue to expand the Marketplace and establish its blockchain.  ¶¶74, 84-91.  Moreover, the *Telegram* court specifically found that horizontal commonality did not just exist before the launch of the blockchain, but post-launch as well.  *See Telegram*, 448 F. Supp. 3d at 370.

Dapper Labs also tries to distinguish these cases by arguing that, "[w]hen Dapper Labs sold Moments, it was not looking for investors; it was selling products to customers."  MTD, at 14.  While selling Moments does not involve express capital fundraising in the same way as an ICO, investors nevertheless bought Moments because of the surging Marketplace and the growth of Dapper Labs and its Flow blockchain that was in development.  NBA Top Shot's own website proclaimed: "Mosey on over to this preview to learn more about Flow, the blockchain that NBA Top Shot is built on. One of the most common questions we get is for more information about FLOW tokens. At launch, FLOW will be utility tokens used only to run the network. This will change in the future as the token is more widely adopted . . ." ¶90, and Dapper Labs teased that more value would soon be created on top of the Flow blockchain.  ¶38.  These are Dapper Labs' own words, which were not lost on investors.  *See* ¶108 ("One analyst's report entitled, *A journey into FLOW. Investing in the tech behind Topshot*, concludes: '[]At the present time it's hard to

justify holding large amounts of FLOW. A better approach for investing is to participate in NBA Topshot.'"); ¶87 ("If you're buying NFTs in the hopes of realizing a financial return, NBA Top Shot is a better bet than a digital collectible from a team or player-specific collection. "Dapper Labs is here to stay, and there is probably more potential and more interesting things that will happen with Top Shot over time [in terms of use-cases][.]"

Finally, Dapper Labs misreads the crypto cases when it claims that "[o]ther cases Plaintiffs invoke, like *Telegram* and their anticipated cite to *Kik*, fail along the same lines – they involved tokens that did not exist, express capital fundraising, and promised uses of capital investments to develop other products from which buyers would directly profit."  MTD at 29.  But the point of the crypto cases finding horizontal commonality is not that the investors would "directly profit" from the promoter's future products, only that the investment depended on the promoter's digital ecosystem taking off.  Moreover, the caselaw is clear that "directly profiting" is **_not_** required.  *See ATBCOIN*, 380 F. Supp. 3d at 354 (adopting SEC's reasoning that "the MUN token was a security, even though it 'did not promise investors any dividend or other periodic payment.' Rather, investors were led to believe that as more individuals began using the MUN 'ecosystem,' the value of investors' MUN tokens would increase.").

Dapper Labs' reliance on *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 302 (Del. Super. Ct. 2022) and *Audet v. Fraser*, 2022 WL 1912866, at *14 (D. Conn. June 3, 2022) is unavailing.  The reason *Diamond Fortress* discussed the recent cryptocurrency cases as specifically applying to ICOs was that *Diamond Fortress* involved an ICO.  *See Diamond Fortress*, 274 A.3d at 287.  And the discussion of Hashlets that Dapper Labs cites in *Audet v. Fraser* is not persuasive for several reasons, including that the court acknowledged that, even after a trial, it was unclear what exactly a "Hashlet" was, and, relatedly, the opinion was limited to whether the jury's

verdict was contrary to the evidence.  *See Audet*, 2022 WL 1912866, at *1-3.  The economic reality present in the recent crypto cases finding horizontal commonality is present here as well, certainly for the purposes of the motion to dismiss where all reasonable inferences must be drawn in the plaintiff's favor.

