UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 02/22/2023           │
└─────────────────────────────────┘
```

---

JEEUN FRIEL, Individually and on behalf of all others similarly situated,

                              Plaintiff,

                - against -

DAPPER LABS, INC. and ROHAM GHAREGOZLOU,

                              Defendants.

---

21 Civ. 5837 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Lead Plaintiff Gary Leuis ("Leuis") and named plaintiff John Austin ("Austin"), individually and on behalf of all others similarly situated (together, "Plaintiffs") bring this action against Dapper Labs, Inc. ("Dapper Labs") and its Chief Executive Officer, Roham Gharegozlou ("Gharegozlou") (together, "Defendants"), alleging that Dapper Labs violated the securities laws by offering for sale to the public certain non-fungible tokens ("NFTs") known as NBA Top Shot Moments ("Moments") without filing a registration statement with the Securities and Exchange Commission (the "SEC"). Plaintiffs assert two causes of action: (1) violations by Dapper Labs of Sections 5 (15 U.S.C. § 77e) and 12(a)(1) (15 U.S.C. § 77*l*) of the Securities Act of 1933 ("Securities Act") for the unregistered offer and sale of a security, to wit, Moments ("Moments"), sold on its NBA Top Shot application; and (2)

1

violation of Securities Act Section 15 (15 U.S.C. § 77o) against Gharegozlou as control person liability for the primary violations alleged in the first cause of action.

Now before the Court is Defendants' motion to dismiss the Amended Complaint ("AC") in its entirety and with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (See "Motion," Dkt. No. 37.) For the reasons stated below, Defendants' motion is **DENIED**.

## I.   BACKGROUND

### A.   FACTUAL BACKGROUND[1]

Dapper Labs, founded by Gharegozlou, is a Vancouver, Canada-based corporation that develops blockchain technologies. In simplest terms, a "blockchain" is a

---

[1] The factual recitation set forth below, except as otherwise noted, derives from the Amended Complaint ("AC") (Dkt. No. 27), and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. The recitation is also based on the documents incorporated in the AC and attached to the Declaration of Erin Zatlin, attorney for Defendants, (see Dkt. Nos. 38, 40) for which Defendants request, unopposed, that the Court take judicial notice. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Tech Fin. Grp., Inc., 282 F.3d 147, 152 (2d Cir. 2002)); see Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) ("Although the general rule is that a district court may not look outside the complaint and the documents attached thereto in ruling on a Rule 12(b) motion to dismiss, we have acknowledged that the court may also consider matters of which judicial notice may be taken." (quotation marks and citations omitted)); Fed. R. Evid. 201. To the extent that the Court refers to and quotes from the documents incorporated by reference into the AC and for which the Court takes judicial notice, it does so only for the purpose of determining "what statements the documents contain . . . [and] not for the truth of the matters asserted." Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (citing Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)) (original alteration omitted). Except where specifically quoted, no further citation will be made to the AC or the documents referred to therein.

decentralized digital ledger used to record and validate transactions. As discussed in more detail below, after a previous foray into developing blockchain-based assets on other blockchains, Dapper Labs created its own, the Flow Blockchain. Dapper Labs developed the Flow Blockchain as part of a larger so-called Flow Network, which would host applications that run atop and whose transactions are validated on the Flow Blockchain.

### 1. Blockchain Technology[2]

To better grasp Dapper Labs's business-model, understanding the technical operation of a blockchain is necessary. As already mentioned, a "blockchain" is a decentralized digital ledger.[3] Blockchains may be either

---

[2] Throughout this subsection, the Court references scholarly work describing blockchains but only to the extent that it helps inform Plaintiffs' allegations. The Court does not weigh these statements for the truth of the matters asserted therein. See Kramer v. Time Warner Inc., 937 F.2d 767, 773-74 (2d Cir. 1991). In doing so, the Court takes "judicial notice on its own" of the statements made in these scholarly writings. Fed. R. Evid. 201(c)(1). It does so for two reasons. First, the Court finds that statements regarding the scientific and technical operations of blockchain technology generally are "not subject to reasonable dispute" and come from "sources whose accuracy cannot reasonably be questioned." Id. 201(b); see also Christian v. Loyakk, Inc., No. 22 Civ. 215, 2023 WL 170868, at *1 (D. Wy. Jan. 12, 2023) (taking judicial notice on its own on a motion to dismiss of scholarly articles not referenced in the complaint describing blockchain and cryptocurrency). Second, because the descriptions largely mirror those already made in the AC, and are not taken for their truth, the Court finds they would not "create a point of factual dispute." Contra Tomasino v. Estee Lauder Cos., Inc., No. 13 Civ. 4692, 2015 WL 1470177, at *6 (E.D.N.Y. Mar. 31, 2015).

[3] See also Jonathan Rohr & Aaron Wright, Blockchain-based Token Sales, Initial Coin Offerings, and the Democratization of Public Capital Markets, 70 HASTINGS L.J. 463, 469 (2019) ("At their core, blockchains are decentralized databases maintained by a network of computers. Using public-private key cryptography and strict code-based rules -- known as

public, like that underlying perhaps its most famous use-case, Bitcoin, or private, like Dapper Labs's Flow Blockchain.[4] While generally associated with the transfer of digital currencies (often called cryptocurrencies, or crypto for short), blockchains can be used not only to store information about the transfer of the currency but can also be applied to record ownership of a wide variety of more traditional assets, like stocks and bonds.

Unlike traditional ledgers, which are managed and validated by a centralized authority, blockchains are distributed and decentralized. This structure offers greater transparency as to ownership by being based on consensus as to the accuracy of the transactions consummated on the network. To reach consensus, embedded in each blockchain platform is a software protocol, or consensus mechanism, which provides governance standards over how information is added to the blockchain. Blockchain-based transactions are

consensus mechanisms -- blockchains store tamper-resistant, resilient, and authenticated data, enabling users to engage in pseudonymous transactions.").

[4] See also Joseph D. Moran, The Impact of Regulatory Measures Imposed on Initial Coin Offerings in the United States Market Economy, 26 CATH. U. J.L. & TECH. 213, 222 (2018) ("Private blockchains use the same technology as public blockchains, however, a single entity administers them. This results in more control for the entity to restrict permission or allow access to only approved, or invited users. Private blockchains are attractive because they require less computational power to maintain a given ledger and offer more privacy for transactions. Private blockchains operate in a fully private space, such as a private server or cloud-based environment.").

considered more secure and trustworthy than ledgers controlled by centralized authorities, like a bank, because adding, changing, or removing information from the blockchain is made purposefully difficult, making it harder to falsify a transaction or hack into the ledger itself.[5]

Unlike a bank that exercises complete control over validating any transaction on its ledgers, transactions on decentralized blockchains must be validated by the network of users. To encourage validation of the transactions on a blockchain, validators (called "miners") are provided incentives often in the form of cryptocurrency or cryptographic tokens, which may have additional functionality. Blockchain transactions are validated by miners through either "Proof of Work" or "Proof of Stake" methods.

For example, Bitcoin operates a "Proof of Work" blockchain. To generate a new "hash" (or ledger entry) for a block of transactions on the Bitcoin blockchain, miners engage in a mathematical (i.e., cryptographic) guessing game

---

[5] Rohr & Wright, *supra* note 3 at 471 ("[B]lockchain-based consensus mechanisms make adding information to a blockchain purposefully difficult and even harder to remove once saved, creating data that is hard to alter once stored. Blockchain-based protocols groups sets of transactions into blocks, which are linked together to form a sequentially ordered chain. Before a block can be added to a blockchain, the protocol requires that a valid cryptographic hash for a block (an encrypted representation of the underlying transactional data) is generated.").

requiring their computers to, through brute-force computing, guess the answer to an algorithm.[6] The miner who wins the guessing game broadcasts the new hash to the network and, once confirmed by other miners, is rewarded with Bitcoin for their efforts. In the case of other "Proof of Work" blockchains, the miner would be awarded with a token or asset associated with that blockchain, such as Ether, a crypto asset associated with the Ethereum blockchain. "Proof of Work" protocols consume large amounts of energy and computational resources.

"Proof of Stake" protocols require much less energy, making them desirable for private blockchains looking to scale quickly. "Proof of Stake" requires miners to "stake" or lock up tokens or assets that they already own. Much like a lottery system, miners with more tokens and a longer period validating transactions on the network are selected by an algorithm to validate new transactions. Once new transactions are validated, the miner earns additional tokens as a reward.

2.   CryptoKitties

Moments was not Dapper Labs's first foray into blockchain technology and crypto assets. In November 2017,

---

[6] Id. at 471 ("The proof of work guessing game requires a computer to repeatedly execute a hashing algorithm until the algorithm outputs a valid hash with a sufficient number of leading zeros. Members of a blockchain-based network (known as *miners)* play this proof of work guessing game and expend computational resources to generate a valid hash.").

Dapper Labs released CryptoKitties, which was built on the Ethereum blockchain, a public blockchain using a "Proof of Work" protocol. CryptoKitties used Ethereum's "smart contract functionality . . . to allow users to breed and collect digital cats with a variety of characteristics." (AC ¶ 28.) CryptoKitties were a hit. So much so that the volume of activity, combined with Ethereum's burdensome "Proof of Work" validation, overwhelmed Ethereum's network, causing a slowdown of all transactions on the network. (See AC ¶ 29.)

### 3.   The Flow Blockchain

Following the launch of CryptoKitties, Gharegozlou stated in an interview with USA Today that Dapper Labs had started to work on a "scaling solution" for the business. (AC ¶ 31.) Dapper Labs announced that solution in September 2019 -- the development of its own private blockchain, Flow. The Flow Blockchain uses "Proof of Stake" validation to allow the business to scale more efficiently. Dapper Labs also created a token, FLOW, which miners would be able to stake to validate transactions.[7] Because FLOW tokens were used to validate

---

[7] Much of Dapper Labs's proprietary technology is named or relates to the word "flow." For clarity, the Court refers to the crypto-token as FLOW, in all capitals, so as to distinguish it from the Flow Blockchain, which refers to only the blockchain created and controlled by Dapper Labs. As alleged by Plaintiffs, both FLOW and the Flow Blockchain, exist within the so-called Flow Network, which includes the NBA Top Shot application as well as other potential applications developed by Dapper Labs. To the extent that it is alleged that all applications on the Flow Network run atop the Flow Blockchain, those terms may by use interchangeably.