## ii.  *Plaintiffs Allege Pooling*

Dapper Labs also argues that there is no pooling because "Plaintiffs fail to allege that their fortunes are tied to the fortunes of other card owners."  MTD at 9.  Here Dapper Labs relies on caselaw remarking that "'[p]ooling' has been interpreted to refer to an arrangement whereby the account constitutes a single unit of a larger investment enterprise in which units are sold to different investors and the profitability of each unit depends on the profitability of the investment enterprise as a whole."  *See Savino v. E. F. Hutton & Co.*, 507 F. Supp. 1225, 1236 (S.D.N.Y. 1981).  Dapper Labs' cases are inapposite.  *Savino* dealt with discretionary brokerage accounts that the portfolio manager, Hutton, in turn, invested in stocks and stock options.  *Id*. at 1235.  While the court noted that plaintiffs had successfully alleged that they purchased a "security" because the underlying stocks and stock options were securities, the court found that the Hutton brokerage accounts themselves did not constitute a common enterprise, as they were separately held and not pooled together.  *See id*. at 1236.  The heart of the reasoning is that these were not investments in Hutton, but in the stocks and stock options that Hutton picked.  *See id*. at 1235-37.  *Kaplan v. Shapiro*, 655 F. Supp. 336 (S.D.N.Y. 1987), is similar.  *Kaplan* was a lawsuit against investment managers who invested their clients' money in a variety of real estate investments.  *Id*. at 338-39.  Horizontal commonality did not exist, as the real estate investments were not pooled in the hands of the investment manager.  *See id*. at 341.

The Moments here are more like the coins at issue in the crypto cases than the brokerage

accounts in *Savino* or real estate investments in *Shapiro*.  While the Moments, once purchased, are held in individual accounts, they can only be resold in the shop window that is the NBA Top Shot Marketplace, where Dapper Labs is responsible for driving interest, traffic, and money.  While one person trying to sell a Moment in the Marketplace might succeed while another might not, that is true in lots of markets and does not alter the fact that all Top Shot investors have a shared interest in Dapper Labs' continued efforts to support the Marketplace.  Accordingly, the fortunes of Moment investors are linked in the same way as in the other crypto ventures: The proceeds of investors' purchases in Moments are pooled in the hands of Dapper Labs, which uses the money to stir up interest in the Marketplace for Moments and build out its Flow blockchain, which, in turn, further drives interest, traffic, and money to NBA Top Shot.[8]

       iii.    *The Law is Clear that Unique and Collectible Assets can be Securities Under Howey*

Dapper Labs claims that courts consistently hold that unique collectibles like art are not securities.  MTD at 11-12.  Dapper Labs is wrong.

The rare coins at issue in *Marini*, for instance, were collectible and perhaps unique assets, but they still constituted securities under the *Howey* test (under strict vertical commonality rather than horizontal commonality, based on the allegations in that case).  *See Marini*, 812 F. Supp. 2d at 261.  And in *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 147 (7th Cir. 1984), which deals with the purchase of paintings and on which Dapper Labs relies to claim that unique collectibles like art are not securities, the court wrote that "[t]his case . . .  is radically different from the sale

---

[8] Dapper Labs' brief has a whole section pointing out that Plaintiffs do not allege that Moment investors are entitled to a pro rata share of profits, however, a pro rata distribution or other formal profit-sharing mechanism is not required.  *See, e.g., ATBCOIN*, 380 F. Supp. 3d at  354.

of citrus groves in *Howey* and the sale of beavers in *Kemmerer*[], not because of the difference in goods being sold, but because those cases involved the nominal sale of property as a means of pooling money to be used in a common cultivation and marketing effort." In fact, the *Stenger* court explained that, even though the complaint did not even allege that other investors existed, plaintiff's briefs introduced facts that were suggestive of a security, including the presence of other investors and the right to trade the paintings back into a fund controlled by the gallery. *See id*. at 145-46.[9] While the court did not address those facts as they were not in the complaint, the very discussion assumes that unique assets like art can be securities if they are structured and sold in a way that satisfies the *Howey* test. *See id*. In reality, this is an obvious point.[10] Fungibility is a useful aspect of many securities because it helps create a deep and liquid secondary market, but it is not a requirement. For example, a bespoke over-the-counter option that references a security might be unique and nonfungible, but is still a security. Plaintiffs have pleaded both types of commonality, though only need to plead one to meet the *Howey* test.