transactions on the Flow Blockchain, FLOW are also "required for . . . all the applications on top of [the Flow Blockchain] to function." (AC ¶ 37.) Dapper Labs's website explained that FLOW tokens could be used as "[p]ayment for computation and validation services," as a "[m]edium of exchange," as a "[d]eposit for data storage," as "[c]ollateral for secondary tokens," and for "[p]articipation in governance." (AC ¶ 38.)

Dapper Labs created 1.25 billion FLOW tokens in September 2020 and distributed them to institutional investors and the public between September 2020 and October 2020. Dapper Labs also set aside several million FLOW tokens for "ecosystem development" to compensate its developers and for other purposes, as well as reserving 250 million tokens for itself. Dapper Labs raised around $18 million from the sale of FLOW tokens. However, none of the nearly 13,000 investors who purchased FLOW were from the United States, and FLOW tokens are not a registered security with the SEC. Yet, by July 2021, FLOW tokens were internationally listed on several of the major cryptocurrency exchanges. Dapper Labs stated that "as more value is created on top of the Flow [B]lockchain, more demand is generated for FLOW token." (Id.)

4.    NBA Top Shot and Moments

Dapper Labs first announced its blockchain application, NBA Top Shot, in July 2019 as a joint venture between itself,

the National Basketball Association ("NBA"), and the NBA Players Association ("NBAPA"). NBA Top Shot is a platform or application, owned and operated by Dapper Labs and built on top of the Flow Blockchain. The purpose of the NBA Top Shot application is primarily to provide a platform to sell "Moments," the alleged security at issue in this action.

Moments are NFTs. And NFTs are digital assets whose authenticity and ownership can be recorded on a blockchain. In this case, Moments are a digital video clip of highlights from NBA games, such as a spectacular dunk or game-winning shot. Dapper Labs creates (or, in crypto parlance, "mints") a game highlight into an NFT in collaboration with the NBA and NBAPA, who, together with Dapper Labs, control which highlights become Moments. The minting process prints the NFT with a unique identifier or serial number. So, while Dapper Labs may mint 1,000 copies of a certain basketball highlight into a Moment, only one of each serial number exists, making each Moment unique.

The first "Moments" were made available to a "select list of individuals" as part of a "closed beta" which took place on June 15, 2020. (AC ¶ 52.) On October 1, 2020, Dapper Labs launched an "open beta" for the NBA Top Shot application, for the first time allowing the public to create an NBA Top

Shot account, log-in, and purchase Moments. NBA Top Shot users have been able to purchase Moments ever since.

Ownership of a Moment is limited to only the NFT itself. When a person purchases a Moment, the owner does not acquire any rights to the basketball highlight depicted by the NFT or the underlying artwork or other intellectual property, and thus does not acquire any rights to exploit the highlight without the express permission of the NBA, NBAPA, and Dapper Labs. Accordingly, only the ownership of the Moment, as opposed to the other embedded property, is recorded on the Flow Blockchain.

Moments can be acquired in two ways. First, Dapper Labs sells "packs" of Moments on the NBA Top Shot application at varying prices for the whole pack. Like a pack of basketball cards, packs contain multiple Moments. Packs, however, are not always available for purchase. Instead, Dapper Labs releases a limited number of packs during "drops." Interested purchasers wait in a virtual queue to buy packs when they drop, and the packs often sell out. Supplies are limited and not everyone who queues to purchase a pack during a drop may successfully acquire the pack they want, or any pack at all.

Each pack contains different Moments minted by Dapper Labs. Like physical trading cards, the Moments within each pack are random; purchasers do not know which Moments they

will receive when they purchase the pack. All that is
guaranteed is that certain packs will contain a certain number
of Moments with varying levels of scarcity.

> There are three tiers of packs generally available: (1)
> Common: nine common Moments, which have production of
> over 1,000 with no maximum; (2) Rare: seven common
> Moments and one rare Moment, with a maximum production
> of 999; and (3) Legendary: six common Moments, one rare
> Moment, and one legendary Moment, with a maximum
> production of 99.

(AC ¶ 56.) Dapper Labs and the NBA and NBAPA control which
highlights are designated common, rare, or legendary by
deciding how many Moments of each highlight are minted.

Additionally, people may acquire Moments through a
secondary marketplace, hosted on the NBA Top Shot application
and created and controlled by Dapper Labs (the
"Marketplace"). In the Marketplace, Moments owners can re-
sell individual Moments they acquired in packs or that they
bought from other Moments owners. They may also gift Moments.
Ownership of the Moments, the price paid for the Moments, and
the transfer and sale of the Moments in the Marketplace are
all recorded on only the Flow Blockchain. Dapper Labs does
not recognize and does not endorse Moments being sold or
traded outside of the Marketplace.

While packs may be purchased for as little as nine
dollars (see "Austin Certification," Dkt. No. 27-1) -- or
gifted by Dapper Labs, in the cases of celebrities,

11

influencers, or NBA players -- the Moments within each pack may be considerably more valuable. One Moments owner, Michael Levy, reportedly purchased Moments with a value of, at one point, more than $15.6 million. And in February 2021, another purchaser, Jesse Schwarz, set a record by purchasing a single Moments NFT on the Marketplace for $208,000. Gharegozlou himself owns Moments purportedly worth over $10 million. (See AC ¶ 102.) By late February 2021, Dapper Labs's combined market capitalization from sales of Moments on the NBA Top Shot application had reached $1.9 billion.

Dapper Labs generates revenue from the sale of Moments in three ways. First, Dapper Labs receives revenue reportedly in the tens of millions of dollars from the sale of packs. Second, Dapper Labs receives a five percent transaction fee anytime Moments are sold on the Marketplace. Third, Dapper Labs, which maintains a digital wallet, called a "Dapper Wallet," for all users to facilitate payments, also takes a "cash-out fee" when purchasers transfer their balance from the Dapper Wallet to their bank account. (See id. ¶ 66.)

Moments purchasers who sought to withdraw their cash off of the NBA Top Shot application have not always been able to do so, nor has it been quick. On March 26, 2021, Dapper Labs published on the NBA Top Shot website that withdrawals would first be enabled in six to eight weeks. (See id. ¶ 95.) Once

enabled, Dapper Labs stated that withdrawals would be "processed within 21 days but others may take 40 days or more." (Id.) Not all persons on the NBA Top Shot platform had withdrawal capabilities enabled by Dapper Labs, and Plaintiffs allege that, even once Dapper Labs enabled the functionality, many were not able to withdraw their funds.

Plaintiffs' putative class includes individuals who purchased Moments between June 15, 2020, and the present. According to Dapper Labs, as of April 2021, more than 800,000 people used the NBA Top Shot platform to purchase Moments. Many thousands of those purchasers fall within the putative class. Dapper Labs has not filed any registration statement for the sale of Moments with the SEC at any point.

B.   PROCEDURAL HISTORY

On May 12, 2021, plaintiff Jeeun Friel filed a putative class action complaint in the Supreme Court of the State of New York, New York County. On July 7, 2021, Dapper Labs removed the action from the state court pursuant to 28 U.S.C. Sections 1332, 1441, 1446, and 1453. (See Dkt. No. 4.) On August 11, 2021, Dapper Labs requested that the Court suspend the deadline to respond to the Complaint until Plaintiffs had complied with the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), including the Court's appointment of a Lead Plaintiff in the case. (Dkt.

No. 11.) On October 5, 2021, Plaintiff Gary Leuis moved, unopposed, to serve as Lead Plaintiff. (<u>See</u> Dkt. Nos. 20-22.) And on October 8, 2021, the Court granted that motion, appointed Leuis as Lead Plaintiff and approved The Rosen Law Firm, P.A. as Lead Counsel. (<u>See</u> Dkt. No. 23.)

On October 22, 2021, the Court granted the parties' joint request for an extension of time for Plaintiff to file an Amended Complaint and for Defendants to respond. (<u>See</u> Dkt. No. 26.) Plaintiffs filed their Amended Complaint on December 27, 2021. (<u>See</u> Dkt. No. 27.)

On January 27, 2022, Defendants filed a pre-motion letter addressed to Plaintiffs, pursuant to the Court's Individual Rules of Practice, Section II.B., stating grounds justifying dismissal of the action under Rule 12(b)(6). (<u>See</u> Dkt. No. 30.) Plaintiffs opposed those grounds by letter dated February 3, 2022. (<u>See</u> Dkt. No. 31.) And on February 22, 2022, Defendants indicated to the Court that the pre-motion letter practice was unable to resolve the dispute and avoid motion practice at this point and requested a conference on the proposed motion to dismiss. (<u>See</u> Dkt. No. 32.) On June 24, 2022, the Court denied the request for a conference and directed the parties to submit a proposed briefing schedule for the motion to dismiss. (<u>See</u> Dkt. No. 33.)

On August 31, 2022, Defendants filed their Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(6), a request for Judicial Notice supported by the declaration of Defendants' attorney, Erin Zatlin, with accompanying exhibits, and their brief in support of the Motion. (See "Motion," Dkt. No. 37; "Request for Judicial Notice," Dkt. No. 38; "Brief," Dkt. No. 39; "Zatlin Decl.," Dkt. No. 40.) Plaintiffs filed their Opposition on October 31, 2022 (See "Opposition," Dkt. No. 41), and Defendants submitted a Reply in further support of their motion on November 30, 2022 (See "Reply," Dkt. No. 42).