### 2. Plaintiffs Reasonably Expected Profits

"*Howey*'s third prong examines whether the investor entered the relevant transaction with the expectation of profit." *Telegram*, 448 F. Supp. 3d at 371. "An investor possesses an expectation of profit when their motivation to partake in the relevant 'contract, transaction or scheme' was 'the prospects of a return on their investment.'" *Id*. (citation omitted). The requisite expectation of profit can exist alongside, and can even be secondary to, other, non-profit motives.

---

[9] The facts of *Stenger* are also distinguishable from those here, as the court noted that "Plaintiff's paintings may appreciate and he is free to sell them through any means he wishes; defendant would not share in any profit." *See id*. at 147.

[10] There are other promoters that offer investors shares of collectibles and artwork, including NFTs, and these investments are registered under the Securities Act. *See, e.g.,* https://www.withotis.com/about-otis.

*See SEC v. Hui Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019).  While the *Howey* test is objective, the subjective intent of purchasers is probative on the issue of what a reasonable investor would expect.  *Audet*, 2022 WL 1912866, at *17 n.7; *Telegram*, 448 F. Supp. 3d at 374 ("The Court's finding that the [crypto asset purchasers] had a reasonable expectation of profit is buttressed by [the purchasers'] subjective views … The subjective intent of the [purchasers] does not necessarily establish the objective intent of the reasonable purchaser.  However, the stated intent of prospective and actual purchasers… may be properly considered in the Court's evaluation of the motivations of the hypothetical reasonable purchaser.")

For its part, the SEC's Framework for "Investment Contract" Analysis of Digital Assets provides certain characteristics that indicate a reasonable expectation of profit in the digital asset context.  These include whether the digital asset provides the opportunity to realize gain from capital appreciation of the digital asset, with the SEC specifically clarifying that "[t]he opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, ***particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains***."  ¶76.  Other factors weighing toward the reasonable expectation of profit are when "[t]he digital asset is transferable or traded on or through a secondary market or platform[,]" and when ***"[p]urchasers reasonably would expect that an AP's [Active Participant, or promoter] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.*** "  ¶76.

Here, the investors in Moments are clearly expecting profit.  Many investors have said so. ¶76 ("***These are investments***," he [Schwarz] says. "That Lebron that I bought for $208,000 was worth seven figures right away.  ***And, that's a big reason why I bought it***."); ¶61 ("A number of

the platform's users interviewed for this story told of similar arcs; they initially invested a few thousand dollars, only to see the value of their accounts balloon by factors greater than 10, almost overnight. ***The promise of soaring earnings—even offset against the fear, among some, of a bubble in the making—has kept a steady stream of new users joining [NBA Top Shot]***"); *see also* ¶79 ("The reality is that the growing fanatical NBA Top Shot database is all about the investment, speculation and appreciation of the Top Shot NFTs and the NBA Top Shot Marketplace. With its varying levels of scarcity and its legion of clamorous promoters, NBA Top Shots reinforces these notions exponentially.").

Contrary to Dapper Labs' contentions, the stated intentions of purchasers are not irrelevant, but highly probative on the question of what a reasonable purchaser would expect. *See Audet*, 2022 WL 1912866, at *17 n.7; *Telegram*, 448 F. Supp. 3d at 374. Moreover, the fact that some purchasers might have other, non-profit reasons for investing in Moments does not destroy the reasonable expectation of profit here, just as the fact that foreign investors investing in U.S.-based projects in order to be eligible for a U.S. visa did not destroy the reasonable expectation of profit in those investments. *See Hui Feng*, 935 F.3d at 730-31. While some investors might have bought a Lebron James Moment because they love Lebron James, investors might buy Tesla stock because they love Elon Musk, or Coca-Cola stock because they love the soda. This does not destroy the expectation of profit for the purposes of the *Howey* test, and is, at best, an issue for class certification rather than a motion to dismiss.