## II.   <u>LEGAL STANDARD</u>

### A.   <u>RULE 12(B)(6) MOTION TO DISMISS</u>

To survive a motion to dismiss, pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, (2007)). A complaint satisfies this standard when it contains sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially

plausible. <u>See</u> <u>id.</u> However, if the factual allegations sufficiently "raise a right to relief above the speculative level," then a court should not dismiss a complaint for failure to state a claim. <u>Twombly</u>, 550 U.S. at 555.

When resolving a motion to dismiss, the Court's task is to "assess the legal feasibility of the complaint, not . . . the weight of the evidence which might be offered in support thereof." <u>In re Columbia Pipeline, Inc.</u>, 405 F. Supp. 3d 494, 505 (S.D.N.Y. 2019) (quoting <u>Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.</u>, 375 F.3d 168, 176 (2d Cir. 2004)). At this stage, a court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual . . . allegations." <u>Dane v. UnitedHealthcare Ins.</u>, 974 F.3d 183, 188 (2d Cir. 2020).

B.   <u>SECTIONS 5 AND 12 LIABILITY AND THE HOWEY TEST</u>

Section 5 of the Securities Act prohibits persons from offering, selling, or delivering by means of interstate commerce any security, "[u]nless a registration statement [filed with the Securities and Exchange Commission] is in effect." 15 U.S.C. § 77e(a), (c). Section 12 creates a private right of action for any person who purchased a security from another, in violation of Section 5, "to recover the

consideration paid for such security with interest thereon." 15 U.S.C. § 77*l*(a). In this case, the foundational question of liability under Sections 5 and 12(a) is whether Dapper Labs's offer and sale of Moments amounts to an offer or sale of a security.

"Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." <u>SEC v. Edwards</u>, 540 U.S. 389, 393 (2004). The Securities Act's definition of a security is broad so as to effect that purpose, and includes, as relevant here, an "investment contract" within the definition. 15 U.S.C. § 77b(a)(1).[8] And while the Securities Act does not define the scope of an "investment contract," in the seminal case <u>SEC v. W.J. Howey Co.</u>, the Supreme Court of the United States defined an "investment contract" as "a contract, transaction or scheme whereby a person invests

---

[8] Along with "investment contract," the Securities Act defines a "security" to mean "any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, . . . voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U.S.C. § 77(b)(a)(1).

[their] money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298-99 (1946).

Courts refining and applying the so-called Howey test are directed to put function over form. The definition established in Howey "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Id. at 299. In analyzing whether some new-fangled scheme fits within the definition of an "investment contract," "form should be disregarded for substance." Tcherepnin v. Knight, 389 U.S. 332, 336 (1967). To that end, what matters is "not [] the name appended" to a transaction, United Hous. Found., Inc. v. Forman, 421 U.S. 837, 849 (1975), but "whether, in light of the economic reality and the totality of circumstances," the instrument was an investment contract. Glen-Arden Commodities, Inc. v. Constantino, 493 F.2d 1027, 1034 (2d Cir. 1974).

At the motion to dismiss stage, Plaintiffs must plead facts adequate to establish the three prongs of the Howey test: (1) an investment of money (2) in a common enterprise (3) with the expectation of profit from the essential

entrepreneurial or managerial efforts of others.[9] Howey, 328
U.S. at 298-99.

### III. DISCUSSION

Since 1946, courts have applied Howey, which itself
dealt with citrus orchards, to evaluate and classify a wide
range of financial schemes and investment contracts, offers,
and instruments that at first blush would not appear to be
securities. See Glen-Arden Commodities, 493 F.2d 1027
(whiskey casks); Miller v. Cent. Chincilla Grp., Inc., 494
F.2d 414 (8th Cir. 1974) (chinchillas); Marini v. Adamo, 812
F. Supp. 2d 243 (E.D.N.Y. 2011) (rare coins).

The rise of blockchain-based technology has led a spate
of courts in this Circuit to further invoke Howey to assess
whether crypto tokens are securities. In these actions, the
tokens were offered for sale as part of initial coin offerings
("ICOs") -- a term derived from and functioning similarly to
a traditional initial public offering, or IPO, of company
stock; used to raise funds to develop the company. See
Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340 (S.D.N.Y. 2019);
SEC v. Telegram Group Inc., 448 F. Supp. 3d 352 (S.D.N.Y.

---

[9] Some courts refer to Howey as requiring a four-prong analysis, splitting
the third prong in two: (a) an expectation of profits (b) derived from
the efforts of others. See, e.g., SEC v. Telegram Grp. Inc., 448 F. Supp.
3d 352, 367-68 (S.D.N.Y. 2020). However, the parties essentially agree,
and the Court finds, that the test and analysis are the same no matter
how it is divided. (See Brief at 7 n.18; Opposition at 7 n.4.)

2020); <u>SEC v. Kik Interactive, Inc.</u>, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (together, the "<u>ICO Cases</u>").

The <u>ICO Cases</u>, although speaking in a similar technical vernacular as that used here, do not involve identical schemes and thus, even if this Court were bound by them, do not dictate an outcome. To the Court's knowledge, no other courts have addressed either the exact substance or posture of the dispute here: whether allegations that an unregistered offer for purchase or sale of, specifically, an NFT constitutes an investment contract under <u>Howey</u> and thus survive a motion to dismiss under Rule 12(b)(6).

In the most general terms, the Court is asked to assess whether Moments are more like cardboard basketball cards, i.e., commodities, or more like crypto tokens. As the <u>ICO Cases</u> reveal, tokens offered as part of ICOs often bear the hallmarks of a security. Here, it is a close call and the Court's decision is narrow. If there is a defining line separating those offerings that are securities from those that are not, whether Moments qualify toes that line intimately. Nevertheless, mindful of the purposive nature of <u>Howey</u>, the Court finds that Plaintiffs' allegations render each consideration under <u>Howey</u> facially plausible and survive Defendants' Motion to Dismiss the alleged violation of Sections 5 and 12 of the Securities Act. <u>See</u> <u>Gary Plastic</u>

Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 237 (2d Cir. 1985) (explaining that the Congressional purpose for enacting the Securities Act was "to provide investors with material information and to protect the investing public from the sale of worthless securities through misrepresentation") (citing H.R. Rep. No. 85, 73d Cong., 1st Sess. 1-5 (1933)).

Before reaching Howey, however, the Court must begin where Defendants' Brief ends. As part of their concluding arguments, Defendants ask the Court to not be distracted by Plaintiffs' references to and allegations about the FLOW tokens that Dapper Labs created. Defendants urge the Court to ignore FLOW tokens because they "and digital basketball cards (Moments) are, as alleged, separate products." (Brief at 28.) They caution the Court to not be "confuse[d]" by Plaintiffs' "talking a lot about technology and cases involving cryptocurrencies," namely, the ICO Cases. (Id.) And they insist that "the securities analyses for these products[, FLOW and Moments,] are, likewise, separate." (Id.)

The Court certainly agrees with Defendants that FLOW and Moments are separate instruments, that FLOW is not sold in the United States, that Plaintiffs did not allege they own FLOW, and that FLOW is not the instrument on which Plaintiffs' Securities Act violations are premised. Nevertheless,

Defendants' view of this point is too narrow. They ignore that FLOW is part of the economic realities of the investment scheme in dispute. And, moreover, the Court finds that Defendants are wrong that Dapper Labs's "embrac[ing] a new technology -- NFTs -- does not change the underlying legal analysis." (Id.) In stark contrast to Defendants' contention, "the involvement of blockchain technology *does* [] alter" the conclusion, as the Plaintiffs' allegations make plausible that but for Dapper Labs's creation, development, and maintenance of the *private* Flow Blockchain, Moments would have no value. (Id. (emphasis added).)

The interplay among FLOW, the Flow Blockchain, and Moments is necessary to the totality of the scheme at issue. Plaintiffs have alleged that, without FLOW tokens, no transactions on the Flow Blockchain can be validated. Indeed, the "Proof-of-Stake" mechanism employed by the Flow Blockchain requires FLOW to power it and incentivize miners to validate transactions. In that respect, FLOW's utility creates value for Moments through the network's consensus as to ownership and the price of each transaction. Plaintiffs' general appeal to "crypto"-adjacent cases is apt in that regard. Although those cases have primarily dealt with initial offerings of assets, like the FLOW token, the more pertinent throughline between those cases and the present

action is the presence of the blockchain itself. In each case, the promoters privatized their ledger, making the purchasers reliant upon the promoter for the asset's value. That similarity is true whether the instrument is a crypto token or an NFT. And it is the critical similarity here. Plaintiffs allege a scheme of directly correlated value between FLOW and Moments, insofar as FLOW is necessary to creating the value of Moments via blockchain validation with "[t]he economic impact [being] that as more value is created on top of the Flow [B]lockchain, more demand is generated for FLOW tokens." (AC ¶ 107.)

To be sure, however, and as discussed in more detail below, the Court's conclusion that the offer of Moments constitutes an investment contract is not premised on the sale and distribution of FLOW, and the Court provides no view on whether FLOW, itself, constitutes a security. While the <u>Howey</u> analysis for Moments is separate from that pertaining to FLOW, the economic realities and technological interplay between FLOW, the Flow Blockchain, and Moments, as alleged by Plaintiffs, are what supports the Court's conclusions.

A.   <u>APPLYING HOWEY</u>

1.   <u>Investment of Money</u>

The Court finds that the first prong of <u>Howey</u>, an investment of money, is adequately pled. Austin's PSLRA

23

Certification establishes that he spent considerable money purchasing Moments from Dapper Labs. (See Austin Certification.) The parties do not dispute this, and none of the briefing submitted addresses this prong. The dispute instead involves only the second and third <u>Howey</u> considerations: whether Plaintiffs have adequately pled (2) a common enterprise and (3) an expectation of profits derived from the essential entrepreneurial or managerial efforts of others. The Court addresses those in turn.