Not surprisingly, the reason so many investors viewed Moments in terms of expected future profits is that they were hyped up as investments. Dapper Labs used the prospect of making money from investing in Moments in its marketing efforts, employing its official Twitter account to tweet out high prices achieved in the Marketplace, along with emojis including the spaceship taking off,

the stock chart shooting up, and the money bag. ¶¶62-65. Because Top Shot users know that the Moments trading for these high prices in the Marketplace would have been acquired in packs for a fraction of the prices being publicized, these tweets are dangling the prospect of huge profits in an attempt to further pump up the price of Moments.[11] ¶64. Defendant Gharegozlou, speaking in a podcast, has also acknowledged the obvious: that fans prefer to buy Moments rather than attend NBA games so that they can **_"benefit financially."_** ¶80. It is hard to imagine a clearer reference to investors' pursuit of profit than that.[12]

Finally, Dapper Labs claims that the securities laws do not apply because Plaintiffs had "consumptive intent" under *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 853 (1975). This is wrong factually and legally. First, this argument ignores all of the facts suggesting that plaintiffs bought Moments as investments. *See, e.g.*, ¶76 ("**_These are investments_**," he [Schwarz] says. "That Lebron that I bought for $208,000 was worth seven figures right away. **_And, that's a big reason why I bought it_**."); ¶¶62-65, 80. In addition, *Forman*, which dealt with real estate, held that "[i]n the present case there can be no doubt that investors were attracted **_solely_** by the prospect of acquiring a place to live, and not by financial returns on their investments." *See id.* (emphasis added). *Forman* is therefore consistent with the above cases holding that, while plaintiffs must reasonably expect to profit, the profit motive need not be the only motive. *See Hui Feng*, 935 F.3d at 730-31; *Telegram*, 448 F. Supp. 3d at 371. Moreover, attempts to argue "consumptive intent" under *Forman* have been repeatedly rejected in the crypto asset context, where, unlike real estate,

---

[11] Plaintiffs would certainly characterize this series of tweets and other marketing hype as "persistent," – the Amended Complaint cites five tweets for illustrative purposes at ¶¶62-65 – but do not agree with Dapper Labs' attempt to graft that term onto the *Howey* test. *See* MTD at 19.

[12] And because the profit investors are seeking results from a "secondary trading market that enables digital asset holders to resell their digital assets and realize gains," Moments are the epitome of what the SEC intended to define as securities under the *Howey* test. *See* ¶76.

the asset is worthless without the promised digital ecosystem. *See Kik Interactive Inc.*, 492 F. Supp. 3d 169, 180 (S.D.N.Y. 2020) ("Unlike real estate, Kin have no inherent value and will generate no profit absent an ecosystem that drives demand."); *Telegram*, 448 F. Supp. 3d at 373. And contrary to Dapper Labs' suggestion, there is nothing in cases like *Marini* finding that whatever "joy in collecting" one might derive from collecting rare coins – or digital assets reflecting a basketball highlight – forecloses one's rights under the securities laws. *See Marini*, 812 F. Supp. 2d at 260-61.

### 3.  Plaintiffs Clear the Essential Efforts Prong

"The final *Howey* prong considers whether the expectation of profit stems from the efforts of another." *Telegram*, 448 F. Supp. 3d at 375.  While *Howey* refers to "profits to be derived solely from the efforts of others," the Second Circuit has instructed that "the word 'solely' should not be construed as a literal limitation" and that the test is met where the promoter's efforts are the "undeniably significant ones[.]"  *See ATBCOIN*, 380 F. Supp. 3d at 354-55 (citations omitted). "The efforts of promotors, undertaken either before or after gaining control over investor funds, are relevant considerations due to *Howey's* focus on economic realities." *Telegram*, 448 F. Supp. 3d at 375; *see also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 743-44 (11th Cir. 2005) (explaining that "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether *Howey*'s test is satisfied[.]")