2.   <u>Common Enterprise</u>

Defendants contend that Plaintiffs have failed to adequately allege a common enterprise under either of the two theories accepted in this Circuit. (See Brief at 8-18.) The first of those theories is known as "horizontal commonality." Although typically analyzed together, horizontal commonality exists where two considerations are established: (1) a sharing or pooling of the funds of investors and (2) that "the fortunes of each investor in a pool of investors" are tied to one another and to the "success of the overall venture." See <u>Revak v. SEC Realty Corp.</u>, 18 F.3d 81, 87 (2d Cir. 1994) (citation omitted); <u>In re J.P. Jeanneret Assocs., Inc.</u>, 769 F. Supp. 2d 340, 359 (S.D.N.Y. 2011). Courts have also found that while the pro-rata distribution of profits is evidence of horizontal commonality, "such a formalized

24

profit-sharing mechanism is not required." ATBCOIN LLC, 380 F. Supp. 3d at 354; see also Kik, 492 F. Supp. 3d at 178 (same); Revak, 18 F.3d at 87 (defining horizontal commonality as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, *usually* combined with the pro-rata distribution of profits") (emphasis added).

Common enterprise may also be established by showing vertical commonality. Two types of vertical commonality are recognized by some courts, "broad" and "strict" vertical commonality. Broad vertical commonality is established by showing that "the fortunes of investors are tied to the efforts of the promoter." Revak, 18 F.3d at 88. Although other Circuits accept broad vertical commonality as a viable theory, in Revak, the Second Circuit explicitly rejected its application because it "effectively merged into a single inquiry" the "two separate questions posed by Howey -- whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others." Id. at 88.

Accordingly, only "strict vertical commonality" is accepted in this Circuit.[10] "Strict vertical commonality requires that the fortunes of investors be tied to the *fortunes* of the promoter." Id. (internal quotation marks omitted). "Stated otherwise, strict vertical commonality exists where there is a 'one-to-one relationship between the investor and investment manager' such that there is 'an interdependence of *both* *profits* *and* *losses* of the investment.'" Marini, 812 F. Supp. 2d at 256 (citation omitted). In such a common enterprise, "the fortunes of plaintiff and defendants are linked so that they rise and fall together." Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Investments Ltd., 205 F. Supp. 2d 243, 249 (S.D.N.Y. 2002) (citation omitted).

    a)   Horizontal Commonality

    (1)   Pooling

First, the Court addresses whether Plaintiffs have adequately pled a "pooling" of the investors' funds. Defendants argue that Plaintiffs fail to allege pooling, stating that "there are no meaningful facts alleged showing

---

[10] The Second Circuit did not "address the question of whether *strict* vertical commonality gives rise to a common enterprise" in Revak, but also did not reject it. Revak, 18 F.3d at 88. Since Revak, courts in this Circuit have continued to assess the common enterprise prong under the theory of strict vertical commonality. See In re J.P. Jeanneret Assocs. Inc., 769 F. Supp. 2d at 360 (collecting cases); see also generally ICO Cases.

pooling" and further that "no variation of the word 'pool' appears in" the AC. (Brief at 17.) While the Court agrees with Defendants that there are no detailed factual recitations in the AC regarding the word "pooling," pooling may be reasonably inferred from Plaintiffs' allegations. See Dane, 974 F.3d at 188 (requiring courts to "accept as true all factual allegations and draw from them all reasonable inferences"); see also United States v. Zaslavskiy, No. 17 Cr. 647, 2018 WL 4346339, at *6 (E.D.N.Y. Sept. 11, 2018) ("Though the Indictment is not explicit, it can readily be inferred from the facts alleged that the Recoin and Diamond investment strategies depended upon the pooling of investor assets.").

Generally, pooling occurs when the funds received by the promoter through an offering are, essentially, reinvested by the promoter into the business. In turn, such reinvestment increases the value of the instrument offered. See Milnarik v. M-S Commodities, Inc., 457 F.2d 274, 278 (7th Cir. 1972) (describing the origins of pooling in Howey as creating "a pool of capital to be used in furthering a common enterprise" even where the "sales of units of land . . . purported to be outright sales from one individual to another"). It is those conditions that, in the words of Revak, "tie[] the fortunes of each investor in a pool of investors to the success of the

overall venture." 18 F.3d at 87 (quoting <u>Hart v. Pulte Homes</u> <u>of Mich. Corp.</u>, 735 F.2d 1001, 1005 (6th Cir. 1984)).

To that end, the courts in the <u>ICO Cases</u> have found pooling satisfied where allegations plausibly tied the funds received by the promoter through the offering to an improvement of the ecosystem (i.e., the private blockchain) that consequently increases the value of the token offered during the ICO. For example, in <u>Kik</u>, the court found pooling was adequately alleged where

> Kik deposited the funds into a single bank account. [And] Kik used the funds for its operations, including the construction of the digital ecosystem it promoted. . . . The success of the ecosystem drove demand for Kin[, the crypto token offered by Kik in its ICO,] and thus dictated investors' profits. . . . Rather than receiving a pro-rata distribution of profits, which is not required for a finding of horizontal commonality, investors reaped their profits in the form of the increased value of Kin.

492 F. Supp. 3d at 178. Likewise, in <u>Audet v. Fraser</u>, --- F. Supp. 3d ---, 2022 WL 1912866 (D. Conn. June 3, 2022), the court concluded that the jury's finding that there was no pooling was against the weight of the evidence because the "promotional materials described [the promoter's] plan to use funds raised via the various ICO stages to create a [fund] that it would use to guarantee a $20 price floor and facilitate widespread adoption, thereby increasing

Paycoin's[, the crypto token offered,] market value." <u>Id.</u> at
*15.

Defendants argue that these cases, and the <u>ICO Cases</u>
more generally, are inapposite. (<u>See</u> Brief at 12-14.) In
short, Defendants argue that the <u>ICO Cases</u> and others like
them require that the offering, and the capital pooled
therefrom, occur in advance of the construction of the
ecosystem that supports, and which increases, the value of
the token.

Such a temporal requirement is not supported by the case
law and does not follow from a practical perspective. For
example, in <u>Telegram</u>, the court found that the "plain economic
reality is that, post-launch [of the underlying blockchain],
the [crypto assets] themselves continue[d] to represent the
Initial Purchasers' pooled funds." 448 F. Supp. 3d at 369
(citing <u>ATBCOIN LLC</u>, 380 F. Supp. 3d at 354 (pooling of assets
in a post-launch digital asset)). Although both rounds of
purchases were made before the blockchain launched, the court
specifically found that "horizontal commonality exist[ed]
after the launch." <u>Id.</u> at 369. Pooling was established because
the later-round purchasers' and the initial-round purchasers'
funds would support the continued development of the
blockchain, even once it launched, because both rounds of
purchasers "were dependent upon the success of the

[blockchain]." Id. at 370 ("[I]f [the blockchain] failed, all Initial Purchasers would suffer a diminution in the value of their [assets].").

The logic of cases like Telegram is sound. Implementing the temporal bar that Defendants urge is impractical and would inappropriately limit the scope of investment contracts to pre-development initial offerings. Such a limitation does not comport with application of the test embodied by Howey, where the citrus groves had already been established, some for years, prior to offering the land sale investment contracts. Indeed, the funds pooled through the sale of the orchard parcels would "help [the Howey Company] finance additional development," not initial construction. Howey, 328 U.S. at 295; see also id. (explaining that the price per acre of the groves varied based on "the number of years the particular plot ha[d] been planted with citrus trees").

The Court is also not persuaded by Defendants' argument that "[f]or pooling to exist, 'each investor's rate of return' needs to be 'entirely a function of the rate of return shown by the entire account.'" (Brief at 10 (citing Savino v. E. F. Hutton & Co., 507 F. Supp. 1225, 1236 (S.D.N.Y. 1981)).) That proposition from Savino, as formulated by Defendants, overstates the law, is dicta in the context of one example of

pooling (a "commodity pool"), and is raised in the context of pooling with pro-rata distribution. It is not relevant here.

Similarly, Defendants' reliance on <u>Savino</u> and the Seventh Circuit case of <u>Hirk v. Agri-Rsch. Council, Inc.</u>, 561 F.2d 96 (7th Cir. 1997), is also misplaced. Defendants cite these cases for the proposition that the unique nature of the Moments in each Plaintiff's account, comprising different Moments from any other users', undermines the notion of pooling. (Brief at 10). That circumstance may have been true in <u>Savino</u> and <u>Hirk</u>, where the investments had no causal relation to the enterprise, but it is not what Plaintiffs alleged here. As the court in <u>Savino</u> explains, "[w]ith respect to horizontal commonality, the key feature is not that investors must reap their profits at the same time; it is that investors' profits at any given time are tied to the success of the enterprise." <u>Savino</u>, 507 F. Supp. at 1236-37. As described in more detail below, Plaintiffs have adequately alleged that the value of Moments is "causally related to the profitability of [Dapper Labs] as a whole" because their value depends on the success of the Flow Blockchain. <u>Id.</u> at 1237; <u>cf.</u> <u>ATBCOIN LLC</u>, 380 F. Supp. 3d at 354 (rejecting argument that purchasers "gained no share in a common enterprise, but rather exercised individual control over the ATB Coin asset" on the grounds that "the potential profits stemming from the

future valuation of the ATB Coins were entirely reliant on the success of Defendants' new blockchain" (internal quotation marks and alterations omitted)).