The SEC's Framework also sets out characteristics that weigh in favor of the conclusion "that a purchaser of a digital asset is relying on the 'efforts of others.'"  ¶83.  These include that "[a]n AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be

performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose," and – importantly – that ***"[a]n AP creates or supports a market for, or the price of, the digital asset.  This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity[.]"*** ¶83.

### a.   *The Structure of NBA Top Shot Shows Dapper Labs' Complete Control*

Dapper Labs appears to hold up its hands and argue that its efforts cannot be the significant ones that determine the fate of Moment investments because – while Dapper Labs works to drive traffic to the Marketplace and ensure scarcity and keep prices high – it is some combination of market forces and investors' choices that drives outcomes.  *See* MTD at 21-25.

Dapper Labs' argument ignores the managerial control it wields over the entire Top Shot application, from the initial minting of Moments, to how they are packaged and sold to investors, to their transactions in the Marketplace.  *See* ¶¶74, 84-91; *Kik Interactive Inc.*, 492 F. Supp. 3d at 180 ("Kik's insistence in its briefs that 'market forces' would drive the value of Kin ignores the essential role of Kik in establishing the market.").  For one, as seen in its marketing tweets attempting to pump up the prices of Moments in the Marketplace, Dapper Labs actively works to disseminate the message that the prices of Moments in the Marketplace are surging and will continue to do so.  These are the "undeniably significant" efforts under *Howey*, as, without continued interest and money flowing into the Marketplace, the investments fail.  *See ATBCOIN*, 380 F. Supp. 3d at 354-55 (citations omitted); *Kik Interactive Inc.*, 492 F. Supp. 3d at 180.

Dapper Labs' attempts to wiggle out of this conclusion falls short in several ways.  First, Dapper Labs again looks to real estate cases, which are particularly inapposite in a case concerning a digital crypto asset.  *See id*. ("These efforts by Kik were crucial because without the promised

digital ecosystem, Kin would be worthless. This point draws attention to why Kik's reliance on case law from the real estate context is misplaced. . .  Unlike real estate, Kin have no inherent value and will generate no profit absent an ecosystem that drives demand.").

Second, Dapper Labs suggests that Plaintiffs' claims fail "temporally," as "Plaintiffs admit that the[] scarcity metrics are disclosed prior to the purchase [of Moments]" and "Plaintiffs offered nothing in their letter explaining how *backwards* looking scarcity can satisfy this prong."  MTD at 22-23.  As an initial matter, "[t]he efforts of promotors, undertaken either before or after gaining control over investor funds, are relevant considerations due to *Howey*'s focus on economic realities." *Telegram*, 448 F. Supp. 3d at 375.  But more importantly, it is not the case that Dapper Labs' key managerial efforts all take place before Moments are purchased.  While "scarcity metrics" might be disclosed prior to purchase, an investor's ability to re-sell the Moment for a profit in the Marketplace will depend on Dapper Labs' ability to keep up demand and prices, which is likely to turn on post-purchase efforts – marketing, promotions, social media activity, and the continued growth of Flow.  *See id.*, at 369-71 (recognizing pre and post-purchase efforts and the continued importance of the promoter's reputational goodwill).  Dapper Labs' managerial efforts, both pre and post purchase of Moments, are "the primary driver of th[e] ecosystem," *see Kik Interactive Inc.*, 492 F. Supp. 3d at 180, and its efforts to "support a market price of [Moments] . . . by . . . ensuring scarcity" and surging demand, ¶83, are precisely the type of promotional efforts that satisfy the final prong of the *Howey* test.

Moreover, that investors purchased Moments relying on the promotional expertise of Dapper Labs is confirmed by investors' own statements:

> *There were some periods early in Top Shot's lifespan where people questioned whether Dapper Labs was making good decisions with the supply of Moments*

> ***and whether the website itself would hold up with a larger user base***, Levy
> says. . . .  "So it feels validating to see it all play out the way a lot of us hoped it
> would."