Bearing this background in mind, the Court is persuaded that the AC adequately alleges pooling to survive the Motion to Dismiss. Plaintiffs alleged that Dapper Labs's sale of packs of Moments and the transaction fees on the Marketplace generate revenue used to support and grow the blockchain. (See AC ¶ 66.) This factual assertion would be sufficient to support a reasonable finding of pooling. But Plaintiffs also allege that purchasers' capital is then held by Dapper Labs in Dapper-controlled wallets. (Id. ¶ 102.) Further, they contend that Dapper Labs has been retaining purchasers' cash on its books for months after withdrawals are requested to help "raise money at a high valuation," to "prop up the value of the [FLOW] token," because, without capital on the platform, "the platform will collapse." (Id. ¶¶ 97-102, 106, 111.) In other words, Plaintiffs allege that Dapper Labs has pooled Moments purchasers' funds to raise additional capital, outside of and along with revenue, to ensure the Flow Blockchain does not collapse. The reasonable inference to draw from these allegations is that the capital Dapper Labs raises through the offer of Moments is used to develop and maintain the Flow Blockchain. (See also Zatlin Decl. Ex. 7 §

3(ii) (hereinafter, "NBA Top Shot Terms of Use") ("Every transaction on the Flow Network [and over the Flow Blockchain] requires the payment of a transaction fee . . . [that] fund[s] the network of computers that run the decentralized Flow Network.").) And because, as discussed below, the Flow Blockchain is necessary to the value of Moments, pooling is facially plausible. See Telegram, 448 F. Supp. 3d at 370. Accordingly, Plaintiffs adequately allege a pooling of assets.

(2)   Investors' and Enterprise's Fortunes Tied

The Court has an easier time finding that the second consideration, that the fortunes of each investor is tied to the success of the overall venture, is adequately pled. As explained in Revak: "[I]n a common enterprise marked by horizontal commonality, the fortunes of each investor depend upon the profitability of the enterprise as a whole." 18 F.3d at 87. The common thread pulled from the ICO Cases is that this second consideration is satisfied where the digital asset's value is tied, and depends upon, the continued success of the blockchain. See Telegram, 448 F. Supp. 3d at 369-70; Kik, 492 F. Supp. 3d at 178; ATBCOIN LLC, 380 F. Supp. 3d at 353.

Plaintiffs adequately allege that the purchasers' fortunes were tied to the overall success of Dapper Labs.

Specifically, Plaintiffs assert that "Dapper Labs controls the enterprise," including the "Flow Blockchain" that Moments sit atop. (AC ¶ 74.) Plaintiffs have also alleged that Moments, once purchased in packs, can be sold only in the Marketplace, which again, is controlled by Dapper Labs. (See AC ¶ 67.) And Plaintiffs have alleged that purchasers of Moments are "hitching their wagons to the continued success of NBA Top Shot, [and] to Dapper Labs and the Flow Blockchain that underlies the platform." (AC ¶ 86.)

An article incorporated in the AC by reference, and of which Defendants ask the Court to take judicial notice, includes statements supporting a finding that Plaintiffs' horizontal commonality allegations are plausible. The article, published by Sports Illustrated, explains that "[i]n the days following [a] Feb[ruary] 22 [M]arketplace spike, trading was halted for hours at a time, leading to a sharp drop in the prices of [M]oments." (Zatlin Decl. Ex. 2 at 8.) This statement ties the value of Moments to Dapper Labs's success. If the fortunes of Moments purchasers were entirely divorced from the success of Dapper Labs's Flow Blockchain, then such price reactions based on Dapper Labs's management of the Flow Blockchain would be unlikely. Plaintiffs will need evidence to prove this causal connection, but the Court is persuaded that Dapper Labs's scheme to sell Moments

34

plausibly reflects horizontal commonality by being "intertwined with interest in Dapper Labs, its burgeoning new blockchain, and the token that 'powers it all.'" (AC ¶ 89.)

The cases cited by Defendants do not alter this conclusion. (See Brief at 11-12 (citing Dahl v. English, 578 F. Supp. 17 (N.D. Ill. 1983); Stenger v. R.H. Love Galleries, Inc., 741 F.2d 144 (7th Cir. 1984); Wells v. Jackie Fine Arts, Inc., No. C-2-86-0374, 1989 WL 140912 (S.D. Ohio Sept. 25, 1989)).) In citing these cases, Dapper Labs incorrectly targets the product or instrument being offered in those cases, rare collectibles. Defendants miss the mark. Moments are not comparable to those rare collectibles. And Defendants' focus on the instrument being offered is askew. Rather, in determining whether horizontal commonality exists, the aim must be on the totality of the scheme and the economic realities that encompass it. In each of the cases cited by Defendants, horizontal commonality did not exist because there was no causal connection between "unique pieces of artwork" being sold and the promoter making the offering. See, e.g., Dahl, 578 F. Supp. at 20. That is not the case here.

Although Moments are unique and (definitionally) non-fungible, having a differing value based on serial number or the highlight represented in the NFT -- like the artwork sold

in Dahl, see id. -- Plaintiffs have plausibly alleged that
Moments' continued value is dependent upon the success of
Dapper Labs. This may be reasonably inferred from the AC.
Dapper Labs controls the Flow Blockchain. Moments cannot be
sold or traded outside of the Marketplace, also controlled by
Dapper Labs. And all that Moments purchasers own is,
essentially, the line of code recorded on the Flow Blockchain,
as no other rights to use or display the image are
transferred. The NBA Top Shot Terms of Use also states that
Moments have no intrinsic or inherent value outside the Flow
Blockchain. (See NBA Top Shot Terms of Use §§ 2(vi), 9(i) &
9(v).) It follows that, if, hypothetically, Dapper Labs went
out of business and shut down the Flow Blockchain, the value
of all Moments would drop to zero. That is the critical causal
connection that other collectibles cases lack, and which is
alleged here.

Assessing those allegations in connection with the
analogy Defendants favor -- cardboard basketball cards --
reveals the flaw in their analysis. Hypothetically, if Upper
Deck or Topps, two longtime producers of physical sports
trading cards, were to go out of business, the value of the
cards they sold would be wholly unaffected, and may even
increase, much like posthumously discovered art. That is not
true here, where Plaintiffs allege that the pooling of capital

36

generated from the sale of Moments propped up the Flow Blockchain and where the value of Moments is intertwined with the success of that blockchain and Dapper Labs. Accordingly, the Court finds that Plaintiffs have satisfied the horizontal commonality test and thus adequately pled an investment in a common enterprise.

b)   Strict Vertical Commonality

Although the Court finds that Plaintiffs have pled a common enterprise existed through horizontal commonality, it takes the opportunity to discuss the alternative theory Plaintiffs rely on, strict vertical commonality. "To support a finding of strict vertical commonality, a plaintiff must establish that 'the fortunes of plaintiff and defendants are linked so that they rise and fall together.'" Marini, 812 F. Supp. 2d at 256. In other words, plaintiffs show strict vertical commonality by alleging a "one-to-one relationship between the investor and the investment manager" such that there is an "an interdependence of *both profits and losses* of the investment." Kaplan v. Shapiro, 655 F. Supp. 336, 341 (S.D.N.Y. 1987).

The entirety of Plaintiffs strict vertical commonality argument hinges on one allegation -- that Dapper Labs collected a five percent fee on every transaction in the Marketplace. (See AC ¶ 66.) The Court is not persuaded that

this lone allegation, along with the other reasonable inferences drawn from it, is sufficient to establish strict vertical commonality as a matter of pleading or law.

Plaintiffs draw on two cases in support of their argument that they have alleged strict vertical commonality. Both compel the opposite conclusion. In <u>In re J.P. Jeanneret Associates</u>, the court found that strict vertical commonality was established based on a performance fee paid to the investment manager. 769 F. Supp. 2d at 360. The agreement controlling the investment outlined that the investment manager would be "paid (1) a basic quarterly fee in the amount of one-eighth of one percent (.00125) of the 'closing value' of the assets in the investment account, and (2) a performance fee equal to 20% of the profits in the investment account that exceed the preferred return and the basic quarterly fee." <u>Id.</u> Although the court there referenced the "basic quarterly fee" in describing the investment agreement, its conclusion with respect to strict vertical commonality turned on payment of the performance fee: "if profits were not generated in a calendar year, or if the profits did not exceed the preferred return, then JPJA did not receive a *performance fee*." <u>Id.</u> (emphasis added).

Plaintiffs try to avoid this reading of <u>Jeanneret</u> by pointing to the basic quarterly fee, stating that "[s]ince

the investment manager earns a quarterly fee based on total assets in the account, the manager could make a profit in a quarter where the investor took a loss." (Opposition at 11.) The statement is true enough. But the better reading of Jeanneret is that the presence of the quarterly fee, insofar as it is not paid based on profits, and while being potentially probative of an interdependence between investor and promoter, is not sufficient to establish strict vertical commonality on its own. The performance fee based on profits is the critical element.

The other case Plaintiffs rely on, Marini v. Adamo, is unpersuasive. Marini involved a scheme for the purchase and sale of rare coins. Like the Marketplace here, "Adamo [the promoter of the scheme] insisted that Marini buy and sell coins only through Adamo." 812 F. Supp. 2d at 249. On a motion for summary judgment, Marini argued that strict vertical commonality was satisfied because Adamo would receive a commission based on the sale of the rare coin. See id. at 259-60.

Plaintiffs' latch on to the court's statement in Marini that "if Adamo were to receive a commission on the sale of the coins, his fortunes would be inextricably tied to those of Marini's," id. at 260, and invites the Court to hold the same with respect to Dapper Labs's five percent fee

(Opposition at 11-12). The Court declines the invitation. On one hand, the court in Marini did not find that strict vertical commonality was established. Instead, it found that "disputed issues of material fact exist[ed] as to whether Adamo earned commissions on the sale of Marini's coins and, accordingly, the Court c[ould not] conclude as a matter of law whether Adamo's fortunes would rise and fall with plaintiffs' fortunes." 812 F. Supp. 2d at 259-60. This undermines any reliance on the court's passing reference to a "commission" as establishing the requisite linkage for strict vertical commonality. The record in Marini was also not clear as to when the purported commission was earned and whether it was based on profits or mere sale of the coin. The Court finds that Marini does not support Plaintiffs' strict vertical commonality argument.