¶85.   As that quote makes clear, investors bought knowing full well that the fate of their

investments depended on Dapper Labs "making good decisions" in limiting the supply of Moments

and keeping the Marketplace hot.  This dynamic – investors relying on the decisions of Dapper

Labs to support the Marketplace and turn a profit – captures the economic reality of the transaction,

***even though***, as Dapper Labs points out repeatedly, each Moment is a unique NFT and each

investor's holdings will inevitably vary as well.

Dapper Labs attempts to rely on cases involving the price of commodities, but these cases

prove Plaintiffs' point.  In *Noa v. Key Futures, Inc.*, the court held that agreements to buy and sell

bars of silver were not securities under the *Howey* test, because "the profits to the investor

depended upon the fluctuations of the silver market, not the managerial efforts of Key Futures."

638 F.2d 77, 79 (9th Cir. 1980).  This was because "[t]here is a national market for silver which is

not dependent upon Key Futures."  *Id.* at 80.  The court held similarly in *Lehman Bros. Com. Corp.

v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, dealing with foreign exchange transactions,

writing that "any gain likely would result in large part from market movements, not from capital

appreciation due to Lehman's efforts."  179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001).

This case is very different, where the prices of Moments in the Marketplace do not depend

on the movement of commodity markets, but are a function of Dapper Labs' promotional successes

or failures.  *See Kik Interactive Inc.*, 492 F. Supp. 3d at 180 ("Kik's insistence in its briefs that

'market forces' would drive the value of Kin ignores the essential role of Kik in establishing the

market.").  A more apt comparison is *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce,

Fenner & Smith, Inc.*, where the Second Circuit deemed the certificates of deposit that Merrill

Lynch sold to investors to be securities because of Merrill Lynch's important managerial efforts, both before and after purchase.  756 F.2d 230, 240-41 (2d Cir. 1985):

> The customers rely on the skill and financial stability of Merrill Lynch for a number of reasons. First, resale in the secondary market created and maintained by Merrill Lynch is crucial to the investor . . .  Second, the investor relies on Merrill Lynch's implicit promise to maintain its marketing efforts. The success of the secondary market and the availability of CDs at competitive rates hinge on Merrill Lynch's success in finding new buyers of CDs and developing strong working relationships with issuing banks. If Merrill Lynch were not an influential and well- known participant in the marketplace, the CD Program would not be viable.

*Id*.  Dapper Labs attempts to distinguish the case by pointing out that Merrill Lynch had agreed to buy back the CDs from investors.  *See* MTD at 26.  That is true, but the thrust of the reasoning is that the CDs are investments because the investor is reliant on the skill and reputation of the promoter to maintain the secondary market without which the investment would not be viable, and these managerial efforts extend far beyond the buyback.  *See Gary Plastic*, 756 F.2d 230, 240-41. Dapper Labs engages in similar efforts here, where the "market forces" driving Moment prices are not external commodity prices, but are merely a shorthand for the degree of success that Dapper Labs has had in hyping up Moments and driving demand to the Marketplace.

Dapper Labs suggests that it is possible for investors to sell Moments outside of the Top Shot Marketplace, and relies on a Sports Illustrated article cited in Plaintiffs' Complaint.  *See* MTD at 4, 25.  But that article confirms Plaintiffs' allegation: "[Moments] can be procured ***from one of two places***: directly from Top Shot . . . ; ***or in the marketplace***, where moments opened in the aforementioned packs can be swapped between users for cash."[13]

---

[13] *See* Dkt. No. 40-2 at 1-2.  Later in the article, in a discussion of certain "confounding" Marketplace transactions that resemble money laundering, Defendant Gharegozlou suggests an explanation: "most of the time, he says, one user will have conversed with another outside of

b.   *Dapper Labs' "Contractual and Retained Control" Argument Fails*

Dapper Labs contends that Plaintiffs fail the "essential efforts" prong because the Terms of Use ensure the investor's right to control his or her collection of Moments, and to actively manage that collection as a show of his or her fandom.  MTD at 26-27.  Dapper Labs' appeal to investors' "retained control" fails, as similar appeals have been repeatedly rejected.