On the other hand, the cases cited in Marini provide the better answer. Other than citing Jeanneret for the proposition discussed above, the court in Marini also discussed Walther v. Maricopa Int'l Inv. Corp., No. 97 Civ. 4816, 1998 WL 186736 (S.D.N.Y. Apr. 17, 1998). Walther makes clear the fault in Plaintiffs' assertions. In Walther, the court found that "strict vertical commonality exist[ed]" because "the defendants were to be paid only if Walther's funds made substantial gains. Consequently, if Walther's

funds appreciated in value, the defendants were financially compensated. On the other hand, if Walther's investment did not perform well, the defendants were not paid." Id. at *7 (internal quotation and citations omitted). Both Jeanneret and Walther support a finding that strict vertical commonality exists, in a commission-based scheme, where the commission is paid only in connection with the plaintiff's investment turning a profit.

Such is not the case here. Dapper Labs collects the five percent fee -- concededly called a "transaction fee" by Dapper Labs, not a commission -- regardless of the performance of the Moments in the marketplace. And while it is percentage-based, making the amount of the fee rise and fall with the value of the sale on the Marketplace, the Court is persuaded that such direct correlation does not satisfy the strict vertical commonality test.

Outside of their fee-based argument, Plaintiffs resort, in a footnote, to arguing that in blockchain-related cases, like Telegram, courts have found that strict vertical commonality is satisfied where the success of the investment is tied to the performance of the blockchain. (See Opposition at 13 n.7.) The Court agrees that Plaintiffs have plausibly alleged that Moments' success is tied to the performance of the blockchain. But the circumstances in Telegram are

41

distinct. In <u>Telegram</u>, strict vertical commonality was dependent upon the court's finding that Telegram's largest asset was a large reserve of the same crypto token, Grams, it offered to investors, "thereby linking the company's financial fortunes to the price of Grams and the success of the TON Blockchain." 448 F. Supp. 3d at 370. Although true that Plaintiffs have alleged that Dapper Labs maintains a large reserve of FLOW token, whose value is connected to the economic value of activities on the Flow Blockchain, none of the Plaintiffs claims to own FLOW and the Securities violations alleged are not for the offer of FLOW. This breaks the required linkage.

To illustrate, while the value of FLOW is alleged to be connected to the value of Moments, if Dapper Labs offered another NFT on the Flow Blockchain and decided to shut down the NBA Top Shot application altogether, it is plausible that the value of FLOW would be propped up and potentially increased by the new offering, while the value for Moments plummeted. Essentially, while Moments depend on FLOW, the value of FLOW could depend on other of Dapper Labs's offerings supported by the Flow Blockchain and existing in the Flow Network. Thus, the value for Moments and FLOW, as the necessary asset for strict vertical commonality under the theory promulgated in <u>Telegram</u>, would not rise and fall

together. Cf. Jordan (Bermuda) Inv. Co., 205 F. Supp. 2d at
249.

### 3.   Expectation of Profits

Plaintiffs must also adequately plead the final Howey
prong: that Dapper Labs's offer of Moments on NBA Top Shot
came with "a reasonable expectation of profits to be derived
from the entrepreneurial or managerial efforts of others."
Forman, 421 U.S. at 852. While Howey contemplated that the
investor must be "led to expect profits *solely* from the
efforts of the promoter or a third party," Howey, 328 U.S. at
299 (emphasis added), the Second Circuit has since held that
"the word solely should not be construed as a literal
limitation; rather, we consider whether, under all the
circumstances, the scheme was being promoted primarily as an
investment." United States v. Leonard, 529 F.3d 83, 88 (2d
Cir. 2008) (internal quotation marks omitted); see also
ATBCOIN LLC, 380 F. Supp. 3d at 355 ("[T]he third prong of
the Howey test is satisfied when the efforts made by those
other than the investor are the undeniably significant ones,
those essential managerial efforts which affect the failure
or success of the enterprise.") (citation omitted).

The "expectation of profits" test is an objective one.
Howey directs courts to "examine the offering from an
objective perspective," SEC v. Aqua-Sonic Prods. Corp., 687

F.2d 577, 584 (2d Cir. 1982), and decide "based upon what purchasers were 'led to expect'" by the promoter, Audet, 2022 WL 1912866, at *17 n.7 (D. Conn. June 3, 2022). Even so, courts in this Circuit have assessed the "subjective intent," of purchasers, although not determinative, as "probative on the issue of what a reasonable purchaser would have expected." Id.; see also Telegram, 448 F. Supp. 3d at 374 ("The Court's finding that the [cryptocurrency purchasers] had a reasonable expectation of profit is buttressed by [the purchasers'] subjective views. . . . The subjective intent of the [purchasers] does not necessarily establish the objective intent of a reasonable purchaser. However, the stated intent of prospective and actual purchasers, though not considered for the truth of their content, may be properly considered in the Court's evaluation of the motivations of the hypothetical reasonable purchaser." (citing SEC v. Tex. Gulf Sulphur Co., 446 F.2d 1301, 1305 (2d Cir. 1971)).)[11]

---

[11] Defendants' Reply argues that "The Second Circuit has affirmed a case confirming that '[t]he subjective intention or motivations of the investors are irrelevant.'" (Reply at 9 (citing SEC v. Aqua-Sonic Prods. Corp., 524 F. Supp. 866, 867 (S.D.N.Y. 1981), aff'd, 687 F.2d 577).) But the very next sentence of the district court's opinion explains that "to the extent that subsequent events give rise to inferences that are relevant to the economic reality of the transactions at the time they occurred, they were considered, but only to that extent," strongly suggesting that subjective intent plays some role in probing the issue. Aqua-Sonic Prods. Corp., 524 F. Supp. at 876. Further, in affirming Aqua-Sonic, the Second Circuit did not pronounce a view (and has not since) on the extent to which the subjective motivation of purchasers is relevant to buttressing the objective inquiry. And as explained above, cases since

a)   <u>Promise of Profits</u>

Defendants' Motion on the third prong of <u>Howey</u> begins with the argument that, objectively, Dapper Labs never persistently promised profits to potential purchasers. (Brief at 19-20.) To begin, Defendants misstate the law. Their representation that "[t]here needs to be a 'persistent' promise of profit," has no support in the Second Circuit. (Brief at 19 (quoting <u>SEC v. SG Ltd.</u>, 265 F.3d 42, 54 (1st Cir. 2001).) In the case Defendants cite, <u>SEC v. SG Ltd.</u>, the First Circuit used "persistent" to describe SG's actual actions in that case, not to define a rule. Other than <u>SG Ltd.</u>, the Court's research did not reveal any other court in any jurisdiction requiring any such persistency. Thus, a persistent promise of profits is sufficient, but not necessary, to satisfy <u>Howey</u>.

As to the allegations here, the Court finds that Defendants' public statements and marketing materials objectively led purchasers to expect profits. The AC includes Tweets, i.e., marketing materials, made by Dapper Labs via its NBA Top Shot account (AC ¶¶ 63 & n.1, 65 & n.2):

---

<u>Aqua-Sonic</u> in this Circuit have extolled the virtue of assessing subjective intent as probative of whether a reasonable investor was led to expect profits. The Court follows suit.



Each Tweet promotes a recent sale or statistics of recent sales of Moments on the Marketplace. And although the literal word "profit" is not included in any of the Tweets, the "rocket ship" emoji, "stock chart" emoji, and "money bags" emoji objectively mean one thing: a financial return on investment. See SEC v. Edwards, 540 U.S. 389, 396 (2004) ("[T]he commonsense understanding of 'profits' in the Howey test [is] simply 'financial returns on . . . investments.'" (internal citation omitted)). Gharegozlou also admits a profit motive. He is quoted promoting Moments to "younger

generations" as giving them an opportunity to "benefit financially" from the purchase. (AC ¶ 80.) And he publicly promotes his own holdings as "valuable." (Id. ¶ 103.)

Defendants' argument that these "tweets merely provide accurate facts regarding recent sales, and do not reference any gains or losses," (Brief at 19) is rebutted by the alleged sales structure of Moments packs. Dapper Labs markets Moments based on scarcity, offering common, rare, legendary, and other premium packs. (Id. ¶¶ 56-57.) The pricing of these packs at a drop is as low as nine dollars for common packs and higher based on the promise of acquiring scarcer Moments. Taken together with the Tweets promoting record high sales, exponentially higher than the price of Moments in a pack, makes plausible that Dapper Labs objectively led purchasers to expect that they would realize the same gains. Cf. Kik, 492 F. Supp. 3d at 179 (finding that an explanation of the "role of supply and demand in driving the value of Kin" as sufficient to establish the expectation of profits prong).

Although the Court is persuaded that the allegations regarding Dapper Labs's statements support a finding that the promise of profits consideration is established, that conclusion is buttressed by the subjective observations of purchasers and those reporting on the NBA Top Shot offering.

The AC details an investor, Jesse Schwarz ("Schwarz"), who was quoted as stating that purchases of Moments "are investments" and that he was motivated to buy the Moment of a LeBron James dunk "for $208,000" because it "was worth seven figures right away." (AC ¶ 59.) He continues that "investing in [] Moments is a lot like investing in stocks. . . . 'It's not only about what the best company or best player is. It's about understanding what's baked into the price and what other people aren't seeing.'" (AC ¶ 78.) In the same article in which Schwarz is quoted, incorporated by reference in the AC, Michael Levy, another Moments purchaser and host of an NBA Top Shot podcast, explained one of his motivations for purchasing Moments was "[o]bviously the financial returns." (Zatlin Decl. Ex. 1 at 16.)

The Sports Illustrated article incorporated by reference in the AC also bolsters the notion that Dapper Labs promised profits, going so far as to state that it was the "promise of soaring earnings . . . [that] has kept a steady stream of new users joining [NBA Top Shot]." (AC ¶ 61.) The reporter explains that "those lucky enough to acquire packs for $9 or even $99 . . . have effectively hit a jackpot: The [M]oments within are always valued magnitudes higher than the pack itself." (Zatlin Decl. Ex. 2 at 7.) And the article recounts that purchasers who "initially invested a few thousand

dollars" saw "the value of their account balloon by factors
greater than 10, almost overnight." (Id. at 2.)