First, Dapper Labs relies on the generalized language that "[i]t is the passive investor for whose benefit the securities laws were enacted," and claims that investors are not passive because they can choose which Moments to buy and sell.  *See* MTD at 26-27 (citing *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008)).  But that is not the control that matters under the securities laws.  *See, e.g., ATBCOIN*, 380 F. Supp. 3d at 356 ("Although Defendants argue that ATB Coin purchasers 'had complete control over [their ATB] coins as soon as they were purchased, including the decisions of when and for how much to sell,' purchasers had no control over whether the new ATB Blockchain technology worked"); *Kik Interactive Inc.*, 492 F. Supp. 3d at 179 ("the fact that TDE purchasers could sell their Kin whenever they pleased is not dispositive").  While investors could decide which Moments to sell and when, Plaintiffs' allegations are that Dapper Labs' managerial efforts controlled the Marketplace that was key to investor profit.  *See* ¶¶74, 84-91.  Moment investors are completely passive in this regard.

Finally, Dapper Labs points out that "the Terms of Use state that collectors 'own the

---

TopShot, negotiating the swap of a handful of moments for a set price, then using one moment to move a lump sum while the other user gifts the buyer the remaining moments for free."  *Id*. at 9. The ability to gift Moments does not undermine Plaintiffs' allegations in the least.  In any event, even if it is technically true that there is some way to sell Moments outside of the Marketplace, it would not change the basic structure of the platform, which is that investors rely on the Marketplace to resell their Moments and turn a profit, thanks to the managerial efforts of Dapper Labs.  Dapper Labs has, at best, raised a factual issue that is not proper for a Motion to Dismiss.

underlying NFT completely,' and 'have the right to swap their Moment, sell it, or give it away.'" MTD at 27.  That Term of Use does not negate or even address the managerial efforts that Plaintiffs have alleged here, and defendants' attempts to disclaim their "essential efforts" by contract are regularly rejected.  *See Telegram*, 448 F. Supp. 3d at 358 ("the Court finds an implicit (though formally disclaimed) intention on the part of Telegram to remain committed to the success of the TON Blockchain post-launch."); *Kik Interactive Inc.*, 492 F. Supp. 3d at 178 (looking to economic reality, rather than to the "Terms of Use Agreement, [where] Kik expressly disclaimed any ongoing obligation to TDE purchasers after the distribution of their Kin").  This is because "[d]isclaimers, if contrary to the apparent economic reality of a transaction, []are not dispositive." *Telegram*, 448 F. Supp. 3d at 365 (citing *S.E.C. v. SG Ltd.*, 265 F.3d 42, 48, 54 (1st Cir. 2001) (finding investment contract despite promoter's language cautioning investors that the virtual shares were only intended as part of a video game)).  The economic reality of the transaction controls, and, here, confirms that Moments are securities under the *Howey* test.[14]

## IV.   CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.  If it is not, Plaintiffs respectfully request leave to replead.  Defendants identify no reason why amendment would be futile, and this Complaint was the first to be tested by a motion to dismiss.  *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) ("Without doubt, this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6).").

---

[14] For the same reasons that Plaintiffs have pleaded a primary violation of the Securities Act, Plaintiffs have pleaded a control person claim against Defendant Gharegozlou, Dapper Labs' CEO, under Section 15.  *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012).

DATED:      October 31, 2022
            New York, New York

                                              **THE ROSEN LAW FIRM, P.A.**

                                              /s/ *Phillip Kim*
                                              Phillip Kim, Esq.
                                              Laurence M. Rosen, Esq.
                                              Michael Cohen, Esq.
                                              275 Madison Avenue, 40th Floor
                                              New York, New York 10016
                                              Telephone: (212) 686-1060
                                              Fax: (212) 202-3827
                                              Email: pkim@rosenlegal.com
                                              Email: lrosen@rosenlegal.com
                                              Email: mcohen@rosenlegal.com

                                              *Counsel for Plaintiffs and the Class*