The AC also quotes the former Chief of the SEC's Office
of Internet Enforcement, who comments that "[t]he reality is
that the growing fanatical NBA Top Shot database is all about
the investment, speculation and appreciation of the Top Shot
NFTs [i.e., Moments] . . . reinforces these notions
exponentially." (AC ¶ 79.) These subjective observations all
bolster the Court's objective inquiry into how Dapper Labs
marketed Moments and its finding that Defendants led
purchasers to expect profits.

That finding is not changed by Defendants' consumptive
use argument. (Brief at 20-21.) Defendants contend that
Plaintiffs' promise of profits allegations fail because
"Plaintiffs do not disavow that they intended to consume --
'to occupy the land or to develop it themselves,' -- the
basketball cards in the way that other collectors do, e.g.,
by buying preferred playing cards, seeking cards from
preferred teams, and actively selling or trading cards."
(Brief at 21 (citing Forman, 421 U.S. at 852-53).)

Factually, Forman is irrelevant. The Supreme Court found
that the record established that there was "no doubt that
investors were attracted solely by the prospect of acquiring
a place to live, and not by financial returns on their

49

investments." Forman, 421 U.S. at 853. Legally, Forman left open the possibility that "[i]n some transactions the investor is offered both a commodity . . . for use and an expectation of profits" and noted "the application of the federal securities laws to these transactions may raise difficult questions that are not present in this case." Id. at 853 n.17. These difficult questions are raised here but are, mostly, factual in nature and should not be answered in the current procedural posture.

Defendants assert that "collectors purchase Moments with a desire to consume them for what they are: unique cards depicting specific NBA games, plays, and players." (Reply at 10.) Defendants also point to Leuis's PSLRA certification for which they assert that "over 45% of the individual Moments purchased . . . are for players who were on the New York Knicks" representing Leuis's fandom as a New Yorker and a consumptive motivation.[12] Defendants' arguments about the extent to which members of the putative class bought Moments for commercial or investment purposes are important factual questions that are ill-suited for resolution on a motion to

---

[12] The Sports Illustrated article that the Court judicially notices includes statements that do not support consumptive intent, explaining that purchasers of NFTs more generally "aren't just paying for a memento or to support someone they believe in. They buy in because, like a seed investor, they can reap stunning profits as that product's or artist's [or, here, athlete's] profile rises." (Zatlin Decl. Ex. 2 at 5.)

dismiss. But at this point, none of their arguments establish that the "transaction[s were] *primarily* for commercial (i.e., motivated by a desire to use, consume, occupy or develop) . . . purpose[]." <u>Seagrave Corp. v. Vista Resources, Inc.</u>, 534 F. Supp. 378, 383 (S.D.N.Y. 1982) (citations omitted).

Rather, Plaintiffs' allegations, including those detailed above, are adequate to support a finding that Moments were primarily purchased for an investment purpose. Other than the ability to view particular Moments one owns, and to seek out certain players, plays, or teams in the Marketplace, Moments have no other utility. The AC alleges, and Defendants do not rebut, that "the owner does not acquire any intellectual property rights or rights to the underlying NBA highlight." (AC ¶ 55.) The Verge article the Court judicially notices, points out the many restrictions imposed by the NBA Top Shot Terms of Use. It restricts owners of Moments from making "merch unless the NBA approves it," "chang[ing] the Moment," or placing the Moment on social media or other platforms under certain conditions. (Zatlin Decl. Ex. 1 at 9.) Dapper Labs places strict limitations on how purchasers can actually consume Moments, undermining a finding that their purpose is primarily consumptive.

Further, as detailed in the Verge article, Dapper Labs's "big plans" for other consumptive uses of Moments -- with application to a "mobile basketball game," ability to "watch your Moments in [Virtual Reality] or [Augmented Reality]," or to have "perks at the real [basketball] games" -- appear to be only speculative uses and are fact questions for which discovery is needed. (Zatlin Decl. Ex. 1 at 14.) Even so, "none of this 'consumptive use' was available at the time" Moments were offered to Plaintiffs, raising considerable doubt as to a consumptive motivation for the purchases. Kik, 492 F. Supp. 3d at 180. Other than Dapper Labs's self-serving definition of Moments as "Art," Defendants concede that the definition connects only to "the videos and pictures underlying each Moment," which purchasers do not own, thus ignoring that the "totality of the evidence" supports a finding that Moments were purchased with "investment intent." See Telegram, 448 F. Supp. 3d at 371-72. The Court is persuaded that the AC plausibly alleges that profits were promised by Defendants in connection with Moments transactions and were the primary motivator of Moments purchasers.

b)   Efforts of the Promoter

The promise of profits must also be "derived from the entrepreneurial or managerial efforts of others." Forman, 421

U.S. at 852. Defendants argue four reasons why Plaintiffs'
allegations fail to establish this prong. First, they offer
that Dapper Labs's creation of scarcity does not establish
managerial efforts. (Brief at 22-23.) Second, they argue that
Plaintiffs' "hype" allegations fall short. (<u>Id.</u> at 24-25.)
Third, Defendants assert that Dapper Labs's creation of the
Marketplace does not establish the efforts of others prong.
(<u>Id.</u> at 25-26.) And fourth, Defendants argue that where a
plaintiff maintains control over the instrument, the efforts
of others prong cannot be met. (<u>Id.</u> at 26-28.) None of these
arguments is persuasive.

In fact, Defendants concede the necessary element in
their opening paragraph. And that element is dispositive
here. Defendants state that "[t]he law requires []
that . . . the efforts of the *promoters* . . . must be
necessary to the success of the venture, such that without
them, the 'investments would be virtually worthless.'" (Brief
at 21 (citing <u>Bender v. Cont'l Towers Ltd. P'Ship</u>, 632 F.
Supp. 497, 501 (S.D.N.Y. 1986)).) That element is plausibly
alleged and persuasively argued by Plaintiffs here.

As detailed above, it is plausible that Moments' value
is derived almost entirely from the continued operation by
Dapper Labs of the Flow Blockchain, which enables price
transparency (and thus influences value) but, perhaps more

critically, appears to provide purchasers with the ability to trade at all. Defendants' failure to acknowledge the blockchain technology that underlies Moments is fatal to their Motion in this respect. Without Dapper Labs's continued maintenance of the Flow Blockchain and the "token that powers it all," FLOW, Plaintiffs' AC plausibly alleges that Moments would have no value. (See, e.g., AC ¶¶ 86, 89, 106; see also NBA Top Shot Terms of Use §§ 2(vi), 9(i) & 9(v) (stating that Moments have "no inherent or intrinsic value").) And because Moments can be purchased only from NBA Top Shot in packs, or traded on the Marketplace that Dapper Labs controls,[13] Dapper Labs's continued management and efforts to develop the

---

[13] Defendants' assertion that Moments can be traded off the Marketplace is not well supported and does not undermine Plaintiffs' allegations, which the Court accepts as true. Defendants point to the Sports Illustrated article as supporting this claim, but the article's reference to purchasers buying unopened packs from third parties does not refute the allegation that the packs would have been transferred over the Marketplace. (See Zatlin Decl. Ex. 2 at 6.) The NBA Top Shot Terms of Use also states that purchasers "can purchase Moments in two ways: (a) by buying packs of Moments from us on the App (each, a 'Pack'); or (b) by buying Moments from other users in the App's marketplace (the 'Marketplace')." (NBA Top Shot Terms of Use § 2(ii).) Further, even if the packs were transferred outside of the Marketplace, the AC plausibly alleges that the transactions would necessarily be recorded, i.e., validated, on the Flow Blockchain, which only Dapper Labs controls. (See AC ¶ 20, 37-38, 49; see also NBA Top Shot Terms of Use §§ 4(i) ("Ownership of the Moment is mediated entirely by the Flow Network."), 9(iii) ("The App does not store, send, or receive Moments. This is because Moments exist only by virtue of the ownership record maintained on the App's supporting blockchain in the Flow [N]etwork. Any transfer of Moments occurs within the supporting blockchain in the Flow [N]etwork, and not on the App.").) Either way, the question presents a factual issue not suited for resolution on a motion to dismiss.

ecosystem, both technologically and as a matter of promotion, are crucial to Moments retaining and increasing in value.

In that respect, Plaintiffs' reliance on <u>Gary Plastic Packaging Corp v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 756 F.2d 230 (2d Cir. 1985) and <u>Kik</u> is persuasive. In <u>Gary Plastic</u>, the Second Circuit held that "a significant portion of the customer's investment depend[ed] on Merrill Lynch's managerial and financial expertise." 756 F.2d at 240. This was based on Merrill Lynch's provision of "a secondary market" and their ability to, within that market, "cultivat[e] a large group of banks that desire to borrow money." <u>Id.</u> So too here, Dapper Labs has created (and controls) a secondary market, the Marketplace. Plaintiffs allege the Marketplace is the only place Moments can be traded. And Plaintiffs also plausibly allege that the value of Moments in the secondary market depends upon Dapper Labs's ability to maintain hype and keep purchasers interested in buying and trading Moments. For example, Plaintiffs allege that Dapper Labs's decisions to "give packs away" has caused the "scarcity, and therefore value," of Moments to decline. (AC ¶ 99.) Likewise, the Sports Illustrated article incorporated by reference contains statements that support the conclusion that profits depended on the managerial efforts of Dapper Labs. As previously discussed, in February 2021 "trading was halted [by Dapper

Labs] for hours at a time" on the Marketplace, "leading to a sharp drop in the prices of [M]oments." (Zatlin Decl. Ex. 2 at 7.)

There are other similarities with the scheme in Gary Plastic that also justify the Court's conclusion. The Second Circuit illustrated in Gary Plastic that customers' reliance on Merrill Lynch was evidenced by the fact that if "Merrill Lynch were to become insolvent and investors were unable to sell their [certificates of deposit] in the secondary market [that Merrill Lynch created], they would lose . . . liquidity and capital appreciation." Gary Plastic, 756 F.2d at 240. Likewise, as discussed above, Plaintiffs allege that Moments' value relates to Dapper Labs's continued success of the Flow Blockchain. (AC ¶ 86.) Like Merrill Lynch, if Dapper Labs became insolvent and purchasers were unable to trade their Moments on the Marketplace, purchasers would lose the value of their Moments.

The court in Kik reached similar conclusions -- that a company's efforts to develop and maintain an ecosystem for trading sufficiently establishes the third Howey prong. In Kik, the court found that the value of the crypto token, Kin, "would rely heavily on Kik's entrepreneurial and managerial efforts" because of a "promised digital ecosystem" where Kin would be integrated to drive engagement. Kik, 492 F. Supp. 3d

at 180. The court concluded that "[t]hese efforts by Kik were crucial because without the promised digital ecosystem, Kin would be worthless." Id.

Likewise, Dapper Labs's implicit promise to maintain the Flow Blockchain and facilitate trades on the Marketplace drive Moments' value. And the Court is not persuaded by Defendants' quarrel with the lack of explicit promises by Dapper Labs to purchasers to "maintain a certain level of consumer interest or guarantee profits" to purchasers in the AC. (Brief at 24.) These are the very disclosures that Plaintiffs seek through this action. What's more, Defendants' argument that "Dapper's marketing efforts would have no effect on the value of the basketball cards being sold, because each card has an inherent worth" is contradicted by Dapper Labs's Terms of Use for the NBA Top Shot application, which repeats four times that Moments have "no inherent or intrinsic value." (NBA Top Shot Terms of Use §§ 2(vi), 9(i) (repeated twice) & 9(v).)

As explained in the Verge article incorporated by reference in the AC, Dapper Labs's provision of the Flow Blockchain makes it "possible for outside observers to track when specific Moments began to take off in value." (Zatlin Decl. Ex. 1 at 18.) Plaintiffs plausibly allege that Moments would be worth far less without the price transparency and

trust that the Flow Blockchain enables as well as Dapper
Labs's facilitation of trading on the Flow Blockchain via the
Marketplace. Compare Kik, 492 F. Supp. 3d at 180 ("Unlike
real estate, Kin have no inherent value and will generate no
profit absent an ecosystem that drives demand."), with e.g.,
(NBA Top Shot Terms of Use § 2(vi) (conceding that "Each
Moment has no inherent or intrinsic value")).   The
circumstances here are more like Kin and less like physical
basketball cards. And as Plaintiffs allege, while Moments
purchasers may "own" the NFT (or line of code that indicates
ownership on the blockchain) they have no rights to the
underlying intellectual property the NFT depicts. (AC ¶ 55.)
To that end, purchasers rely on Dapper Labs's managerial
efforts in cultivating the Marketplace and maintaining the
Flow Blockchain, as without those efforts Moments would not
exist. (See NBA Top Shot Terms of Use § 7 (explaining that
"Moments are intangible digital assets that exist only by
virtue of the ownership record maintained in the Flow
Network").)

    While true that some market forces outside of Dapper
Labs's control may influence the price of Moments, such as an
NBA player's popularity, Defendants' "insistence in its
briefs that 'market forces' would drive the value of [Moments]
ignores the essential role of [Dapper Labs] in establishing

the market." <u>Kik</u>, 492 F. Supp. 3d at 180. Besides, the
presence of external market forces should not be dispositive
of whether a scheme is or is not a security. One need not
look further than the recent GameStop trading frenzy, where
stock prices surged despite the company being on the verge of
bankruptcy, to realize that even the value of stock -- a
quintessential security -- is not necessarily tied only to a
company's fundamentals. (<u>See</u> Opposition at 6; Zatlin Decl.
Ex. 2.)

The Court is also not persuaded by Defendants' appeal to
a purchaser's control over their portfolio. Defendants argue
that "where there is a reasonable expectation of significant
investor control, the protection of the 1933 and 1934 Acts
would be unnecessary." (Brief at 27 (citation omitted).) They
assert that because purchasers "own the underlying NFT
completely" and "have the right to swap their Moment, sell
it, or give it away," Plaintiffs cannot establish the efforts
of others prong. Defendants' argument is belied by their own
citation. In support for their proposition, Defendants rely
on the Ninth Circuit case <u>Hocking v. Dubois</u>, which held that
where a purchaser "maintains legal control over his
investment . . . in order to claim the investment is a
security he must show practical dependence, an inability to

exercise meaningful powers of control." 885 F.2d 1449, 1460
(9th Cir. 1989) (en banc).

Plaintiffs have plausibly alleged that they have
practical dependence on Dapper Labs. Dapper Labs maintains
control over the purchaser's ability to trade Moments,
including via the statement that Dapper Labs has, in the past,
halted trading on the Marketplace. (Zatlin Decl. Ex. 2 at 4,
7.) Dapper Labs and the NBA and NBAPA also maintain complete
control over the underlying intellectual property represented
in the Moments. And Dapper Labs maintains control over the
Marketplace. As was the case in ATBCOIN LLC, it is plausible
that the "failure of [the Flow Blockchain and Marketplace]
technology [would be] likely to . . . render [Moments]
undesirable, regardless of the individual purchaser's
'business skills.'" 380 F. Supp. 3d at 356. Together with
Dapper Labs's other control, the Court is not persuaded that
purchasers' mere ability to choose when to buy or sell is
dispositive. See Kik, 492 F. Supp. 3d at 179 ("[T]he facts
that [] purchasers could sell their Kin whenever they pleased
is not dispositive.").

Other than generally stating that purchasers are not
"passive" because they can select which Moments to buy and
when to trade them, Defendants do not explain how that form
of control creates Moments' value. Rather, the type of control

the securities laws appear to care about is control over management of the scheme itself, and that control must be significant. See Leonard, 529 F.3d at 89 (assessing LLC membership interests as securities based on the extent to which "members were expected to play an active role in the management of the companies"); Aqua-Sonic Prods. Corp., 687 F.2d at 585 ("If . . . the reasonable expectation was one of significant investor control, a reasonable purchaser could be expected to make his own investigation of the new business he planned to undertake and the protection of the 1933 and 1934 Acts would be unnecessary.") Dapper Labs's Terms of Use for Top Shots limits purchasers' control over the enterprise itself. Like those who invested and expected the Howey Company to care for and cultivate the citrus trees in Howey, Moments purchasers "lack the knowledge, skill, and equipment necessary for the care and cultivation of" a blockchain and thus would not be expected to exercise control over the value creating proposition here. Howey, 328 U.S. at 296. The Terms of Use also contain a multitude of restrictions on where Moments can be sold (only in the Flow Network and on the Flow Blockchain) as well as restrictions on the permitted uses for Moments once "owned." (See generally NBA Top Shot Terms of Use § 3.) Accordingly, the Court is hard-pressed to find that purchasers exercise any significant control over the ability

to create value for Moments separate from Dapper Labs and rejects Defendants' arguments on these grounds.

The allegations that Dapper Labs created and maintains a *private* blockchain is fundamental to the Court's conclusion. By privatizing the blockchain on which Moments' value depends and restricting the trade of Moments to only the Flow Blockchain, purchasers must rely on Dapper Labs's expertise and managerial efforts, as well as its continued success and existence. As Plaintiffs allege, this is unlike public blockchains, such as that underlying Bitcoin. (AC ¶¶ 23, 84.) The privatization and restrictions that Dapper Labs implements are what distinguish Moments from cardboard basketball cards, which can be freely alienated to whomever and over whatever platform the owner prefers. Thus, the Court finds that Plaintiffs have adequately alleged that the promise of profit was based on the essential managerial efforts of Dapper Labs, and the final Howey prong is established here.

* * * * *

Ultimately, the Court's conclusion that what Dapper Labs offered was an investment contract under Howey is narrow. Not all NFTs offered or sold by any company will constitute a security, and each scheme must be assessed on a case-by-case basis. Cf. Reves v. Ernst & Young, 494 U.S. 56, 62 (1990) ("A

commitment to an examination of the economic realities of a transaction does not necessarily entail a case-by-case analysis of every instrument.") Rather, it is the particular scheme by which Dapper Labs offers Moments that creates the sufficient legal relationship between investor and promoter to establish an investment contract, and thus a security, under Howey. And that legal relationship is derived primarily from the plausible allegations that Dapper Labs maintains private control over the Flow Blockchain, which significantly, if not entirely, dictates Moments' use and value; that Dapper Labs touted Moments as a means for purchasers to realize substantial profits through the low sale prices for packs and marketing of the substantial profits others had made through sale on Dapper Labs's proprietary Marketplace; and that without Dapper Labs's essential efforts in maintaining the Flow Blockchain and Marketplace, Moments would be valueless. In totality, the economic realities of this case support the Court's conclusion that the AC's allegations pass muster at this stage. In sum, Plaintiffs adequately allege that Dapper Labs's offer of the NFT, Moments, was an offer of an "investment contract" and

therefore a "security," required to be registered with the SEC. See <u>Aqua-Sonic Prods. Corp.</u>, 687 F.2d at 585.

### B.   CONTROL PERSON LIABILITY

Defendants' only argument for dismissal of the Section 15 control person claims against Gharegozlou is that Plaintiffs have not alleged a primary violation of the Securities Act. (Brief at 30.) As the Court concludes that Plaintiffs have sufficiently alleged primary liability under Sections 5 and 12 of the Securities Act, the Court also finds that Plaintiffs have sufficiently alleged violations of Section 15 and denies Defendants' motion to dismiss on that ground.

### IV.   ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Dkt. No. 37) of Dapper Labs Inc. and Roham Gharegozlou (together, "Defendants") to dismiss Plaintiffs' Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **DENIED.** Defendants are directed to Answer within twenty-one (21) days of the date of this Order.

**SO ORDERED.**

Dated:     22 February 2023
           New York, New York

_____
                Victor Marrero
                U.S.D.J.